EVAN A. JENNESS (SBN 136822)
2115 Main Street
Santa Monica, California 90405
Telephone: (310) 399-3259
Facsimile: (310) 392-9029
evan@jennesslaw.com

JEFFREY J. DOUGLAS (SBN 106922)
1717 4th Street, 3rd Floor
Santa Monica, California 90401
Telephone: (310) 576-3411
Facsimile: (310) 576-3408
jjdxxx1@gmail.com

Attorneys for Defendant
WALTER WILLIAMS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br>  Plaintiff, <br><br> v. <br><br> WALTER LEE WILLIAMS, <br><br>  Defendant. | CASE NO. CR 13-302-PSG <br><br> WALTER WILLIAMS' MOTION TO DISMISS BASED ON LACK OF COMPULSORY PROCESS AND/OR DUE PROCESS OR, IN THE ALTERNATIVE, FOR A JURY INSTRUCTION REGARDING DISPARATE ACCESS TO WITNESSES AND EVIDENCE <br><br> Motion Date:  March 3, 2014 <br> Motion Time:  10:00 a.m. <br> Trial Date:  March 18, 2014 <br> Trial Time:  9:00 a.m. <br> Place:  880-Roybal |

## MOTION

Walter Williams, through counsel, hereby moves this Court for an order dismissing the indictment because the charged statutes, which criminalize in the United States conduct which is alleged to have occurred overseas, vitiate Professor Williams' fundamental rights to compulsory process under the Sixth Amendment and due process under the Fifth Amendment. In the alternative, if the Court declines to dismiss the charges, jurors should be instructed regarding the preferential access to witnesses and documentary evidence enjoyed by the government in this case, and advised that they may consider this in evaluating the evidence.

This motion is based on the accompanying memorandum of points and authorities and exhibits; all files and records in this case; and such further evidence and argument as may be presented by the defense in support of this motion.

Dated: January 31, 2014          Respectfully submitted,

                                            LAW OFFICES OF EVAN A. JENNESS


                                              /s/ Evan A. Jenness
                                            EVAN A. JENNESS


                                            JEFFREY J. DOUGLAS LAW OFFICES

                                              /s/ Jeffrey J. Douglas
                                            JEFFREY J. DOUGLAS


                                            Attorneys for Walter Williams

**TABLE OF CONTENTS**

PAGE

MEMORANDUM OF POINTS AND AUTHORITIES .......................... 1

I.   INTRODUCTION ................................................. 1

II.  STATEMENT OF FACTS ........................................... 3

III. ARGUMENT ..................................................... 3

    A.   The Lack of an Procedural Framework For the Defense to Compel Foreign Witnesses to Testify or Produce Documents Renders the Charged Statutes Constitutionally Infirm ............................... 3

    B.   The Mutual Legal Assistance Treaty Between the United States and the Republic of the Philippines Compounds the Unfairness of This Prosecution by Conferring Benefits on the Government While Specifically Excluding the Accused From Those Benefits ..... 7

    C.   Letters Rogatory Are an Inadequate Means of Safeguarding the Accused's Constitutional Rights ............................... 9

    D.   The Possibility of Rule 15 Depositions Does Not Level the Playing Field Sufficiently to Protect Professor Williams' Rights .... 10

    E.   Informal Relationships and Governmental Advantage in International Evidence Gathering Works a Fundamental Unfairness in This Case .. 11

    F.   The Flawed Statutory Scheme Supports Dismissal Wholly Apart From the Facts at Hand ...................................... 12

    G.   At a Minimum, the Jury Should Be Instructed About the Special Powers the Government Alone Has Enjoyed in this Case, and the Fact That Professor Williams is Deprived of Constitutional Protections Which Jurors Otherwise Would Assume He Enjoys ..... 13

IV.  CONCLUSION ................................................... 14

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Barber v. Page*,
    390 U.S. 719 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Government of Virgin Islands v. Mills*,
    956 F.2d 443 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Maryland v. Craig*,
    497 U.S. 836, 110 S. Ct. 3157 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Societe Nationale Industrielle Aerospatiale v. U.S. District Court*,
    482 U.S. 522, 107 S. Ct. 2542 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*States. See Mancusi v. Stubbs*,
    408 U.S. 204 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Drogoul*,
    1 F.3d 1546 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Greco*,
    298 F.2d 247 (2nd Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*United States v. Mann*,
    590 F.2d 361 (1st Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. McKeeve*,
    131 F.3d 1 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*United States v. Valenzuela-Bernal*,
    458 U.S. 858, 102 S. Ct. 3440 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Zabaneh*,
    837 F.2d 129 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Washington v. Texas*,
    388 U.S. 14 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

**STATUTES & RULES**

18 U.S.C. § 3161 .................................................. 9

18 U.S.C. § 2251(c) .............................................. 1, 3

18 U.S.C. § 2423 ................................................... 3

28 U.S.C. § 1781 ................................................... 9

Fed. R. Crim. P., Rule 15 ........................................ 10

**OTHER AUTHORITIES**

U.S. Const. Amend. V ......................................... *passim*

U.S. Const. Amend. VI ........................................ *passim*

William Wirt Blume, *The Place of Trial of Criminal Cases: Constitutional
    Vicinage and Venue*, 43 Mich. L. Rev. 59 (1944 ......................... 4

Daniel Huff, *Witness for the Defense: The Compulsory Process Clause
    as a Limit on Extraterritorial Criminal Jurisdiction,*
    15 Tex. Rev. L. & Pol. 129 (Dec. 2010). . ............................ 4

Neale Lyma, *Compulsory Process in A Globalized Era: Defendant Access
    to Mutual Legal Assistance Treaties*,
    47 Va. J. Int'l L. 261 (Fall 2006) ............................ *passim*

Joseph Story, *Commentaries on the Constitution of the United States*
    58 (1987). . ......................................................... 4

David Whedbee, *The Faint Shadow of the Sixth Amendment: Substantial
    Imbalance in Evidence Gathering Capacity Abroad Under the
    U.S.-P.R.C. Mutual Legal Assistance Agreement in Criminal Matters*,
    12 Pac. Rim L. & Pol'y J. 561, 575 (March 2003). . .............. 6, 8, 9

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

Walter Williams is accused of engaging in illicit sexual conduct with minors in the Republic of the Philippines. Although the entire focus of the case will be events alleged to have occurred approximately 7,000 miles away, the trial will be in the United States. This is because Professor Williams is charged under Title 18 U.S.C. §§ 2251 and 2423, statutes which extend United States extraterritorial jurisdiction over Americans who travel overseas and engage in sexual conduct with minors. Such a prosecution extends the reach of United States' law so far beyond our borders that it strains longstanding concepts of jurisdiction.

While the charged statutes purport to extend United States jurisdiction without territorial limit, they fail to extend the Constitutional rights and protections afforded accused persons in this country. Although the indictment might appear proper on its face insofar as it tracks the language of the charged statutes, it nonetheless is constitutionally infirm because Professor Williams' Fifth Amendment due process rights and Sixth Amendment compulsory process right are violated by the absence of any meaningful procedural mechanism to ensure that (1) witnesses with exculpatory information may be compelled to testify, and (2) the defense has equal access to evidence gathering in the Republic of the Philippines.

The unfairness of being prosecuted under such a one-sided statutory scheme is compounded in this case by the mutual legal assistance treaty between the United States and the Philippines, which confers rights only upon the government, and not upon accused persons such as Professor Williams. Similarly, the government has cultivated formal and informal working relationships with law enforcement in the Republic of the Philippines. The case agents worked hand-in-hand with such officials in locating and interviewing dozens of witnesses, including the alleged victims identified by initials in the indictment, and in locating

1

and garnering extensive documentary evidence in the Republic of the Philippines. The government also will be bringing to this country, and undoubtedly obtaining temporary immigration status for, many witnesses from the Philippines. The defense has no means of doing any of these things. In sum, the government has at its disposal vast tools and resources, and a procedural framework (both formal and informal) in place to interface with foreign officials and to effectuate extraordinary prosecutions such as this.

Accused persons such as Professor Williams, however, are deprived of the tools that are at the government's disposal. This is a radical departure from centuries of jurisprudence in cases involving alleged wrongdoing in this country. In contrast to the government, the defense in this case has no means of garnering support from, and the assistance of, foreign law enforcement. The critical design flaw in prosecutions such as this is that there is no concomitant procedural framework under the charged laws that enables the defense to protect the accused's basic constitutional and procedural rights. While the government has vast tools under a mutual legal assistance treaty, there is no way for the defense to locate and subpoena witnesses to testify, or to identify and have documents produced, for pretrial or trial proceedings. In contrast to a domestic prosecution, here the accused is deprived of any semblance of equal access to evidence and the fundamental right of compulsory process.

With no formal or informal procedural mechanism in place to interview foreign witnesses and compel their testimony in the United States, the defense is left without the most basic means of investigating and defending against the extremely serious charges in this case. The extraterritorial application of United States laws set forth in the indictment is fundamentally flawed by the absence of a concomitant right to compulsory process. Compulsory process is not a mere formality, it is a matter of basic fairness. As the Supreme Court has stated, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967). Indeed,

compulsory process is "fundamental and essential to a fair trial." *Id*. at 17. Accordingly, this prosecution is fundamentally unfair, and should be dismissed. At a minimum, our jurors should be instructed that Professor Williams has been deprived of fundamental constitutional protections which they otherwise would mistakenly assume he enjoys.

## II.
## STATEMENT OF FACTS

Professor Williams is renowned gay academic, anthropologist, published author and archivist. He previously was a professor at the University of Southern California, and has been widely recognized for his scholarship and other academic achievements. The indictment charges offenses infrequently prosecuted, under relatively new statutes. Count 1 of the indictment alleges a violation of Title 18 U.S.C. § 2251(c) [Sexual Exploitation of Children] - causing a minor to engage in sexually explicit conduct outside the United States for the purpose of producing a visual depiction and transporting the image into the United States. Count 2 alleges a violation of Title 18 U.S.C. § 2423 [Transportation of Minors], sub-part (b) [Transportation With Intent to Engage in Illicit Sexual Conduct. Counts 3 and 4 allege foreign travel and illicit sexual conduct with two specified victims, in violation of Title 18 U.S.C. § 2423, sub-part (c) [Engaging in Illicit Sexual Conduct in Foreign Places]. The charged violations are alleged to have occurred between January 22 and February 11, 2011.

## III.
## ARGUMENT

**A.** **The Lack of a Procedural Framework For the Defense to Compel Foreign Witnesses to Testify or Produce Documents Renders the Charged Statutes Constitutionally Infirm.**

In 1769, the British Parliament responded to unrest in the colonies with a stern rebuke to the inhabitants of Massachusetts Bay: their "daring insults offered to his

Majesty's authority" were treasonous and those responsible would be brought to England for trial.[1]  The colonies responded quickly, with the Virginia House of Burgesses, and later other colonies, resolving that "sending . . . Persons, to Places beyond the Sea, to be tried, is highly derogatory of the Rights of British subjects; as thereby the . . . Liberty of summoning and producing Witnesses on such Trial, will be taken away from the Party accused."  The Framers of our Constitution were mindful of this injustice when they drafted the Sixth Amendment.  As Justice Joseph Story reports in his *Commentaries on the Constitution,* a motivating concern behind the Sixth Amendment was that a "trial in a distant State or territory might subject the party . . . to the inability of procuring the proper witnesses to establish his innocence."[2]  Failing to presage statutes like those charged here, Justice Story assured readers that, "[t]here is little danger, indeed, that Congress would ever exert their power in such an oppressive and unjustifiable a manner."

Consistent with the Framers' intent, the Sixth Amendment provides, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor . . ."  U.S. Const. Amend. VI.  The due process clause of the Fifth Amendment provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law. . . ."  U.S. Const. Amend. V.[3]  The Compulsory Process Clause

---

[1]  William Wirt Blume, *The Place of Trial of Criminal Cases: Constitutional Vicinage and Venue*, 43 Mich. L. Rev. 59, 63 (1944), *cited in* Daniel Huff, *Witness for the Defense: The Compulsory Process Clause as a Limit on Extraterritorial Criminal Jurisdiction,* 15 Tex. Rev. L. & Pol.  129 (Dec. 2010), copy available at: www.trolp.org/main_pgs/issues/v15n1/Huff.pdf.

[2]  *Huff*, at 130, *citing* Joseph Story, *Commentaries on the Constitution of the United States* 58 (1987).

[3]  "There is apparently little, if any, difference in the analysis" between Fifth Amendment due process and Sixth Amendment compulsory process claims. *Gov't of Virgin Islands v. Mills*, 956 F.2d 443, 445 n. 4 (3d Cir. 1992).

4

imposes a simple procedural obligation on courts to issue and enforce subpoenas for the benefits of the defense "in all criminal cases." While criminalizing conduct beyond our borders, the statutes charged in this case fail to incorporate any mechanism for protecting a defendant's Sixth Amendment rights, or safeguarding against one-sided prosecutions such as this.

Without a procedural mechanism to protect the fundamental rights of those accused of violations on foreign lands, an accused such as Professor Williams is deprived of his Sixth Amendment compulsory process rights because courts decline to extend the right to compulsory process to foreign witnesses outside the territorial borders of the United States. *See Mancusi v. Stubbs*, 408 U.S. 204, 212-213 (1972) (state "powerless to compel" attendance of witness residing overseas); *United States v. Greco*, 298 F.2d 247, 251 (2nd Cir. 1962) ("the Sixth Amendment can give the right to compulsory process only where it is within the power of the federal government to provide it," because "[o]therwise any defendant could forestall trial simply by specifying that a certain person living where he could not be forced to come to this country was required as a witness in his favor"); *United States v. Zabaneh*, 837 F.2d 129, 1259-61 (5th Cir. 1988) ("the United States courts lack power to subpoena witnesses . . . (other than American citizens) from foreign countries"). However these cases are distinguishable. There is a material difference between a prosecution under a statute typically applied to domestic wrongdoing where evidence incidentally exists beyond our borders, and a prosecution like this one in which the charged statutes have the purpose and intent of punishing extraterritorial conduct, and it is a virtual certainty that defense witnesses and documents will lie beyond the reach of the courts' process.[4]

---

[4] *Greco* involved receiving stolen Canadian securities and transporting them in New York. The defendant argued for the first time on appeal that his compulsory process rights were violated by the absence of any right to compel the attendance of Canadian witnesses. *Zabaneh* involved drug importation charges arising from a shipment of marijuana from Belize to the United States. The court denied the defendant's Sixth Amendment argument with a single sentence and a

1  It is because the statutes charged here inevitably will lead to the deprivation of Sixth
2  Amendment rights that they should be held unconstitutional.
3        In stark contrast to the prejudice suffered by accused persons such as
4  Professor Williams, prosecutors are not hobbled by the absence of procedural
5  protections in the charged statutes.  Rather, by reason of formal and informal
6  relationships with foreign governments and officials, prosecutors enjoy - in effect - a
7  monopoly when it comes to garnering evidence abroad.  *See* Neale Lyma, *Compulsory*
8  *Process in A Globalized Era: Defendant Access to Mutual Legal Assistance Treaties*,
9  47 Va. J. Int'l L. 261 (Fall 2006).[5]  Meanwhile, no efforts have been made to protect
10 the constitutional rights of the accused which are inherent in our legal system.  *See*
11 David Whedbee, *The Faint Shadow of the Sixth Amendment: Substantial Imbalance in*
12 *Evidence Gathering Capacity Abroad Under the U.S.-P.R.C. Mutual Legal Assistance*
13 *Agreement in Criminal Matters*, 12 Pac. Rim L. & Pol'y J. 561, 575 (March 2003).[6]
14 Thus, accused persons such as Professor Williams are put at an extreme disadvantage,
15 and are deprived of the ability to compel witness to provide exculpatory evidence on
16 their behalf.  *Id*.  This imbalance of access to evidence and witnesses has created a
17 system, and a prosecution, that are fundamentally unfair.
18       One example of this imbalance effecting the substantial rights of Professor
19 Williams would be the following:  According to discovery, the alleged victim named
20 in Count 4 of the indictment, A.C., has accused Professor Williams of engaging in
21 sexual activity with a child (initials D.M.) who is less than 12 years old.  When D.M.

---

citation to *Greco*.

[5] A copy is available at: https://litigation-essentials.lexisnexis.com/webcd/app?action=DocumentDisplay&crawlid=1&doctype=cite&docid=47+Va.+J.+Int'l+L.+261&srctype=smi&srcid=3B15&key=a46ae5b5ab9692d1317bd9b2cff3d704.

[6] Copy available at: http://digital.law.washington.edu/dspace-law/bitstream/handle/1773.1/734/12PacRimLPolyJ561.pdf.

was interviewed by the case agent, FBI Special Agent Jeff Yesensky, he denied any sexual conduct by Professor Williams. If, during examination at trial, A.C. were permitted to testify consistently with her[7] statement to the Special Agent, the defense would have no means to impeach A.C. despite the direct contradiction by the purported victim, D.M. If these events occurred within the United States, the defense could use the process of this Court to subpoena D.M. and guarantee his attendance. Because he is a citizen of the Republic of the Philippines, and a minor, however, the defense has no means to prevent such an unfair presentation of evidence in this case.

**B.      The Mutual Legal Assistance Treaty Between the United States and the Republic of the Philippines Compounds the Unfairness of This Prosecution by Conferring Benefits on the Government While Specifically Excluding the Accused From Those Benefits.**

The government's advantage in garnering evidence and cooperation from Philippine authorities is institutionalized and aggravated by the treaty between the United States and the Republic of the Philippines. The United States and the Republic of the Philippines have entered into a treaty regarding legal assistance in criminal cases, the Treaty on Mutual Legal Assistance in Criminal Matters between the Republic of the Philippines and the United States of America, Nov. 13, 1994 (1996).[8] This MLAT treaty confers on prosecutors a wide array of tools for garnering evidence to assist in prosecutions. This includes assistance from Philippine authorities in locating witnesses and documents, the ability to take depositions, and the ability to obtain documents and other evidentiary materials, among other things. However, the treaty specifically excludes as a beneficiary any accused persons such as Professor

---

[7]     A.C. is a transgender individual whose outward appearance is female. Accordingly, A.C. is referred to herein in the feminine. At trial the defense will defer to witnesses' expressed preference or the Court's direction.

[8]     Copy available at: www.gpo.gov/fdsys/pkg/CDOC-104tdoc18/pdf/CDOC-104tdoc18.pdf.

Williams, stating:

> "This Treaty is intended solely for mutual legal assistance between the parties. The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain . . . any evidence . . . ."

art. 1, ¶ 4. In sum, instead of exercising restraint because accused persons lack compulsory process rights abroad, Congress magnified the inequity by providing prosecutors alone with enhanced tools for investigating and prosecuting extraterritorial events.

This one-sided benefit conferred on the prosecution in this case works a substantial unfairness on the defense. The purpose of MLAT treaties is to "overcome entrenched jurisdictional obstacles and foreign procedures that render evidence . . . inadmissible in U.S. courts" (*Whedbee*, *supra*, at 572), and to create a legal framework for the exchange of relevant legal evidence. "By their terms they compel assistance, including judicial process . . . ." *Lyma*, *supra*, at 281. In contrast to the government in this case, the defense enjoys no such benefits. This resulting imbalance in the relative strength between the prosecution and defense is exactly the evil that the Sixth Amendment sought to avoid, "namely an imbalance in compulsive power between prosecution and defense" that would be intolerable in domestic prosecutions. *Lyma, supra*, at 282.[9] Here, the defense faces insurmountable obstacles - both legal and practical - in garnering evidence in the Republic of the Philippines, and making use of it in pretrial and trial proceedings. "There is ... no adequate justification for placing defendants at a disadvantage" (*id*. at 292) while securing for prosecutors extraordinary means of investigating and prosecuting citizens like Professor Williams for alleged

---

[9] The patent imbalance in benefits under one-sided MLAT treaties such as that at hand has even caused (then) Senate Foreign Relations Committee Chairman Jesse Helms to inquire as to the "fairness and even the constitutionality" of the fact that "defendants do not have access to information through MLAT procedures." Extradition Treaties: Hungary; Belgium; *Etc*.: Hearing Before the S. Comm. on Foreign Relations, U.S. Senate, 104th Cong. (1996).

violations overseas.

In sum, the absence of a formal mechanism by which the defense can protect the very basic safeguards of a domestic prosecution renders the charged statutes unconstitutional. Dismissal is appropriate where, as here, the globalization of law enforcement by the United States is not accompanied by the constitutional protections that are the bedrock of criminal proceedings in this country.

## C. Letters Rogatory Are an Inadequate Means of Safeguarding the Accused's Constitutional Rights.

Letters rogatory are the default means for the defense to gather evidence beyond the territorial jurisdiction of the United States. *See* 28 U.S. C. § 1781. Such letters are simply a request from a court of one country to a court in another country to place a foreign citizen under oath and depose him on a specific topic. *Lyma, supra*, at 275. However, letters rogatory are inadequate to address the imbalance created by the one-sided MLAT treaty in this case, and have numerous practical and substantive problems. *See id*. at 271-275; *Whedbee, supra,* at 569-70.

"The unreliability of the letters rogatory process . . . is problematic under the Compulsory Process Clause of the Sixth Amendment." *Id.* at 581. First, United States courts have no procedural powers abroad, nor any means of enforcing compliance with a letters rogatory request. Second, the burdensome nature of the process necessarily forces an accused to surrender his Speedy Trial rights[10] – after a court has prepared and executed a request, it must be sent to the State Department, which is then charged with forwarding it to the appropriate embassy for presentation to the relevant foreign ministry for transmittal to a local judge or prosecutor for execution. *Lyma, supra,* at 273. This procedure has been described as "complicated, dilatory, and expensive." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court*, 482 U.S. 522, 531, 107 S. Ct. 2542 (1987). Even the government has not found them effective:

---

[10] *See* 18 U.S.C. § 3161(c)(1) (trial to commence within 70 days from filing of indictment or arraignment).

9

"[L]etters rogatory are inadequate for many evidence-gathering tasks, as the Justice Department has itself recognized . . . [which is] the very reason that a substitute, the MLAT, was invented." *Lyma, supra*, at 275.  Third, the execution of letters rogatory by foreign governments is purely a matter of comity.  An accused has no remedy if a request is declined, lost or simply ignored by foreign authorities at any stage of the process.  *Id*. at 274.

In sum, letters rogatory do not make up for the one-sided access to evidence that the government enjoys in this case, are wholly inadequate when it comes to ensuring the level playing field that is a hallmark of United States criminal justice, and are insufficient to protect Professor Williams' rights in this case.

**D.     The Possibility of Rule 15 Depositions Does Not Level the Playing Field Sufficiently to Protect Professor Williams' Rights.**

Rule 15 of the Federal Rules of Criminal Procedure authorizes both sides to take depositions in criminal cases involving transnational crimes, and to introduce such testimony as substantive evidence if the witness is unavailable.  Fed. R. Crim. P., Rule 15.  However, the use of deposition testimony in criminal trials is disfavored, largely because such evidence tends to diminish the accused's Sixth Amendment confrontation rights.  *See United States v. McKeeve*, 131 F.3d 1, 11 (1st Cir. 1997) ("tension between the defendant's Confrontation Clause rights and the prosecution's need to obtain evidence from persons domiciled abroad, while new to this circuit, threatens to become a recurring theme"); *United States v. Drogoul*, 1 F.3d 1546, 1551 (11th Cir. 1993) ("Depositions generally are disfavored in criminal cases" and permitted only where moving party establishes "exceptional circumstances justifying" deposition); *United States v. Mann*, 590 F.2d 361, 365 (1st Cir. 1978) (reversible error to admit deposition testimony absent proof of unavailability).  The Confrontation Clause's "central concern ... is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."  *Maryland v. Craig*, 497 U.S. 836, 845, 110 S. Ct.

3157, 3163 (1990). Deposition testimony - particularly where it is taken in a foreign land, and may be subjected to the scrutiny of foreign law enforcement, is insufficiently reliable to protect the rights of the accused.

Foreign depositions, in contrast to testimony during trial proceedings, are far removed from the protections of a neutral and disinterested court. Witnesses in foreign countries such as the Republic of the Philippines may be fearful of testifying in a manner that differs from law enforcement authorities' position, and/or may be discouraged from coming forward. In such an environment, defense counsel would be unable to adequately confront government witnesses who are coloring their testimony out of fear of adverse repercussions from foreign officials. *Id*. Courts can offer no assurances, oversight or protection to such witnesses once proceedings are completed. Under these circumstances a deposition would run afoul of the Sixth Amendment and the Due Process clause of the Fifth Amendment. *Id*. Moreover, testimony presented by deposition deprives jurors of the ability to engage in a critical function - evaluating witnesses' demeanor. *See Barber v. Page*, 390 U.S. 719, 725 (1968) ("The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness."); *McKeeve*, 131 F.3d at 9 ("Face-to-face confrontation in a courtroom setting has yet another virtue; it permits the trier of fact better to observe a witness's demeanor."). In sum, the possibility of foreign depositions is not a sufficient substitute for the many procedural safeguards Professor Williams is denied because he is being prosecuted for alleged wrongdoing overseas.

**E.      Informal Relationships and Governmental Advantage in International Evidence Gathering Works a Fundamental Unfairness in This Case.**

It is clear from discovery that there was a high level of informal cooperation and coordination between the Federal Bureau of Investigation and law enforcement authorities in the Republic of the Philippines in this case. This undoubtedly resulted from our government's prestige and diplomatic relationships, formalized structures for

1  inter-governmental law enforcement cooperation,[11] and formal infrastructure for
2  securing assistance through the MLAT treaty.  As a result of such relationships, the
3  agents in this case had Philippine authorities locate, and produce for interviews,
4  numerous witnesses, including the alleged victims named by initials in the indictment.
5  The case agents also were able to obtain Philippine businesses records upon request.
6  The defense, of course, has no ability whatsoever to obtain Philippine authorities
7  assistance, either informally or formally.
8        The disparity in access to evidence is extremely problematic from a
9  constitutional perspective.  Defense counsel has no practical means of locating
10 witnesses from years ago, and certainly no means to compel them to speak with the
11 defense.  The defense has no formal means of obtaining access to records or
12 compelling witness to submit to interviews, or to appear and testify in pretrial or trial
13 proceedings in the United States.  These disparate abilities fly in the face of
14 fundamental notions of due process that are central to United States jurisprudence.

15 **F.       The Flawed Statutory Scheme Supports Dismissal Wholly Apart From
16           the Facts at Hand.**

17       The Supreme Court has held that in order to establish a violation of Sixth
18 Amendment compulsory process and due process rights, an accused "must make some
19 plausible showing of how [the missing] testimony would have been both material and
20 favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102
21 S. Ct. 3440 (1982).  However, this rule is not fairly applied where, as here, the defense
22 is not provided with the basic investigatory tools necessary to garner favorable
23 witnesses and evidence.  In contrast to the government, the defense has no means of
24 locating, let alone obtaining cooperation from, potential defense witnesses.
25 Accordingly, the defense cannot be expected to make such a showing, and should not

---

[11] For example, the FBI has a legal attache office in the Philippines, and the DOJ's Overseas Prosecutorial Development, Assistance & Training employs a Resident Legal Advisor to the Philippines.

be required to satisfy this burden.

**G.     At a Minimum, the Jury Should Be Instructed About the Special Powers the Government Alone Has Enjoyed in this Case, and the Fact That Professor Williams is Deprived of Constitutional Protections Which Jurors Otherwise Would Assume He Enjoys.**

Because the charged statutes do no include the substantive or procedural safeguards of an accused's rights that otherwise would apply in a criminal case, the indictment should be dismissed. Should the Court decline to do so, however, at a minimum, our jury should be instructed that this is no ordinary prosecution. Because of the rarity of prosecutions in this country for alleged wrongdoing overseas, jurors naturally would assume that Professor Williams has enjoyed all of the protections of an accused in an ordinary criminal case, including the ability to obtain witnesses and evidence in support of his position. Such an assumption would be natural, but also erroneous. In order to ensure the jury is not misled, a jury instruction informing jurors of the unique nature of this case would be appropriate. Specifically, jurors should be told that the government alone has enjoyed the benefit of a treaty that has allowed it to obtain access to witnesses and evidence in the Philippines, and to secure the presence of such witnesses and documents at trial; that unlike the typical criminal case, Professor Williams has enjoyed no such benefits in this case; and that they may take into account this disparate access to witnesses and evidence in considering the evidence in this case. Such an instruction would not be covered by any other charge to the jury, and without such an instruction the jury is likely to mistakenly believe that the proceedings in this case are as fair as those in any other criminal matter.

# IV.
# CONCLUSION

This prosecution is fundamentally unfair and violates the Fifth and Sixth Amendments because a valid procedural framework does not exist under the charged statutes for the defense to interface with foreign governments, have equal access to witnesses, and compel witnesses to testify and documents to be produced in this Court. Accordingly, the indictment should be dismissed based on the deprivation of Professor Williams' constitutional rights. Alternatively, if the indictment is not dismissed, jurors should be informed about the extraordinary powers enjoyed by the government alone in this case, and permitted to consider this in evaluating the evidence presented.

Dated: January 31, 2014

Respectfully submitted,

LAW OFFICES OF EVAN A. JENNESS

  /s/ Evan A. Jenness
EVAN A. JENNESS

JEFFREY J. DOUGLAS LAW OFFICES

  /s/ Jeffrey J. Douglas
JEFFREY J. DOUGLAS

Attorneys for Walter Williams