1        **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3      **HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE**

4

5   **UNITED STATES OF AMERICA,**                )
                                                 )
6                      **PLAINTIFF,**            ) CASE NO.
                                                 ) CR 13-302
7          **VS.**                               )
                                                 )
8   **WALTER LEE WILLIAMS,**                     )
                                                 )
9                      **DEFENDANT.**            )
    ─────────────────────────────────────────────)

10

11

12

13

14                    **REPORTER'S TRANSCRIPT OF**
         **DEFENDANT'S MOTION FOR DISCOVERY, HEARING ON JOINT**
15            **EVIDENTIARY BRIEF, MOTIONS IN LIMINE,**
          **DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**
16                **MONDAY, APRIL 28, 2014**
                        **1:59 P.M.**
17              **LOS ANGELES, CALIFORNIA**

18

19

20

21

22   ──────────────────────────────────────────────────────────

23            **MAREA WOOLRICH, CSR 12698, CRR**
             F E D E R A L   O F F I C I A L   C O U R T   R E P O R T E R
             2 5 5   E A S T   T E M P L E   S T R E E T ,   R O O M   1 8 1 - K
24           L O S   A N G E L E S ,   C A L I F O R N I A   9 0 0 1 2
                   m a r e a w o o l r i c h @ a o l . c o m

25

**UNITED STATES DISTRICT COURT**

1                    **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4       U.S. Department of Justice
        By:  Ravi Sinha, Esquire
5       Child Exploitation and Obscenity Section
        1400 New York Avenue NW, 6th Floor
6       Washington, DC 20005
        (202) 353-4698
7
        U.S. Department of Justice
8       By:  Herbrina Delores Sanders, Esquire
        Child Exploitation and Obscenity Section
9       1400 New York Avenue NW, 6th Floor
        Washington, DC 20005
10      (202) 616-1951

11

    **FOR THE DEFENDANT:**
12
        Law Offices of Evan A. Jenness
13      By:  Evan A. Jenness, Esquire
        2115 Main Street
14      Santa Monica, CA 90405
        (310) 399-3259
15

16      Law Offices of Jeffrey J. Douglas
        By:  Jeffrey J. Douglas, Esquire
17      1717 4th Street, 3rd Floor
        Santa Monica, CA 90401-3319
18      (310) 576-3411

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1            LOS ANGELES, CALIFORNIA; MONDAY, APRIL 28, 2014

 2                           1:59 P.M.

 3                            -oOo-

 4

 5            THE CLERK:  Calling item 5, Criminal 13-302,

 6    United States of America vs. Walter Williams.

 7         Counsel, please state your appearances.

 8            MR. SINHA:  Good afternoon, Your Honor.  Ravi Sinha

 9    and Herbrina Sanders on behalf of the United States.

10            MS. JENNESS:  Good afternoon, Your Honor.

11    Evan Jenness and Jeffrey Douglas on behalf of Mr. Williams who

12    is present.

13            THE COURT:  Good afternoon.

14         Since our last session, I received the defendant's outline

15    of evidence subject to suppression motion.  I've received the

16    defendant's brief regarding the evidence sought to be

17    suppressed in the motion to suppress.  And then I've looked at

18    it very briefly, the Government's supplemental brief filed

19    Friday.  I just looked at it briefly this afternoon.  I just

20    want to ask a couple of questions and then propose future

21    scheduling.

22         Ms. Jenness, could I first ask a couple of questions of

23    you?

24            MS. JENNESS:  Yes, Your Honor.

25            THE COURT:  It's still a little different than I
```

1    expected, but it's fine.  When you lay out what was in the

2    HP laptop, what was in the Compaq laptop, and what was in the

3    camera/memory card as well, and some of the -- it's still not

4    as specific as I thought it would be, but it's good enough.

5         But if you make the statement that defense does not know

6    with certainty what evidence was obtained directly from the

7    computer, just explain to me how is that so.  It just doesn't

8    make any sense to me in terms of how something would be

9    organized.  Was it the Government was never given an inventory

10   of what was from the HP or what was from the Compaq or what was

11   from the camera?

12         MS. JENNESS:  That's correct, Your Honor.  We

13   haven't been given an inventory.  Because of the nature of some

14   of the materials on the computer, they were produced to us only

15   in person while we were supervised.  So we haven't actually got

16   in writing anywhere other than to the extent that I was able to

17   take notes during what were, I believe, four, possibly only

18   three, but four sessions when I reviewed the evidence in person

19   and one time accompanied by a defense forensic expert.

20        So I don't actually have an inventory from the Government.

21   I do have from my own notes an idea of what was on either of

22   the two computers.  But as Your Honor knows, computers hold

23   vast amounts of information.  I simply wasn't able to

24   categorically list --

25         THE COURT:  I think we can move forward with the

1  motion to suppress given this.  But down the road, if the trial

2  proceeds forward, there's still going to be some difficulty for

3  me in managing what e-mails were actually -- if there is an

4  e-mail presented, whether it was from an item that has been

5  suppressed.  But I think we are fine to proceed.

6       With regard to these lists, not talking about the other

7  lists, just the HP computer, the Compaq computer, and the

8  memory card and camera, does the Government dispute what's been

9  summarized in any way or the categories of items?

10            MR. SINHA:  Well, Your Honor, is the Court asking

11  about the fruits or just the --

12            THE COURT:  No.  That's what I said.  I said forget

13  about the -- I just talking about -- that's what I said.

14  Listen to what I said.  I said the HP, the Compaq, the memory

15  card.  Forget the other for now.  Is there any dispute as to

16  what's in the -- is there any controversy as to how the

17  inventory is summarized?

18            MR. SINHA:  I don't believe so, Your Honor.

19            THE COURT:  I made a comment the last time that it

20  seemed to me in the briefing that there was not much attention

21  given to the separating the memory card and the camera, and I

22  voiced -- articulated this belief that maybe the parties don't

23  really care about the camera and the memory card as much as

24  they care about the computer.

25       What's in the camera and memory card?  Does the Government

```
 1    intend to use anything in the camera and memory card?  How

 2    important is this?  Not that it makes any difference in the

 3    analysis, but I'm trying to get my mind around this.

 4               MR. SINHA:  Your Honor, there are images that the

 5    United States are seeking to introduce as 404 or 414 that were

 6    found on the memory card.  To my knowledge, the camera doesn't

 7    have any internal memory.  So the camera is less important.

 8    But the memory card there are images.

 9               THE COURT:  Say that again.  What would the

10    Government at this point intend to use?

11               MR. SINHA:  It would be images from the memory card.

12    That would be 404 or 414 images, and those were briefed in

13    our --

14               THE COURT:  In the omnibus evidence?

15               MR. SINHA:  Yes, Your Honor.

16               THE COURT:  All right.  This question is again to

17    the Government.  As I said before, there was no attempt to

18    distinguish the memory card/camera from the computers.  But

19    where I got this idea actually was in a Government footnote.

20    And in the footnote, in the opposition to the motion to

21    suppress -- and I forget which number specifically -- it was

22    suggested that there was a distinction between the camera and

23    the computers in light of *Burnette*, and that's the case

24    involving the purse and *Hells Angels*, the right to contest an

25    administrative subpoena.
```

1       However, just looking very quickly at the new Government's

2   submission, it appears that what the Government is arguing is

3   that all of the devices should come in pursuant to the

4   Government border search powers under section 482.  So, in

5   essence, the Government is really arguing an all-or-nothing

6   approach.  There's no backup?

7           MR. SINHA:  Your Honor, the United States does not

8   believe that the law distinguishes between items on which

9   contraband has been observed such as the camera and memory card

10  and items in which it is reasonably suspected to contain

11  contraband.  So they would all be part and parcel of the same

12  analysis.  The answer to your question, I believe, is yes.

13          THE COURT:  Again, I just read it very quickly.

14  I'll be more on top of it the next time.  So because the camera

15  and memory card have three photos depicting what is believed by

16  the special agent as child pornography, the Government can

17  seize indefinitely everything else?  That's really the

18  Government's position?

19          MR. SINHA:  Your Honor, I don't believe it's that

20  simple because, you know --

21          THE COURT:  I thought that argument is that simple.

22  You are basically saying I can keep it forever because I can

23  save it for trial.

24          MR. SINHA:  Your Honor, so I'll address that in a

25  couple parts, if I may.  There is a reasonable suspicion which

1    is not a whim, you know, which is a standard set forth by the

2    Supreme Court.  That's articulable facts based on an officer's

3    experience to reasonably believe that something is contraband.

4    That also includes the officer's training and experience.

5         And so if, after observing child pornography, which what

6    turned out to be child pornography and the agent has sworn he

7    thought it was child pornography at the time, on one of the

8    electronic devices, if after that he had reasonable suspicion

9    to believe that it was on the other two devices, which is what

10   happened here, under the law, the United States may keep those

11   items until trial.  That's not an indefinite detention because,

12   you know, there's a point at which that ends and --

13        THE COURT:  But then does the Government have to get

14   a search warrant to search the computers and the --

15        MR. SINHA:  So, Your Honor, I mean, there are

16   probably instances in which the Government would not have to

17   get a search warrant because of the temporal proximity --

18        THE COURT:  Like *Burnette*.  *Burnette* is with a

19   purse.

20        MR. SINHA:  Sure.  But the point the Government is

21   going to make is the Government doesn't have to get a seizure

22   warrant.  Those objects have been rightfully seized.

23        THE COURT:  From my perspective -- so you

24   acknowledge that under some circumstances, excluding things

25   like *Burnette* where you have the purse and maybe even the

1    memory card, you can just look in the camera, and you may have

2    to scan things to get back to the photographs you were

3    interested in, but at some point in time, the Government has to

4    get a search warrant as it relates to the computers in this

5    case at some point?

6        You are not arguing that you didn't need to get there

7    because the Government didn't even need a search warrant, and

8    we just did it from belts and suspenders, and we didn't need

9    it?

10            MR. SINHA:  With the length of time that elapsed, I

11   think the Government feels comfortable that getting a search

12   warrant was the correct thing to do under these circumstances.

13            THE COURT:  That's really my question then.  Is the

14   delay -- once it's determined that the Government must get a

15   search warrant, are you saying because it's at the border, that

16   could be any time up to indictment?

17            MR. SINHA:  Well, you know, Your Honor, I guess I

18   would distinguish between -- what I would distinguish between

19   is once items are properly seized, lawfully in the Government's

20   control, then I think there's no clock ticking unless there's a

21   spoliation problem.

22            THE COURT:  So basically you are saying -- but then

23   again, this is in the arguments in the prior papers.  That's

24   not the state of the law as it relates to non-border searches.

25            MR. SINHA:  That's not the state of the law as it

1   relates to a narrow group of probable cause non-border

2   seizures, that's true.  Probable cause seizures that are not at

3   the border there's a clock ticking because that's a specific

4   type of seizure that takes place.  So there's a clock ticking.

5   Under Ninth Circuit law, that time may be as little as

6   seven days.

7        But with regards to the thousands upon thousands upon

8   thousands of cases that take place at the border every month

9   where this exact thing happens, say we see 100 kilograms of

10  marijuana --

11            THE COURT:  Right.

12            MR. SINHA:  -- 100 individually-wrapped packages

13  which we think are marijuana and we field test three of them --

14  we don't field test all of them.  We seize all 100 of them --

15  there is no clock ticking that says, hey, if you take these

16  items and in accordance with the 1973 reorganization plan, you

17  take these 100 kilos and hand them off to DEA which is not a

18  customs official, there is no law anywhere that says, okay,

19  Government, you have seven days to go get a seizure warrant for

20  these other 97 kilos because you don't know that those are

21  contraband.  You just reasonably suspect they are contraband.

22  They are packaged the same.  They smell like marijuana, but you

23  haven't done a field test.

24            THE COURT:  In *Cotterman* isn't the Circuit saying

25  that computers might be a little different?

1      MR. SINHA:  They are saying that with a very

2  specific thing with regards to the privacy rights.  So the

3  Supreme Court has always differentiated -- in fact, the

4  language of the Fourth Amendment itself differentiates between

5  the rights one has in a seizure and the rights one has in a

6  search.

7      THE COURT:  I know I can't cite it and -- because

8  *Cotterman* does talk about the period of time that it took to

9  get from the border.  It took two days in *Cotterman*.

10      MR. SINHA:  Yes.

11      THE COURT:  If the panel decision was one that I

12  could cite to, where would your argument be?

13      MR. SINHA:  The argument would be the same,

14  Your Honor.  *Cotterman* --

15      THE COURT:  Have you read the panel decision?

16      MR. SINHA:  I have, Your Honor.  I think --

17      THE COURT:  They did a whole analysis of why the

18  Government's two-day delay was reasonable.

19      MR. SINHA:  Two days' delay in doing a search.

20      THE COURT:  Yes.

21      MR. SINHA:  But that's not the same thing as the

22  delay in doing a search and getting a search warrant.  A

23  two-day delay in doing a border search with no warrant; right?

24  Here we are just saying the Government can seize these items

25  and hold them.  There's no possessory interest that

Mr. Williams had in those items after the Government seized them because the Government has the right to exclude items from passing through customs and coming to the United States.

In *Cotterman* that wasn't the case because they never went back and got a warrant.  They did the search.  What is at issue in both the panel decision of *Cotterman* and the en banc decision is the search, and searches under you the Fourth Amendment have to do with privacy rights.

*Cotterman* Courts, both of them, cared about -- were, hey, laptop computers contain a lot of private information, and there's unique privacy rights that attend laptop computers.

We are not talking about a warrantless search here because we went and got a search warrant.  What we are talking about is a seizure and a seizure that lasted over a few months.

And the rights that are implicated by a seizure are not privacy rights.  The Supreme Court has said this repeatedly. That's not a privacy issue.  That's a possessory issue.

Do you have a possessory interest in a laptop that is different than the possessory interest you have in your car or your luggage or your wallet?  And the answer to that is no. There's nothing unique about a laptop computer with regards to possessory interest.

The *Cotterman* holding, while it's a broad holding and it broadly protects rights under border searches having to do with laptop computers, it doesn't speak at all to border seizures

1  where the Government then went back and prior to doing any

2  search of the devices got a search warrant.

3            THE COURT:  I guess the bottom line though is it's

4  the Government's position that, once the item is properly

5  seized, they can take as long as they want to take to get a

6  search warrant.

7            MR. SINHA:  Again, Your Honor, I don't think it's as

8  long as we want.

9            THE COURT:  After 97 days, the only explanation the

10  special agent had was I was busy.

11            MR. SINHA:  So one, I would say, certainly the

12  amount of time that passed in this case is reasonable under the

13  case law.  So 97 days may be an outer limit --

14            THE COURT:  What case law is there on a border --

15  the case law -- you distinguished the cases, but what cases

16  would you say that 97 days is used as reasonable?

17            MR. SINHA:  The main case that I would rely on,

18  Your Honor -- it's not the number of days.  It's the analysis.

19  But it's the rubric to which these cases were decided.

20            THE COURT:  Which one?

21            MR. SINHA:  We can start with the Supreme Court case

22  I cited in my brief which I believe is *Montoya de Hernandez*.

23            THE COURT:  Just give me one moment.

24            MR. SINHA:  Sure, Your Honor.

25            MS. JENNESS:  Your Honor, the delay in that case was

1   a mere number of days.

2           THE COURT:  Hold on.  Let me just find my notes.

3   Give me a second.

4           MS. JENNESS:  I'm sorry, Your Honor.  I misspoke.

5   It was 16 hours the delay in *Montoya de Hernandez*.

6           THE COURT:  I guess the point -- we'll discuss this

7   again next time.  The thing that I -- *Cotterman* talks about a

8   seizure and the relocated items to a testing site began within

9   two days of seizure.

10       And then there's a Sixth Circuit case *Stewart*, 2013.  It

11   talks about a five-day warrant delay.  Then *Kennedy* which is a

12   district court case from Washington in 2014 talks about a

13   one-week warrant delay.  It seems that all the cases that

14   talked about delays when they found the Government to be acting

15   reasonable -- so, for example, in *Stabile* out of the

16   Third Circuit, finding a three-month delay reasonable because

17   the Government agent was removed from the matter due to a

18   Secret Service assignment.

19       *Whaley*, which is from the Eleventh Circuit, finding a

20   multi-month delay reasonable because the agent was removed from

21   the search due to the Presidential election.  Other cases where

22   the defendant consented.  Other cases talk about the delay in

23   relocated the laptop to a testing site.

24       I guess the question I come back to is why is a 97-day

25   delay with only the affidavit of the agent saying I was busy --

1  it doesn't seem to mesh well with the other cases I was

2  thinking about.

3            MR. SINHA:  Your Honor, there's a couple things.  A

4  lot of those cases, and *Cotterman* is one of them, is talking

5  about the delay that took place before the Government did a

6  warrantless search.  So we are not just talking about the

7  seizure of the items.  We are talking about a search and a

8  seizure.

9       The other thing is that this is a case in which the

10 statute -- so how do we judge reasonableness of a seizure?  We

11 wonder whether the duration of that seizure under the

12 *Montoya de Hernandez* is reasonable in scope and duration to

13 what caused the items to be seized initially.

14      So what here caused these to items to be seized initially?

15 Well, they were reasonably suspected of obtaining contraband.

16 And the agents involved were directed under federal statute

17 that traces its lineage back to 200 years before the founding

18 of our Republic to hold those items until trial.

19      And so you take that statute that says, okay, you are

20 directed to do that.  And there is a mechanism for people to

21 get their property back.  That's not the issue, that there is

22 not a mechanism.

23      They are directed by federal statute that has a

24 constitutional pedigree unlike most that we deal with that

25 says, no, you are supposed to hold this until trial.  The

1    Supreme Court has repeatedly said, hey, look, things that take

2    place at the border are almost per se reasonable by the fact

3    that they take place at the border because the United States --

4    in this balancing act of reasonableness, the United States'

5    interest is at its zenith, and the personal, private, or

6    possessory interest of an individual is at its nadir because

7    you do not have the right to bring anything you want into the

8    country.

9        You can't bring mangos into the country, but you can

10   certainly buy them at Ralph's.  Those are very different

11   situations.  So under this reasonable test, there's no court

12   that's ever found that the prolonged seizure of these items in

13   accordance with what the United States did here was

14   unreasonable under the Fourth Amendment.

15       And I would respectfully suggest to you -- I would

16   respectfully suggest to the Court that were the Court to say,

17   hey, this 97-day delay, which was holding items until trial --

18   I would respectfully suggest to the Court that, if the Court

19   finds that that's unreasonable under the Fourth Amendment,

20   that's a facial challenge on the statute.  The officers acted

21   in accordance with the statute.  If that's the case,

22   Your Honor, I mean, that's fine.  But I would just ask the

23   court, I guess, to make sure that's what we are talking about.

24            THE COURT:  Okay.  All right.

25            MS. JENNESS:  Your Honor, may I respond to a number

1    of points that counsel made?

2          THE COURT:  No.  You are doing fine without them

3    right now.

4          MS. JENNESS:  Thank you, Your Honor.

5          THE COURT:  And I probably asked more questions than

6    I wanted to ask, but it's just things that I'm thinking about.

7    We are going to dig into this deeply one more time.

8       So this is what I want to suggest.  And, again, I think it

9    impacts our trial date.  This is what I would propose we do.

10   I'm not -- the Government doesn't seem to be interested in

11   pursuing the camera differently.  So maybe I should just back

12   off of that.

13      This is what I would suggest.  If you want to reply to --

14   let's forget about the fruits of the tree for just a moment.

15   If you want to reply to what the Government has just submitted,

16   let's say you do that by Friday.

17          MS. JENNESS:  I can do it by tomorrow, Your Honor.

18   I had a lot to say today.

19          THE COURT:  Then it might take longer than until

20   tomorrow to write it down.  But this is what I would suggest.

21   And again, I think it just makes sense to vacate the trial date

22   because we are not ready.  And that is to have a hearing date

23   in one of the days that we were going to start picking a jury

24   for the matters we talked about, the HP, the Compaq, the memory

25   card and do our evidentiary hearing with the cross-examination

```
 1   as to standing and abandonment and whatever cross-examination
 2   Ms. Jenness wants to do with regard to the new declarations
 3   that have just been submitted from the SC folks and others.
 4        And have that hearing that week of May 5th sometime.  The
 5   Court will take it under submission, write something on it.  I
 6   assume I can get something out that same week.  If I grant the
 7   motion, I'm going to treat your fruits of the poisonous tree as
 8   a bifurcated different motion.
 9        So if I did grant the motion, then I would invite you to,
10   in light of what I wrote, submit some type of supplemental
11   motion, let the Government oppose, reply, have a hearing as to
12   whether or not these other things are, in fact, fruits of what
13   has been suppressed.  I think that's probably the better way to
14   go.
15        Thoughts of counsel, Ms. Jenness?
16             MS. JENNESS:  I concur, Your Honor.
17             MR. SINHA:  I agree as well, Your Honor.  It might
18   be helpful to the Government if we could -- it may not be
19   possible -- set a trial date just so we can start rearranging
20   travel plans.
21             THE COURT:  I think we can do it once -- if I grant
22   the motion, that's another thing in place.  If I deny the
23   motion, then the fruits are gone.  So I think sometime May 5th
24   I think we can accomplish that depending on what I do or
25   shortly thereafter.
```

1      If I grant the motion that we are going to go into the
2  fruits of the tree, I don't think we should set at that point
3  until we've ruled on all the motions.  Does that make sense?
4            MR. SINHA:  Yes, Your Honor.
5            THE COURT:  Let's pick a hearing date.  So you are
6  going to respond tomorrow or --
7            MS. JENNESS:  I will file the brief tomorrow,
8  Your Honor.
9            THE COURT:  All right.  Trial date is vacated.
10  What's the most convenient -- if we didn't do it on Monday,
11  that gives me more time to spend with all of you.  What's the
12  best day between the 6th -- my preference would not be
13  Wednesday.  So Tuesday, Thursday, Friday, what's the most
14  convenient date for counsel?
15            MS. JENNESS:  Your Honor, I had a backup evidentiary
16  matter in another courtroom on Friday which I had another
17  attorney who could stand in for me for that, but I'd prefer to
18  do it myself, if possible.  I'm available Tuesday, Wednesday,
19  Thursday.
20            THE COURT:  Tuesday, Thursday?
21            MR. SINHA:  Your Honor, Thursday might be best for
22  us.
23            THE COURT:  So Thursday, May 8th, 9 o'clock, motion
24  to suppress hearing.
25            MS. JENNESS:  Just to clarify, Your Honor, will that

**UNITED STATES DISTRICT COURT**

```
 1   be the hearing on the -- will the declarants be here for
 2   purposes of cross-examination?
 3             THE COURT:  That's what I'm assuming --
 4             MR. SINHA:  Yes.
 5             THE COURT:  That was my wish.  That's my wish.  If
 6   there's going to be any cross-examination of the declarants,
 7   that's what we will do.  And I want to basically have all the
 8   information that I possibly need from that hearing in terms of
 9   making a ruling, and then also we'll continue the discussion
10   that we started today, and Ms. Jenness shall have all the time
11   that she wants to address the points.
12             MR. SINHA:  Your Honor, if I may, just one quick
13   thing.  It might save me the trouble.  And I can file something
14   if the Court would like.
15        This morning I found a case out of the Western District of
16   New York that defendant raises the same arguments at issue
17   here.  The magistrate judge granted the motion to suppress.
18   The chief judge of the district rejected the magistrate's
19   recommendations on the same issues we've raised here.  And I'll
20   give the case name.  It's R, as in "red," o-g, as in "good,"
21   o-z, as in "zebra," i-n, as in "new,"
22   United States v. Rogozin.  And it's 09-CR-00379.  It's the
23   Western District of New York.  And the entry regarding the
24   chief judge's rejection of the magistrate's decision is
25   docket no. 101.  I can supply the Court with the briefing if
```

```
 1   you like.
 2               THE COURT:  I'll take a look at it.
 3       Ms. Jenness, do you want a little more time to look at
 4   that case?  I don't know what the case says.  You don't know
 5   what the case says, or maybe you do.
 6               MS. JENNESS:  I'm prepared to proceed tomorrow.  I'd
 7   rather give the Court additional time to review the materials.
 8               THE COURT:  Okay.
 9               MS. JENNESS:  If the Court intends to do further
10   research at this point, I would like to bring to the Court's
11   attention two additional cases.
12               THE COURT:  Research never ends.
13               MS. JENNESS:  The research never ends.  The
14   Fourth Amendment has been litigated for an awfully long time.
15   In had Corngold vs. United States which is an en banc decision
16   from the Ninth Circuit, customs agents seized some packages
17   that had been delivered to the airport, and they --
18               THE COURT:  Can you just tell me the cite.  I'll
19   take a look at it.
20               MS. JENNESS:  367 F.2d 1.  United States vs.
21   Whiting, 781 F.2d 692.  And another Ninth Circuit case
22   United States vs. Song Ja Cha, 597 F.3d 995.
23               THE COURT:  Okay.  All right.  We'll see you on the
24   8th.
25               MR. DOUGLAS:  I didn't hear the time, Your Honor.
```

1          THE COURT:  9 o'clock.

2             (At 2:27 P.M. the proceedings adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

23

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5              I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

6    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

7    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

8    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

9    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14                       DATED THIS  16TH  DAY OF MAY, 2014.

15

16                  /S/ MAREA WOOLRICH
                    _____
17                  MAREA WOOLRICH, CSR NO. 12698, CRR
                    FEDERAL OFFICIAL COURT REPORTER
18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**