1  UNITED STATES DISTRICT COURT

2  CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3  HONORABLE PHILIP S. GUTIERREZ, U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,                    )
                                                )
6                      PLAINTIFF,               ) CASE NO. 13-302
                                                )
7          VS.                                  )
                                                )
8  WALTER LEE WILLIAMS,                         )
                                                )
9                      DEFENDANT.               )
   _____)
10

11

12

13

14  REPORTER'S TRANSCRIPT OF
    DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
15  THURSDAY, MAY 8, 2014
    10:02 A.M.
16  LOS ANGELES, CALIFORNIA

17

18

19

20

21

22  _____

23
    MAREA WOOLRICH, CSR NO. 12698, CRR
24  FEDERAL OFFICIAL COURT REPORTER
    255 EAST TEMPLE STREET, ROOM 181-k
25  LOS ANGELES, CALIFORNIA 90012
    mareawoolrich@aol.com

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

    U.S. Department of Justice
    By:  Ravi Sinha, Esquire
    Child Exploitation and Obscenity Section
    1400 New York Avenue NW, 6th Floor
    Washington, DC 20005
    (202) 353-4698

    U.S. Department of Justice
    By:  Herbrina Delores Sanders, Esquire
    Child Exploitation and Obscenity Section
    1400 New York Avenue NW, 6th Floor
    Washington, DC 20005
    (202) 616-1951


**FOR THE DEFENDANT:**

    Law Offices of Evan A. Jenness
    By:  Evan A. Jenness, Esquire
    2115 Main Street
    Santa Monica, CA 90405
    (310) 399-3259


    Law Offices of Jeffrey J. Douglas
    By:  Jeffrey J. Douglas, Esquire
    1717 4th Street, 3rd Floor
    Santa Monica, CA 90401-3319
    (310) 576-3411

```
 1                    M A S T E R   I N D E X

 2

 3                    THURSDAY, MAY 8, 2014

 4

 5                         WITNESSES

 6
                                                        VOIR
 7   WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS  DIRE

 8   WALTER LEE WILLIAMS          7

 9   DANI BYRD                    20

10   ROBERT LAU                   41      56       59

11   JEFFREY YESENSKY             63      93

12

13

14                         EXHIBITS

15

16                    FOR              IN      WITHDRAWN
     EXHIBIT          IDENTIFICATION  EVIDENCE  OR REJECTED
17
     1   Grant Application            14
18
     3   Equipment Policies   29
19

20

21

22

23

24

25
```

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, MAY 8, 2014

 2                            10:02 A.M.

 3                             -oOo-

 4

 5              THE CLERK:  Calling item 5, Criminal 13-302.

 6   United States of America vs. Walter Williams.

 7       Counsel, please state your appearances.

 8              MR. SINHA:  Good morning, Your Honor.  Ravi Sinha

 9   and Herbrina Sanders on behalf of the United States.

10              MS. JENNESS:  Good morning, Your Honor.

11   Evan Jenness and Jeffrey Douglas on behalf of Walter Williams

12   who is present.  We are joined by our paralegal assistant

13   Christina Larson Gibbs.

14       Your Honor, may I ask that my client's hand restraints be

15   removed?

16              THE COURT:  They may.

17              MS. JENNESS:  Thank you, Your Honor.  We would also

18   request that all testifying witnesses be excused from the

19   courtroom.

20              MR. SINHA:  Your Honor, we don't have any objection

21   to that except with regards to the case agent who I believe is

22   permitted by rule --

23              THE COURT:  All right.  Everyone except the case

24   agent is excluded.

25       Are there any witnesses in the courtroom?
```

```
1              MR. SINHA:  No, Your Honor.

2              THE COURT:  All right.  Have counsel discussed the

3    proceedings?

4          Ms. Jenness, who did you intend to cross-examine today?

5              MS. JENNESS:  The four declarants for the

6    prosecution, Mr. Dani Byrd (sic), Mr. Robert Lau, the case

7    agent, Jeffrey Yesensky, and the HSI Special Agent

8    Matthew Hernandez.

9              THE COURT:  Then with regard to those four

10   witnesses, I expect that the cross would be fairly narrow?

11             MS. JENNESS:  Limited to the scope of their

12   declarations.

13             THE COURT:  Which is fairly narrow?

14             MS. JENNESS:  Very well, Your Honor.

15             THE COURT:  And the Government?

16             MR. SINHA:  Yes, Your Honor.  I think the only

17   person we are crossing is the defendant with regards to the

18   standing.

19             THE COURT:  Correct.

20             MS. JENNESS:  Your Honor, may I bring an additional

21   issue to the Court's attention?

22             THE COURT:  You may.

23             MS. JENNESS:  Your Honor, we've received note 26.2

24   where Jencks Acts statements regarding any of the declarants --

25   these declarations clearly were prepared by the prosecutors.
```

```
 1    It's inconceivable that there weren't several drafts and

 2    comments provided back and forth between the prosecutors and

 3    the witnesses, and we would ask that those materials be ordered

 4    produced.

 5              THE COURT:  The Government's position?  Are there

 6    any materials, and if so, production?

 7              MR. SINHA:  Your Honor, there wasn't a back and

 8    forth between those things.  I think, you know, as the

 9    witnesses I think will testify, Ms. Sanders and I roughed out

10    an initial draft and then changed it and sent it back to

11    whatever it was supposed to be and sent it back signed.

12              THE COURT:  Are those drafts available?

13              MR. SINHA:  I don't presently have the initial

14    draft.

15              THE COURT:  This courtroom is kind of funny.  It's

16    really hard to hear you when you are not near the microphone.

17              MR. SINHA:  I don't presently have the initial draft

18    that I sent to the witness.  I think that's probably attorney

19    work product.  It's just my statements.  So whatever they

20    did -- I didn't have any subsequent drafts from them.

21              THE COURT:  Let's go ahead and proceed, and then

22    we'll discuss it after the proceeding with regard to whether

23    additional cross is necessary later.  All right.

24         Should we first proceed with Defendant Williams first?

25              MS. JENNESS:  Yes, Your Honor.
```

```
 1              MR. SINHA:  Sure, Your Honor.

 2              MR. DOUGLAS:  Your Honor, Mr. Williams is confined

 3    to a wheelchair.  How would you like to deal with that?

 4              THE COURT:  If he doesn't mind, we can do it from

 5    right there.  Move the microphone closer to him, and counsel

 6    can examine from the lectern.

 7              MR. SINHA:  Yes, Your Honor.

 8              THE COURT:  Just make sure that the microphone is --

 9    go ahead and swear in the witness.

10              THE CLERK:  Yes, Your Honor.

11         Raise your right hand.  Do you solemnly swear that the

12    answers you make to the questions asked of you by the Court

13    shall be the truth, the whole truth, and nothing but the truth,

14    so help you God?

15              THE WITNESS:  I do.

16              THE CLERK:  Thank you.

17              THE COURT:  Ms. Jenness, counsel will examine from

18    the lectern.

19              MR. SINHA:  So, Your Honor, I apologize.  This is

20    the first time that I have been in a court where it's been done

21    by affidavit, essentially it's the direct, and then we would

22    just start with the cross.  Would the Court like me to ask

23    Mr. Williams to identify himself on the record or anything like

24    that?

25              THE COURT:  No.  Just go ahead and proceed with the
```

1    cross.  Thank you.

2                          CROSS-EXAMINATION

3    BY MR. SINHA:

4    Q     Good morning, Mr. Williams.

5    A     Good morning.

6    Q     The thing that I mostly want to talk to you about today is

7    about the HP laptop that was purchased for you by the

8    University of Southern California.  Are you familiar with the

9    laptop that I'm talking about?

10   A     Yes, I am.

11   Q     That was the laptop that was seized from you at the

12   Los Angeles International Airport?

13   A     Correct.

14   Q     Sir, isn't it true that the University of Southern

15   California was actually the agency that purchased that laptop?

16   A     No.  I was the one that chose the laptop, and I used my

17   Faculty Development Award, which had been awarded to me, to

18   purchase it.

19   Q     So I just want to -- we'll get to all of that.  Who

20   actually sent the money to the company that shipped the laptop?

21   A     I asked the business officer to write a check to it.

22   Q     At the University of Southern California?

23   A     Yes.

24   Q     The University of Southern California actually made the

25   purchase from the company?

1    A    It was a USC check, correct.

2    Q    And the University of Southern California, after the

3    laptop came in, they received that laptop; is that correct?

4    A    I'm sorry?

5    Q    The laptop was shipped to the University of Southern

6    California; is that correct?

7    A    It was shipped to me.

8    Q    It wasn't shipped to Jeremy Weimar so that he could

9    install software on it?

10    A    Yes.  He was the one that I asked to put some software on

11    it.

12    Q    So he received the laptop from the company that it was

13    ordered from; is that correct?

14    A    Correct.

15    Q    And --

16           THE COURT:  Counsel, can you slow down.

17    BY MR. SINHA:

18    Q    And when he received that laptop, he installed software on

19    it; is that correct?

20    A    I'm not sure if he installed software or he just checked

21    it out and I picked it up.

22    Q    Mr. Williams, isn't it correct that you asked that the

23    laptop be sent to Mr. Weimar so that software -- USC software

24    could be installed on it?

25    A    I just asked that he check it out and make sure everything

```
 1   was working okay.  I do not recall if he actually installed
 2   anything on it.
 3   Q    So you don't know if any USC software is installed on it?
 4   A    I'm not sure.
 5           MS. JENNESS:  Objection, Your Honor.  Vague as to
 6   "USC software."
 7           THE COURT:  Overruled.
 8   BY MR. SINHA:
 9   Q    And so, Mr. Williams, so there was not a point at which
10   you told Agent Yesensky that USC had installed software on that
11   computer and that it required a password?
12   A    I put a password on it, yes.
13   Q    But you didn't say in your recorded interview that USC had
14   installed that software?
15   A    I do not recall.
16           MS. JENNESS:  Objection.  Beyond the scope.
17           THE COURT:  Overruled.
18   BY MR. SINHA:
19   Q    So, Mr. Williams, you are telling me that you installed
20   the software that put a password on that computer?
21   A    I put the password on it.
22   Q    Did USC have that password?
23   A    No.
24   Q    USC never had the password to your computer?
25   A    No.
```

1    Q    So do you know how Agent Yesensky was able to get the

2    password to that computer?

3    A    Because I told it to him.

4    Q    When did you tell Agent Yesensky the password to the

5    computer?

6    A    When he interviewed me and when I arrived in Los Angeles

7    Airport.

8    Q    That was in your recorded interview, sir?

9    A    Yes.

10   Q    Now, Mr. Williams, you stated that you -- that you

11   purchased the laptop using faculty funds; is that correct?

12   A    It was a Faculty Development Grant that had been awarded

13   to me.

14   Q    So tell me what a Faculty Development Grant is.

15   A    Each year the University provides awards to who they

16   consider their top professors, the people who have published

17   the most.  It's a competitive award that is given to faculty,

18   and then the individual faculty member can choose how they want

19   to use that money.

20   Q    So when we are talking about that, are we talking about

21   Faculty Development Grants?

22   A    Yes.

23   Q    How many Faculty Development Grants did you receive in

24   your time at the University of Southern California?

25   A    I received, I believe, every time I applied for one, many

1    times.

2    Q    Approximately do you have a sense, sir?

3    A    Well, I was hired at USC in 1984, and the last time I

4    taught there was in 2010.  So I believe I received one, if not

5    every year, close to every year.

6    Q    So approximately six or seven; is that correct?

7    A    More.

8    Q    I'm sorry.  What year did you say you started?

9    A    1984.

10   Q    Okay.  1984 not 2004.  So far more than that.

11        And did those Faculty Development Grants come with limits

12   on what that money could be allocated for?

13   A    It was the faculty member's determination.  But it was --

14   the purpose was to assist us in our research and publication.

15   It could be used for anything from research materials to travel

16   to professional conferences to present speeches or anything

17   related.

18   Q    Mr. Williams, could Faculty Development Grants be used to

19   fund faculty stipends?

20   A    No.

21             MS. JENNESS:  Objection, Your Honor.  Beyond the

22   scope.

23             THE COURT:  What's the relevance?

24             MR. SINHA:  Your Honor, there's a disagreement as to

25   what the nature of what these funds are, whether they are

salary or whether they are not salary.  The University of

Southern California and Mr. Williams disagree with that.  So,

you know, the limits that might come along with the grants may

indicate who is in control of that money.

            THE COURT:  Is a stipend different from a grant?

            MR. SINHA:  It is, in fact, different from a grant,

yes, Your Honor.

            THE COURT:  Go ahead.

BY MR. SINHA:

Q     So I'm sorry, Mr. Williams.  Could you repeat your answer.

Could it be used to fund faculty stipends?

A     A stipend would be payment for teaching, and this is not a

payment for teaching.  This is an award.

Q     So it's not a benefit?  A Faculty Development Grant is not

a benefit?  It's not salary?

A     I would say it's not salary.  It's an award.

Q     It couldn't be used for non-research related things; is

that correct?

A     I'm sorry.  Say that again.

Q     Faculty Development Grants can only be used for specific

research to related tasks; is that correct?

A     Something that the faculty member would define as related

to their research or related to their scholarship which could

include travel.

Q     When you get a Faculty Development Grant, are you able to

14

1    spend it without any further approvals?

2    A    Correct.  There's no approval each time you want to spend

3    something.  It's just you direct the business office what you

4    want.

5    Q    So if you don't spend all of the Faculty Development Grant

6    that you are allocated in a year, do you get to take the

7    remainder home?

8    A    No.  You can request to the dean to have it roll over to

9    the next year if you do not spend it all.

10   Q    Then if the dean doesn't allow it to roll over, it reverts

11   back to the University?

12   A    I'm not aware because I always used all of my funds.

13   Q    Did you -- when you were applying for a Faculty

14   Development Grant, did you fill out an application?

15   A    Yes.

16           MR. SINHA:  If I may approach the witness,

17   Your Honor?  Or if I may approach the bench also.

18           THE COURT:  Go ahead and take a look at it and pass

19   it along to your client.

20           MS. JENNESS:  May we have a moment to examine this?

21           MR. SINHA:  Your Honor, may I approach?

22           THE COURT:  You may.

23           MS. JENNESS:  We object on relevance.  This is a

24   contract for his position subsequent to the entry into the

25   agreement.  It has nothing to do with the award.

**UNITED STATES DISTRICT COURT**

 1          MR. SINHA:  I gave you the wrong exhibit.  I

 2   apologize.

 3          MS. JENNESS:  Counsel, what exhibit number is this?

 4          MR. SINHA:  This is exhibit 1.  It's marked as

 5   exhibit 1.

 6          THE WITNESS:  This is a blank form.  This is not a

 7   form that I filled out.

 8   BY MR. SINHA:

 9   Q    Yes, sir, but are you familiar with this form?

10   A    Yes.

11   Q    Can you tell me what this is, please.

12   A    This is the Faculty Development application form.

13   Q    This is not the one that you filled out, but this is the

14   form one would fill out?

15   A    Right.  This is a blank form.

16          MR. SINHA:  Your Honor, I guess I would move for

17   this exhibit to be admitted into evidence.

18          THE COURT:  Any objection?

19          MS. JENNESS:  Relevance, Your Honor.

20          THE COURT:  Overruled.  Admitted.

21          (Exhibit No. 1 admitted in evidence.)

22   BY MR. SINHA:

23   Q    Mr. Williams, I want to draw your attention to the last

24   paragraph on this document which is -- the last paragraph on

25   the first page of this document, the last two paragraphs

1    including the bullet point.  Mr. Williams, this appears --

2    A    The last two paragraphs beginning "sample types"?

3    Q    Yes, sir.  This document seems to indicate a limited

4    number of things that one can spend Faculty Development Grants

5    on; is that correct?

6    A    As I mentioned before.

7    Q    It says that funding that is requested will be considered

8    but that there are objectives that the University will consider

9    in making funding; is that correct?

10   A    I'm sorry.  Say that again.

11   Q    Sure, Your Honor -- sure, Mr. Williams.  I'm just --

12            THE COURT:  Counsel, you have to slow down.  I'm

13   having difficulty following.  I'm sure the witness is as well

14   as well as the court reporter.  So please slow down.  I've

15   asked you once.

16   BY MR. SINHA:

17   Q    Mr. Williams, with regards to the last paragraph, I'm

18   looking at the second sentence.  It notes here that the grants

19   will not fund stipends or benefits or salary or curricular

20   development or non-research related programming, among other

21   things; is that correct?

22            MS. JENNESS:  The document speaks for itself.

23            THE COURT:  Overruled.

24            THE WITNESS:  Yes.  The sentence before says, "this

25   list is not exhaustive, and other requests for funding will be

```
 1   considered."  Okay.  Then this sentence that you began, it says
 2   that it "will not fund faculty stipends, benefits, salary
 3   support, curricular development, non-research related
 4   programming" -- programming meaning a classroom-type
 5   programming -- "or tuition remission."
 6   BY MR. SINHA:
 7   Q    But now, sir --
 8              THE COURT:  Are we really going to spend 20 minutes
 9   talking about stipends and grants?  Are we really going to do
10   that?
11              MR. SINHA:  Your Honor, we can move on.
12              THE COURT:  Please move on.  It's not helpful.
13   BY MR. SINHA:
14   Q    The next thing I'd like to talk to you about is the
15   University policies that apply to the usage of the HP computer.
16   Now, sir, you are aware that, when you receive a computer; that
17   is, a University computer, there are usage policies; is that
18   correct?
19   A    It was my computer.
20   Q    So you did not believe that the HP -- there were any usage
21   restrictions on that HP at all?
22   A    That's correct.
23   Q    You are aware there are usage restrictions on University
24   of Southern California computers; correct?
25   A    If it was part of the computer infrastructure, of course,
```

```
 1   but this was not.
 2   Q    Okay.  So you agree that --
 3              THE REPORTER:  Counsel, can you please repeat your
 4   question.
 5              THE COURT:  Slow down.
 6   BY MR. SINHA:
 7   Q    Mr. Williams, you agree that if the computer was part of
 8   the network infrastructure, there were usage restrictions on
 9   it?
10   A    Since I never used a network infrastructure computer, I
11   really don't know.
12   Q    I just have a couple more questions for you.  I want to
13   hand you what's been marked Government's Exhibit 2, if I could,
14   please.
15        Your Honor, may I approach?
16              THE COURT:  You may.
17              MS. JENNESS:  Objection.  Relevance, Your Honor.
18              THE COURT:  You may inquire.
19   BY MR. SINHA:
20   Q    Mr. Williams, could you tell me what I've just handed you
21   is, please.
22   A    This is the letter from the Executive Vice Dean
23   Michael Quick who responded to my request for me to be put up
24   on the retirement plan for USC.
25   Q    Sir, is this your signature on page 3 of this letter?
```

1    A    Yes, it is.

2    Q    Did you read this letter before signing it?

3    A    Yes.

4    Q    Mr. Williams, you stated in your supplemental declaration

5    that the change of employment that this letter documents took

6    place in April of 2010 -- excuse me -- in May of 2010 and that

7    after that date, you were not asked to give your Hewlett

8    Packard laptop or the Hewlett Packard laptop back to USC; is

9    that correct?

10   A    Correct.

11   Q    That same change in employment, sir, did you change

12   offices as a result of that change in employment?

13   A    No.

14   Q    Did you get new office furniture?

15   A    No.

16   Q    Who owned the desk and chair and filing cabinet in your

17   office?

18   A    As far as I'm aware, the University.

19   Q    After your change in employment, they didn't take those

20   things back; is that correct?

21   A    Correct.

22        MR. SINHA:  Your Honor, if I could just have one

23   second, please.

24        THE COURT:  You may.

25        MR. SINHA:  Thank you, Your Honor.  I have nothing

1    further.

2              THE COURT:  Ms. Jenness?

3              MS. JENNESS:  Nothing further, Your Honor.  Thank

4    you.

5              THE COURT:  Ms. Jenness, which witness first?

6              MS. JENNESS:  (Inaudible response.)

7              THE COURT:  Ms. Jenness, which one first?

8              MS. JENNESS:  These are the Government witnesses,

9    Your Honor.  They've indicated to me that they'd like to call

10   the two USC witnesses first followed by the two agents.

11             THE COURT:  All right.

12             MS. JENNESS:  The first witness is USC Vice Dean

13   Dani, D-a-n-i, Byrd, B-y-r-d.

14             THE COURT:  Thank you.

15             THE CLERK:  If you could please step forward next to

16   the court reporter's desk and raise your right hand.

17        Do you solemnly swear that the answers you make to the

18   questions asked of you by this Court will be the truth, the

19   whole truth, and nothing but the truth, so help you God?

20             THE WITNESS:  I do.

21             THE CLERK:  Thank you.  Please take a seat.

22             THE WITNESS:  May I bring this?

23             THE COURT:  Yes.

24             THE CLERK:  Yes.

25        For the record, can you please state your full name and

```
 1   spell your last name.

 2           THE WITNESS:  My name is Dani Margaret Byrd.  The

 3   last name is spelled B-y-r-d.

 4           THE COURT:  You may inquire.

 5                       CROSS-EXAMINATION

 6   BY MS. JENNESS:

 7   Q    Good morning, Dean Byrd.  Thank you for being here.  Are

 8   you aware that your declaration has been submitted to the Court

 9   in these proceedings?

10   A    Yes.

11   Q    Do you know who prepared that declaration?

12   A    A draft was prepared by Mike Blanton which I edited after

13   received.

14   Q    It was prepared by who?

15   A    Mike Blanton.

16   Q    Have you been in communication with the prosecutors or any

17   of the case agents about your declaration?

18   A    I met with a prosecutor.

19   Q    When was that?

20   A    Yesterday.

21   Q    Can you tell us about the substance of that meeting.

22   A    She helped orient me to the process that I might expect to

23   get today.

24   Q    Who was that agent?

25   A    I believe Miss -- Sanders is the last name.
```

```
 1    Q     The prosecutor who is sitting here in the court?

 2    A     Yes.

 3    Q     Did you discuss your testimony here today?

 4    A     We discussed how I might pay attention to the questions

 5    and be responsive to them.

 6    Q     Did you review the things in your declaration?

 7    A     Some of them.

 8    Q     Did she ask you any questions about them?

 9    A     Yes.

10    Q     What did you discuss?

11    A     We discussed what I wrote in the declaration, what my

12    duties are, for example.

13    Q     Anything else?

14    A     We discussed a number of items so I might be prepared to

15    answer questions today.

16    Q     Did she tell you the questions she thought I would be

17    asking today?

18    A     She told me some topics your topics might touch on today.

19    Q     What were those topics, if you recall?

20    A     The nature of the College's Faculty Development Grant

21    program, my duties, my familiarity with documents that have

22    been submitted.

23    Q     Did she ask you or at any time were you asked to see if

24    you could find an application that had been completed by

25    Professor Williams for grant funds?
```

**UNITED STATES DISTRICT COURT**

1    A    I was already aware of that application.  It was already

2    part of the documents that had been requested previously.

3    Q    Did you locate a completed application, one that

4    Professor Williams had completed and submitted?

5    A    I previously found that application.

6    Q    Did you provide that to the Government?

7    A    Yes, I believe that was among the many documents provided.

8              MS. JENNESS:  Your Honor, that document has not been

9    provided to us.  We would ask that it be provided to us.

10             THE COURT:  Is there an application?

11             MR. SINHA:  Not that I know of, Your Honor.  We

12    provided -- I take it it's probably in the personnel file, if

13    there is one.  I'm not aware of it.  We have provided the whole

14    personnel file.  I'm not aware of this document.

15             THE COURT:  Proceed.

16    BY MS. JENNESS:

17    Q    Were you personally involved in the purchase of the

18    HP laptop computer that's the subject of your declaration?

19    A    I did not make the purchase of that computer.

20    Q    Did you ever speak with Professor Williams about the

21    purchase of that computer?

22    A    I did not speak with him about it.

23    Q    Did you e-mail with him about it?

24    A    He e-mailed an application to the annual Faculty

25    Development Grant program in which he requested funds be

1    allocated for the purchase of a computer.

2    Q    This is the completed application that you've told us

3    about which you believe was given to the Government?

4    A    Yes.

5    Q    Do you have any personal knowledge of anything that

6    anybody at USC told Professor Williams about the use of that

7    laptop?

8    A    Could you repeat that again.

9    Q    Sure.  Do you have any personal knowledge of anything that

10   anyone at USC told Professor Williams about the use of that

11   laptop?

12   A    I have seen e-mails where he requested that his business

13   officer purchase the laptop.

14   Q    But you never discussed the laptop with him yourself?

15   A    No.

16   Q    You are not aware of anyone else having discussed it with

17   him, are you?

18   A    Not personally.  It -- no.

19   Q    You don't have knowledge of anyone at USC telling him that

20   he could not use the computer for various things, are you?

21   A    I have no such knowledge.

22   Q    As far as you know, nobody at USC told him that the

23   computer belonged to USC; correct?

24   A    Do you mean told him verbally?

25   Q    Told him verbally or sent him an e-mail.

1    A    So he is in receipt of a link to USC policies which is

2    policies.usc.edu which would include policies about USC

3    purchased equipment.

4    Q    That link includes a huge volume of documents, doesn't it?

5    A    It includes multiple documents.  I don't know how many.

6    Q    Several dozen?

7    A    I don't know how many.

8    Q    Hundreds and hundreds of pages?

9    A    I don't know.

10   Q    More than a dozen?

11   A    Probably.

12   Q    More than a hundred?

13   A    I don't know.

14              MS SANDERS:  Your Honor, asked several times and

15   answered.

16              THE COURT:  Overruled.

17   BY MS. JENNESS:

18   Q    But getting back to my specific question, neither you nor

19   anyone that you know of specifically told Professor Williams

20   about what that computer could or couldn't be used for;

21   correct?

22   A    I think I answered that.  I can't speak to someone telling

23   him verbally, but he did receive a document in which the link

24   to USC policies that speak to that.

25   Q    That's the only communication whatsoever that you are

```
1    aware of regarding that issue?

2    A    I don't know of any other specific example I could give

3    you.

4    Q    By the way, are there more than one type of grant that

5    professors at USC receive?

6    A    There are internal grants and external awards, say, for

7    example, from the National Science Foundation if that's what

8    you are asking me.

9    Q    Doesn't USC have a whole portal listing different grants

10   and grant sources?

11              MS. SANDERS:  Your Honor, relevance.

12              THE COURT:  Overruled.

13              THE WITNESS:  There are multiple websites at USC

14   that serve the purpose of research advancement.  Some of them

15   might link to opportunities external to the University like at

16   the National Science Foundation and the National Institutes of

17   Health.  Some of them might provide information about internal

18   sources of research support.

19   BY MR. SINHA:

20   Q    Doesn't USC even offer tutorials on the advice of seeking

21   grants and the art of grantsmanship for its faculty members?

22   A    Yes, there are such tutorials.

23   Q    And of all those materials that are on USC website, they

24   don't just specify one particular type of grant?  They are

25   multiple different types of grants?
```

```
 1   A    I think I just answered that.  They are both grants

 2   external to USC that faculty can and do apply for, and there's

 3   grants internal to USC that faculty can and do apply for.

 4   Q    In fact, there are dozens of them, aren't there?

 5   A    I don't know how many surely.

 6   Q    More than a dozen?

 7   A    Certainly if you count external.

 8              THE COURT:  What's the relevance?  I think it's

 9   almost undisputed that the funds came from the Faculty

10   Development Grant.  Are you saying they came from somewhere

11   else?

12              MS. JENNESS:  Your Honor, we don't know where they

13   came from.

14              THE COURT:  Your client said they came from it,

15   didn't he?  What does your client say about it in his

16   declaration?

17              MS. JENNESS:  I understand, Your Honor.  This is --

18   actually the language he uses in his declaration is somewhat

19   different, and this was over half a decade ago.

20              THE COURT:  What difference does it make if it came

21   from grant A, B, C, D, E or F?

22              MS. JENNESS:  I'll move along, Your Honor.

23              THE COURT:  Thank you.

24              MS. JENNESS:  Give me a moment, Your Honor, and I

25   will try to shorten my examination.
```

```
 1              THE COURT:  Okay.
 2    BY MS. JENNESS:
 3    Q    With respect to the Faculty Grant application, there's
 4    nothing in writing that reflects that the purchase of that
 5    computer was with Faculty Grant funds, is there, as far as you
 6    know?
 7    A    Yes, I think there is.
 8    Q    What document is that?
 9    A    There's correspondence between Walter Williams and his
10    business officer that asked the business officer to purchase
11    the computer with funds allocated to him from the annual
12    Faculty Development Grant program.
13    Q    The annual Faculty Development Grant program?
14    A    Yes.
15    Q    Are you aware of any other documentation other than that?
16    A    That's a chain of e-mails that went back and forth.  So I
17    don't know if you consider that one document or multiple
18    documents.
19    Q    But that chain of e-mails, is that the only information
20    that you know of that reflects that?
21    A    Could you say -- reflects what?
22    Q    That reflects the statement that the computer was
23    purchased with Faculty Development Grant funds?
24    A    There's also his application in which he states that his
25    purpose -- proposed purpose for the grant funds is to include
```

1    purchasing a laptop.

2    Q    This is the application that you talked about earlier that

3    you said was provided to the Government?

4    A    Yes.  That responds to the annual call for proposals which

5    I believe you also have.

6    Q    In paragraph 46 of your declaration, you state you are

7    familiar with USC policies regarding ownership of equipment

8    purchased with University funds.

9    A    Yes.

10   Q    Was the laptop purchased with general University funds?

11   A    The laptop was purchased with college funds that were

12   allocated to him for the purpose of research support that year.

13   Q    Was the laptop purchased with funds derived from

14   extramural sponsors?

15   A    That's not my understanding, no.

16   Q    Could I ask you to take a look at what I believe has been

17   provided as exhibit -- your declaration -- do you have a copy

18   of the University Equipment Policies?

19        This document has been provided as exhibit 3 to the

20   prosecution's brief and is referenced in the witness's

21   declaration.  And we can have a copy placed in front of the

22   witness.

23              THE COURT:  Which exhibit is it?  Is it 3?

24              MS. JENNESS:  Exhibit 3.

25              THE COURT:  Exhibit 3 to her declaration?  Is it the

1    Equipment Policies and Procedures?

2            MS. JENNESS:  Yes, it is, Your Honor.

3            THE COURT:  It's exhibit 3.

4            MS. JENNESS:  It's referenced in the witness's

5    declaration.  It is not referenced by exhibit number, however.

6            THE COURT:  All right.

7            MS. JENNESS:  We would ask that this be marked as

8    Defense Exhibit A.

9            THE COURT:  This is going to get really confusing.

10   If it's attached as exhibit 3 to her declaration, why don't we

11   just make reference to it as exhibit 3 to the witness's

12   declaration so I can stay on top of it.

13           MS. JENNESS:  That makes sense.

14           (Exhibit No. 3 marked for identification.)

15   BY MS. JENNESS:

16   Q    Do you have the exhibit in front of you?

17   A    No.

18           MS. JENNESS:  May I approach, Your Honor?

19           THE COURT:  Sure.  I made a mistake.  That's

20   exhibit 3 to Mr. Lau's declaration.  I made a mistake.

21           MS. JENNESS:  Your Honor, we actually couldn't tell

22   in the copy of the pleadings that we received because the

23   exhibits don't immediately follow the declarations.  They are

24   cumulative.  The exhibit, however, is referenced by its title

25   in the --

```
 1              THE COURT:  Does this witness reference exhibit 3 in
 2   her declaration?  I don't believe so.
 3              MS. JENNESS:  She states in paragraph, I believe
 4   it's 4 of the declaration, that "I am familiar with USC's
 5   policies regarding ownership of equipment purchased with
 6   University funds."
 7              THE COURT:  So you want to examine this witness
 8   about what?
 9              MS. JENNESS:  About whether, in fact, this computer
10   comes within the definition included in this manual for
11   University property.
12              THE COURT:  All right.  Go ahead.
13              MS. JENNESS:  All right, Your Honor.  May I
14   approach?
15              THE COURT:  You may.
16   BY MS. JENNESS:
17   Q    Just a moment ago I asked you if the computer was
18   purchased with general University funds; correct?
19   A    You asked me something about that, yes.
20   Q    Could you repeat your answer with respect to --
21   A    Could you repeat your question, and I'll repeat my answer.
22   Q    Was the laptop purchased with general University funds?
23   A    And I answered, I believe, that the laptop was purchased
24   with Faculty Development Grant funds that were allocated to him
25   for research support.
```

1    Q    I'll ask you to take a look at page 27 of the exhibit that

2    you have in front of you, and there are unfortunately a number

3    of different numbers on those pages, but I'm referring to the

4    original page 27.

5    A    That's the last page; correct?

6    Q    It's probably close to it.  The number on the lower

7    right-hand corner of the page, 5396.

8    A    Yes.

9    Q    Is that part of the definition section that you referenced

10   earlier?

11   A    Yes.

12   Q    Does that define University equipment on -- at the very

13   last paragraph of page 27?

14   A    It says, "University equipment" -- written in bold -- "is

15   equipment to which title is vested with the University, whether

16   secured with general University funds or funds derived from

17   extramural sponsors."

18            MS. SANDERS:  I'll object.  I don't believe that

19   there's been a foundation laid as to whether this witness is

20   familiar with this particular document.

21            THE COURT:  Overruled.

22   BY MS. JENNESS:

23   Q    That definition doesn't say anything about items purchased

24   with faculty grants, does it?

25   A    This is referring to the University as a whole.  Within

33

```
 1   the University, there are a number of schools, the college

 2   being one of them.  Each of those schools allocate funds within

 3   the umbrella of the University.

 4   Q    Does this definition say anything about grant funds?

 5   A    I don't know how to answer that.

 6   Q    I'll move along.  Let me ask you to take a look at page 3

 7   of that document, if you would.  I believe the number on the

 8   lower right-hand corner is 5372.

 9   A    This is the page that is titled at the top "University

10   Equipment Procedures"?

11   Q    Yes.

12   A    I have that page here.

13   Q    Do you see the paragraph that says "Equipment Title

14   Ownership"?

15   A    Yes.

16   Q    It says there that, "title to equipment purchased with

17   grant funds is vested in accordance with the provisions of the

18   specific grant or agency policy"; correct?

19   A    That's what it says.

20   Q    So it doesn't say there that equipment purchased with

21   grant funds belongs to USC, does it?

22   A    I think there's a confusion of terminology here.

23   Contracts and grants -- as I mentioned, there are extramural

24   contracts and grants, for example, from grants from the

25   National Science Foundation.  Internal University funds can
```

```
 1   also be used to support research activities.
 2   Q    Are these things you know about because of your expertise
 3   and your experience?
 4   A    What things are you referring to?
 5   Q    You just described a distinction that isn't spelled out
 6   here; correct?
 7   A    I was trying to provide some information about how the
 8   word "grant" can be interpreted in an academic context.
 9   Q    So it can be interpreted in a number of different ways; is
10   that correct?
11   A    Grant funds can come from a number of different sources.
12   Q    Are you aware of whether the HP laptop is listed in any
13   inventory of USC's property?
14   A    I'm not aware of that.
15   Q    Are you aware of anyone telling Professor Williams that
16   USC held title to the laptop?
17   A    I'm not aware of that.
18   Q    Now, on March 11 of 2011, did you recall sending
19   Professor Williams an e-mail saying you were sorry to hear that
20   he was resigning his position?
21   A    I don't know the exact date, but we were in receipt of an
22   e-mail of resignation, and I replied to that via e-mail.
23   Q    Do you recall exhibit 6 to your declaration?
24   A    I don't have exhibit 6 up here.
25   Q    Does it sound familiar?  Do you have a copy there?
```

1          Your Honor, this is a document that's been submitted as an

2     exhibit to the prosecution's brief.  It's --

3               THE COURT:  I have it.

4               MS. JENNESS:  It's exhibit 6.  May I approach,

5     Your Honor?

6               THE COURT:  You may.

7     BY MS. JENNESS:

8     Q    Do you have in front of you exhibit 6?

9     A    I have in front of me a document numbered 000053 at the

10    bottom.  If it has an exhibit number, it's on a different page,

11    the preceding page, yes, exhibit 6.

12    Q    Is that an e-mail from you to Professor Williams stating

13    that you are sorry to hear he was resigning?

14    A    There's two e-mails on this page, one of them is that one

15    you just referred to.

16    Q    In that e-mail, you are expressing USC's warm wishes

17    towards him?

18    A    Correct.

19    Q    And you thanked him and expressed the University's

20    gratitude for his research in archives and other activities for

21    the University?

22              THE COURT:  Ms. Jenness, come on.  I can read.  It's

23    not even relevant to our analysis here.

24    BY MS. JENNESS:

25    Q    Did you direct him in that e-mail or at any other time to

1    give USC the HP laptop?

2    A    No.

3    Q    And you are not aware of anyone else instructing him to do

4    that, are you?

5    A    No.

6    Q    And you are not aware of anyone instructing him to do that

7    when he had resigned his tenured position a year earlier?

8    A    No.

9    Q    Does USC usually ask retiring professors to give the

10   University their laptops?

11   A    This resignation was very atypical.  A normal or typical

12   exit process would include an interview with the faculty

13   member's business officer, and that business officer would have

14   a list of University equipment.

15   Q    Are you aware of any list of University equipment that

16   includes the HP laptop?

17   A    I wouldn't have a such a list.  Normally the business

18   officer in an exit when someone leaves the University would go

19   through that process.

20   Q    Did the Government ask you to try and find such a list?

21   A    No.

22   Q    But you are not aware of one as you sit here today?

23   A    I answered that I think.

24   Q    I'm sorry?

25   A    I thought I just answered that.  You asked me if I am

1    personally aware of that list.  No.  I answered that.

2    Q    Thank you.  Are you familiar with exhibit 5 to your

3    declaration, the grant terms document?  It may not be --

4    A    I assume that's the preceding one in this stack?

5    Q    It may not be actually.

6    A    Yes, I believe I have exhibit 5 here.  It doesn't have a

7    number at the bottom like the others, but I assume you are

8    talking about the document that says, "2008 Faculty Development

9    Grants."

10   Q    Excellent.  Are you familiar with that document?

11   A    Yes.

12   Q    That grant application doesn't warn applicants that, if

13   they buy a computer, it can be monitored by USC in any way,

14   does it?

15   A    It says, "all expenditures are subject to University

16   regulations."  It doesn't speak specifically to the word

17   "monitoring" or anything.

18   Q    Does USC have a policy of monitoring the laptop usage of

19   its professors?

20   A    I have no idea.

21   Q    You are unaware of --

22   A    I do not know that.

23   Q    I'm sorry.  Say --

24   A    I do not know that.  I'm not an IT specialist.

25   Q    Are you aware of any policy in 2011 by which USC monitored

```
 1   the laptop usage of its professors?

 2   A     I have no idea, no.

 3   Q     Do you know if there was such a practice going on?

 4             MS. SANDERS:  Asked and answered several times.

 5             THE COURT:  Overruled.

 6   BY MS. JENNESS:

 7   Q     I'm sorry.  I think we spoke over each other.  Could you

 8   answer it again.

 9   A     Could you ask it again.

10   Q     Are you aware of whether in 2011 USC had a practice of

11   monitoring the laptop usage of its professors?

12   A     No, I'm not aware of that.

13   Q     Do you know if, when you turned on this HP laptop, there

14   was any kind of a warning that it could be monitored by anyone

15   at USC?

16             MS. SANDERS:  Objection, Your Honor.  Asked and

17   answered.

18             THE COURT:  Please stand.  Thank you.

19             MS. SANDERS:  My apologies.

20             THE WITNESS:  I lost track of whose turn it is.

21             THE COURT:  Ask the question again.

22   BY MS. JENNESS:

23   Q     Are you aware that, when you turned on the HP laptop,

24   there's no warning saying your usage could be monitored by USC?

25   A     First of all, I didn't turn on the laptop, and no, I'm not
```

```
 1   aware of any such message if someone had turned on the laptop.
 2   Q    USC didn't have any ability to access that laptop without
 3   Walter Williams' permission, did it?
 4   A    I have no idea.
 5   Q    USC couldn't remotely access the laptop --
 6   A    I have no idea.
 7   Q    You are not aware it could --
 8   A    I'm not aware it could or couldn't.
 9   Q    USC never audited that laptop, did it?
10   A    I'm not even sure what you mean by "audit."
11   Q    Requested Professor Williams to bring it in and let the
12   University look at the contents of it.
13   A    Professor --
14            THE COURT:  Has the Government offered any evidence
15   to suggest that his computer was monitored in any way?
16            MS. JENNESS:  Your Honor, they challenged his
17   privacy interest.
18            THE COURT:  I understand that.  Listen to my
19   question precisely.  Has the Government produced any evidence
20   to contradict your client's statement that his laptop was, in
21   fact, connected to the network and was, in fact, monitored?  In
22   fact, there's no evidence of that happening; right?
23            MS. JENNESS:  I've lost track of the double
24   negative, but no --
25            THE COURT:  I apologize for the double negative, but
```

```
 1   I'm telling you this.  You are going on too long.  Read the

 2   case law that you cited.  Possession is merely one aspect.  And

 3   even if USC owns this laptop, you have plenty of other things

 4   to talk about.  So move on.

 5   BY MS. JENNESS:

 6   Q    Is there any written document saying that equipment

 7   purchased with grant funds is subject to USC's policy on

 8   information technology?

 9   A    I don't know.

10   Q    You are not aware of such a document, are you?

11   A    I said I don't know.

12   Q    As far as you know, grant applications don't warn

13   professors that purchasing a laptop with the funds will subject

14   the professor to information technology policies at USC, are

15   you?

16   A    This call for proposals says only that all expenditures

17   are subject to University regulations.

18   Q    But it doesn't say anything about USC's policy and

19   information technology, does it?

20   A    No.

21   Q    And it does specifically permit grant funds to be used to

22   purchase a computer, doesn't it?

23   A    It allows that as a possible expenditure if someone's

24   proposal explains why that purchase would be in support of

25   their research or scholarly activities.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    You are not aware of Professor Williams ever having given

 2   USC permission to access the laptop, are you?

 3            THE COURT:  Think about your question.  Do you

 4   really think that any such communication exists?  Do you really

 5   think that?

 6            MS. JENNESS:  Well, Your Honor --

 7            THE COURT:  Stop wasting time.  Come on.  Let's get

 8   to the meat.  Let's get to what we are here to do.  Go ahead.

 9   Knock yourself out then.  Go ahead.  Keep going.

10            MS. JENNESS:  I'll submit, Your Honor.  No further

11   questions.

12            THE COURT:  Thank you.

13            MS. JENNESS:  Thank you, Dean Byrd.

14            THE WITNESS:  You are welcome.

15            THE COURT:  Any further questions?

16            MS. SANDERS:  No, Your Honor.

17            THE COURT:  Step down.  Thank you.

18            THE WITNESS:  What should I do with these packages?

19            THE COURT:  If you would collect them.  Ms. Sanders,

20   if you would collect them.

21            MR. SINHA:  Your Honor, may Dr. Byrd be excused,

22   please.

23            THE COURT:  Any objection?

24            MS. JENNESS:  Your Honor, we would like to have

25   produced the complete application about which she testified --
```

**UNITED STATES DISTRICT COURT**

1              THE COURT:  Let's talk about later.  Can she be

2    excused?

3              MS. JENNESS:  Certainly, Your Honor.

4              THE COURT:  All right.

5              MR. SINHA:  With the Court's permission, I'll grab

6    the next witness.

7              THE COURT:  Thank you.

8              THE CLERK:  Sir, if you could please step forward

9    and stand next to the court reporter's desk.  Raise your right

10   hand.

11      Do you solemnly swear the answers you make to the

12   questions asked of you by this Court shall be the truth, the

13   whole truth, and nothing but the truth, so help you God?

14             THE WITNESS:  Yes, I do.

15             THE CLERK:  Thank you.  Please take a seat.

16      For the record, can you please state your full name and

17   spell your last name.

18             THE WITNESS:  Robert Lau.  Last name is L-a-u.

19             THE COURT:  You may proceed.

20                       CROSS-EXAMINATION

21   BY MS. JENNESS:

22   Q    I'm sorry.  Could you pronounce your last name for me.

23   A    Lau.

24   Q    Mr. Lau, you are aware that a declaration you signed has

25   been submitted to the Court?

1    A    Yes.

2    Q    And who prepared that declaration?

3    A    Mike Blanton and myself.

4    Q    Have you been in communication with the prosecutors or the

5    case agents about your declaration?

6    A    Yes.

7    Q    Could you tell us when and who you've been in

8    communication with.

9    A    I think we've met one time -- one time yesterday.

10   Q    With whom did you meet?

11   A    Yes.  Yes.

12   Q    The gentleman here, Mr. Sinha?

13   A    Yes.

14   Q    What did you discuss?

15   A    We just went over my declaration.  We read through it.

16   Q    Did he ask you anything in particular about it?

17   A    No.

18   Q    Did you tell him anything about your -- strike that.  Did

19   he discuss with you your testimony here today?

20   A    No.

21   Q    Have you had any e-mail communications with either the

22   prosecutors or any of the case agents here?

23   A    No.

24   Q    Was that the only meeting that you've had with the

25   prosecutors or the case agents, the one you had yesterday with

```
1   Mr. Sinha?

2   A    We had one meeting prior to that.

3   Q    With whom did you meet and when was that?

4   A    I don't remember the exact date.  Probably three weeks --

5   approximately three weeks ago.

6   Q    Do you recall who was present?

7   A    The prosecutor, the FBI agent.  I can't remember his name.

8   And Mike Blanton.

9          MS. JENNESS:  Your Honor, we've received no

10  information regarding any of these communications.  I would

11  make the same motion I made previously for production of all

12  Jencks Act statements.

13         THE COURT:  Go ahead and continue to examine.

14  BY MS. JENNESS:

15  Q    Did you work for USC in the fall of 2008, November 2008?

16  A    I just returned to USC in December of 2008.

17  Q    So you weren't working for USC when the laptop computer

18  that's discussed in your declaration was purchased?

19  A    Correct, I was not.

20  Q    You were not --

21  A    I was not working for USC at that time, correct.

22  Q    You've never spoken with Mr. Williams about that computer,

23  have you?

24  A    I have never spoken with him.

25  Q    You don't have any personal knowledge of what anybody at
```

UNITED STATES DISTRICT COURT

1    USC told him about that computer, do you?

2    A    Correct.  I have no knowledge.

3    Q    As far as you know, no one told him that it belonged to

4    USC; correct?

5    A    Correct.  I do not know if anyone told him that.

6    Q    Now, you've attached as exhibit 3 to your declaration a

7    copy of USC Equipment Policies.

8    A    Correct.

9    Q    You are familiar with that?

10    A    Yes.

11    Q    You are not aware that anyone provided a copy of it to

12    him, are you?

13    A    It is referenced during all -- during the employee

14    orientation program.

15    Q    Do you know when Professor Williams was first hired at

16    USC?

17    A    No.

18    Q    You don't even know whether this equipment policy manual

19    was in effect when he was hired, do you?

20    A    The policy has been in effect for probably over ten years.

21    So no, I do not know when he started.  So I do not know.

22    Q    Other than that orientation you described, you are not

23    aware of anyone having told him to read the document or make

24    him aware of it?

25    A    Correct.  I do not know.

1   Q    Now, let me ask you about that exhibit.  Do you have a

2   copy of it in it front of you?

3   A    No, I do not.

4             MS. JENNESS:  May I approach, Your Honor?

5             THE COURT:  You may.

6             MS. JENNESS:  For the record, I'm placing in front

7   of the witness exhibit 3 to the prosecution's brief.  It's a

8   document entitled "University of Southern California Equipment

9   Policies and Procedures."

10            THE WITNESS:  Thank you.

11  BY MS. JENNESS:

12  Q    May I draw your attention to page 2 of that document.  I'm

13  referring to the original page 2.  There's actually several

14  numbers on every page unfortunately.  But this is -- the number

15  on the lower right-hand side of the page is 5371.  That states

16  at the top "University Equipment Policy"; correct?

17  A    Correct.

18  Q    It says there that "purchases of less than $5,000 are

19  classified as material and supplies"?

20  A    Correct.

21  Q    "With the following exceptions"; correct?

22  A    Correct.

23  Q    In paragraph 7 of your declaration, you say that that

24  threshold is limited to that section only; is that right?

25  A    Repeat the question, please.

```
 1   Q     In paragraph 7 of that declaration, you indicate that the

 2   $5,000 threshold found on page 2 is limited to that section

 3   only?

 4   A     I don't remember -- do you have a copy of the declaration,

 5   please?

 6   Q     Certainly.

 7         May I approach, Your Honor?

 8               THE COURT:  You may.

 9   BY MS. JENNESS:

10   Q     Have you had a chance to review that?

11   A     Yes.  Thank you.

12   Q     You indicate on there that the $5,000 threshold is limited

13   to that section only?

14   A     Correct.

15   Q     You mean just to that page of the equipment policies?

16   A     No.  I think it actually refers to the -- let me see.

17   Pertains only to the -- I think -- what I meant was it applies

18   to procedures that relate to inventory and capitalization.  So

19   yes.  Yes.

20   Q     Is that explained anywhere in the manual?  In other words,

21   is it explained anywhere in the manual that this $5,000

22   threshold found on page 2 is limited to that section only?

23   A     No, not that I'm aware of.  No.

24   Q     Now, referring to paragraph 8 of your declaration, you

25   state, "equipment purchased for less than $5,000 remains
```

1    subject to the equipment policies"?

2    A    Correct.

3    Q    Did you draft that statement yourself?

4    A    No, I did not.

5    Q    Who prepared that?

6    A    I believe Mike Blanton did.  But --

7    Q    Is there -- sorry.  Mr. Blanton?

8    A    Yes.

9    Q    Your attorney?

10    A    Yes.

11    Q    Is there any written policy or document you are aware of

12    that states that equipment costing less than $5,000 is subject

13    to USC's equipment policies?

14    A    It is not explicitly stated.

15    Q    Was the HP laptop purchased with general University funds?

16    A    I believe so.

17    Q    Could you tell us why you believe that.

18    A    I was informed by Vice Dean Dani Byrd on the process of

19    the Faculty -- I lost the term -- the Faculty Development

20    Awards and how that process is -- how the process works, how

21    faculty have to apply for it, and then they are granted money

22    to purchase supplies.

23    Q    So you don't know anything other than what Vice Dean Byrd

24    told you --

25    A    Correct.

1    Q    -- with respect to that; is that right?

2    A    Correct.

3    Q    May I ask you to take a look at -- no, I'll move along.

4         Could I ask you to take a look at page 3 of that document.

5    I'm referring to exhibit 3, the University of Southern

6    California Equipment Policies.

7    A    University Equipment Procedures?

8    Q    Yes.

9    A    Okay.

10   Q    Does it say there in the paragraph that reads "equipment

11   title/ownership" that title to equipment purchased with grant

12   funds is vested in accordance with the specific grant?

13   A    Correct.

14   Q    So this manual may not apply at all to equipment that's

15   been purchased with a grant; correct?

16   A    One more time.

17   Q    The sentence here that says, "the title to equipment

18   purchased with grant funds is vested in accordance with the

19   specific grant" -- correct?  I'm --

20   A    With contract work -- "title or ownership of the

21   University equipment acquired with University funds is

22   vested" --

23              THE REPORTER:  Can you please repeat --

24              THE WITNESS:  I was just reading the first line of

25   the document.  "Title or ownership" -- "Title to or ownership

1    of University equipment acquired with University funds is

2    vested with the University of Southern California."

3    Q    The sentence after that reads that "title to equipment

4    purchased with contract or grant funds is vested in accordance

5    with the provisions of the specific contract, grant, or agency

6    policy"; correct?

7    A    Correct.

8    Q    So, in fact, this manual may not apply at all to equipment

9    that's been purchased with grant funds; correct?

10   A    Correct.  But I believe this was an award, a Faculty

11   Development Award, not a grant.

12   Q    But you don't have personal knowledge of that, do you?

13   A    Correct.

14   Q    Let me ask you about USC's network infrastructure, and the

15   document I'm going to be referring to is exhibit 4 to your

16   declaration.  Are you familiar with that document?

17   A    Yes.

18         MS. JENNESS:  Can I place a copy of it in front of

19   the witness, Your Honor?

20         THE COURT:  You may.

21         THE WITNESS:  Thank you.

22      Your Honor, I forgot to turn off my cell phone.

23         THE COURT:  We cannot have a private conversation.

24         THE WITNESS:  I'm sorry.  I forgot to turn off my

25   cell phone.

```
  1              THE COURT:  You can go ahead and turn off your cell

  2   phone.

  3              MR. SINHA:  Your Honor, may I give your court

  4   reporter a copy of what they were just reading?

  5              THE COURT:  Sure.

  6   BY MS. JENNESS:

  7   Q    Do you have that document in front of you?  That's

  8   exhibit 4 to the prosecution's brief, and the title of the

  9   document is "USC Policy Information Technology"?

 10   A    Yes.

 11   Q    That document was not created until 2010; correct?

 12   A    This version of the document.  We've had previous

 13   versions.

 14   Q    Did the prosecutors ask you to provide those documents to

 15   them?

 16   A    No.

 17   Q    So you do not have in front of you the policy that was in

 18   effect when the HP laptop was purchased, do you?

 19   A    I do not.

 20   Q    So this is not, in fact, the policy that was in effect at

 21   that time?

 22   A    (Inaudible response.)

 23   Q    When the laptop was purchased?  I just want to be clear

 24   that we have in front of us a document that was not in effect

 25   when the laptop was purchased.
```

1    A    Portions of this document -- correct.

2    Q    You don't have any knowledge of anybody telling

3    Mr. Williams that this document would apply to the laptop that

4    had previously been purchased in 2010, are you?

5    A    That should be part of the employee orientation program.

6    Q    That's when someone is initially hired?

7    A    Correct.

8    Q    But Professor Williams was hired long before 2008.

9    A    I do not know.  Sorry.

10    Q    You don't have any personal knowledge of this policy ever

11    having been provided to him other than when he was initially

12    hired?

13    A    I have no personal knowledge.

14    Q    We know this 2010 document was not in effect then; right?

15    A    Correct.  This version, correct.

16    Q    In paragraph 11 of your declaration, you state that users

17    of network infrastructure have quote "no expectation of a right

18    of privacy when using the network infrastructure."

19    A    Correct.

20    Q    Is there any written policy that defines who has the right

21    to examine professors' laptop computers?

22    A    I am not sure if it's documented somewhere.

23    Q    You are not aware of any such document?

24    A    I am not sure if one exists.  It may.  I do not know.

25    Q    Did the prosecutors ask you to provide such a document?

```
 1   A     No.

 2   Q     And you are not personally aware of any policy saying who

 3   has the right to review a professor's laptop?

 4   A     I'm trying to think through all of our policies.  It may

 5   exist somewhere.  I cannot place it right now.

 6   Q     But you are not aware of it as you sit here today?

 7   A     Correct.

 8   Q     Is there any written USC policy that provides for

 9   professors to be given notice if their laptop computers are

10   going to be monitored?

11   A     No, there's no mechanism for notification.

12   Q     Is there any University policy in writing that says what

13   University Administration could do with anything that they were

14   to find on a professor's laptop?

15   A     No, there's no document.

16   Q     Does USC have a policy of routinely monitoring the laptop

17   use of its professors?

18   A     No.  We only monitor when an incident has been reported or

19   detected.

20   Q     In 2011 there was no policy of monitoring professors'

21   laptops?

22             MR. SINHA:  Your Honor, I'm going to object on

23   relevance grounds.

24             THE COURT:  Overruled.

25   BY MS. JENNESS:
```

54

1   Q    I'll repeat the question.  In 2011, as far as you know,

2   there was no policy by USC of monitoring professors' laptop

3   usage; correct?

4   A    Correct.  We do not routinely monitor usage.

5   Q    And on this HP laptop, you are not aware of any warning on

6   it when you turn it on saying that it could be monitored by the

7   University, are you?

8   A    No.  Correct.  I do not know.  The laptop was administered

9   and configured by the department's IT.

10   Q    So you have no personal knowledge of any warning on this

11   laptop; correct?

12   A    Correct.

13   Q    USC had no ability to access the laptop without

14   Professor Williams' permission, did it?

15   A    Depends -- I do not know.  The department may have

16   installed software on the laptop that I am not aware of.

17   Q    You are not aware of any such software?

18   A    No.

19   Q    Did the prosecutors ask you whether the computer could be

20   remotely accessed by USC?

21   A    I do not remember if they asked me specifically that.

22   Q    But if they had asked you, you would have said you are not

23   aware it could have been?

24   A    Right.

25   Q    USC never asked Professor Williams to submit the laptop

55

```
 1   for an audit, did it?
 2   A     Since -- not that I'm aware of.  The department --
 3   somebody else may have asked.  The department IT may have
 4   asked.  I'm not aware.
 5   Q     You are not aware he was ever asked to do that?
 6   A     If there were -- no such request came through central IT.
 7   Q     You are not aware of any request having come in through
 8   any department to access his laptop, are you?
 9   A     They are not required to tell central IT if they made such
10   a request.
11   Q     You are not aware of USC ever asking Professor Williams to
12   provide USC with a copy of the hard drive of the laptop, are
13   you?
14   A     No such request came through central IT.
15   Q     You wouldn't know anything about that?
16   A     Not if a department asked, no.
17   Q     You are not aware of that having occurred, are you?
18   A     Correct.  Yes, I'm not aware of it having occurred.
19   Q     USC doesn't have a backup of the contents of that
20   HP laptop, does it?
21   A     It depends what software the department IT staff installed
22   on the laptop.  I'm not aware.
23   Q     Have you been asked to look and see whether USC has a copy
24   of the contents of that laptop?
25   A     I have not been asked.
```

```
1    Q    But as far as you know, based on your own personal
2    knowledge, USC doesn't have a copy of the contents of the
3    laptop?
4    A    Central IT does not have a copy.
5    Q    USC didn't ask Professor Williams to give the laptop to
6    USC when he resigned in 2011, did it?
7    A    I am not aware of that conversation if there was one.  I
8    don't know.
9    Q    Is there any written document that says that equipment
10   purchased with grant funds is subject to the USC policy on
11   information technology?  That's exhibit 4 to your declaration.
12            MR. SINHA:  I'm going to object on relevance
13   grounds.
14            THE COURT:  Overruled.
15            THE WITNESS:  We have --
16   BY MS. JENNESS:
17   Q    Do you want me to repeat the question?
18   A    I'm trying to think -- from my experience, there has been
19   no difference in how we treat any device that is purchased by
20   University funds, grant or otherwise.  Any device that's used
21   at USC, there has been no difference.
22   Q    When you say "used at USC," a laptop can be used in any
23   number of places; correct?
24   A    Correct.
25   Q    Are you aware of any written document saying that a
```

 1  computer purchased with grant funds is subject to the

 2  University's Information Technology policy?

 3  A    I don't think it says so explicitly.

 4  Q    And as far as you know, grant applications don't warn

 5  applicants that any equipment purchased or a computer purchased

 6  can be subject to USC's policy in information technology;

 7  correct?

 8  A    I believe it depends on the grant process.  And I'm not

 9  aware of --

10  Q    You are not personally aware that they do give such a

11  warning, are you?

12  A    No.

13          MS. JENNESS:  No further questions.  Thank you,

14  Your Honor.

15          THE COURT:  Anything further from the Government?

16          MR. SINHA:  Your Honor, if I may just ask a couple

17  clean-up questions.

18          THE COURT:  You may.

19                    REDIRECT EXAMINATION

20  BY MR. SINHA:

21  Q    Mr. Lau, with regards to exhibit 4 which is the Network

22  Infrastructure Use Policy, your declaration stated that that

23  policy applied to the HP computer at issue; is that correct?

24  A    Correct.

25  Q    Can you explain why that applies and what "network

1    infrastructure" means, please.

2    A    We believe it applied -- I believe it applied because the

3    laptop was purchased with University funds.

4    Q    So could you talk to me about section 3.1 which appears to

5    give some examples of what network infrastructure is.

6         MS. JENNESS:  Objection, Your Honor.  Vague, calls

7    for a narrative.

8         THE COURT:  Overruled.

9         THE WITNESS:  3.1 is very broad.  Basically any

10   computing device used at USC is considered -- and purchased

11   with University funds is considered part of USC's network

12   infrastructure.

13   BY MR. SINHA:

14   Q    Does it matter whether that device that is purchased with

15   USC funds is physically connected to a USC network?

16   A    No, it does not.

17   Q    Does it matter if that device is physically located on

18   USC's campus?

19   A    No.

20   Q    Does it matter if it's connected to a wifi network at USC?

21   A    No, it does not.

22   Q    I'd like to ask you, if I could, please, about exhibit 3,

23   University Equipment Procedures.  I believe you stated in your

24   declaration that the section of this policy that applies to --

25   that's listed on page 3 under "Equipment Title and Ownership"

1    applies to the HP computer; is that correct?

2    A    Correct.

3    Q    Could you explain, please, why that applies to the

4    HP computer.

5    A    Because it was purchased with University funds.

6    Q    Finally, Mr. Lau, I wanted to talk to you about the date

7    of these two policies.  So exhibit 4 -- and I apologize for

8    hopping back and forth.  But exhibit 4 which is Network

9    Infrastructure Use, November 5, 2010.  Now, is that the policy

10   that is applicable to any use of any network infrastructure

11   after the effective date; that is to say, after November 5,

12   2010?

13   A    Correct.  It is -- it goes into effect on the date it was

14   published.

15   Q    If the University of Southern California purchases a

16   computer for someone in 2008, the Network Infrastructure Policy

17   that is in place in 2008, they don't get grandfathered into it;

18   correct?

19   A    Correct.  There's no grandfathering.

20   Q    When there's a new policy that comes out, say, in November

21   of 2010, that is the policy that applies until the next policy

22   comes out?

23   A    Correct.

24   Q    As USC employees, are people made aware that policies are

25   subject to revision and that they could be changed?

```
 1   A      Yes.

 2   Q      Specifically with regards to computer usage policies?

 3   A      Correct, yes.

 4   Q      Have computer usage policies, such as the Network

 5   Infrastructure Use Policy and the Equipment Policy, changed and

 6   evolved over the years?

 7   A      Definitely, yes.

 8   Q      Why is that?

 9   A      Because technology changes.  The way people use devices

10   change.

11            MR. SINHA:  That's all the questions I have,

12   Your Honor.  Thank you.

13            THE COURT:  Ms. Jenness?

14                      RECROSS-EXAMINATION

15   BY MS. JENNESS:

16   Q      Other than at the time a professor is hired, you are not

17   aware of any time that a professor is specifically told about

18   USC's information technology policies; correct?

19   A      So approximately seven years ago a task force, strategic

20   technology task force, was formed at USC where director -- IT

21   directors from every unit and every department are invited.

22        At that forum, which meets once a month, any changes to

23   policies are communicated to every director, and it is their

24   responsibility to then communicate to their constituents.

25   Q      And you are not specifically aware at all that anyone
```

```
 1   communicated any of those policies to Professor Williams, are
 2   you?
 3   A    I am not personally aware.
 4   Q    Are you aware that he was first hired in 1984?
 5   A    No, I did not know.
 6   Q    Fair to say there probably was not an information
 7   technology policy document that looked anything like this back
 8   in 1984?
 9   A    Correct.
10            MS. JENNESS:  No further questions.  Thank you.
11            THE COURT:  Anything further from the Government?
12            MR. SINHA:  No, Your Honor.
13            THE COURT:  You may step down.
14            THE WITNESS:  Thank you.
15            THE COURT:  Ms. Jenness, how long do you anticipate
16   the cross-examination of the two agents?
17            MS. JENNESS:  Depends how much leeway Your Honor
18   gives me.  I'll attempt to --
19            THE COURT:  What's your best estimate if we'll be
20   staying here today?
21            MS. JENNESS:  Approximately half an hour for each.
22            THE COURT:  Let's take a five-minute break.
23                 (A brief recess was taken.)
24            THE COURT:  Which agent is first?
25            MS. JENNESS:  Special Agent Yesensky, Your Honor.
```

```
 1              MR. SINHA:  Before we get started, could I ask the

 2    Court to please excuse Mr. Lau?

 3              THE COURT:  Any objection?

 4              MS. JENNESS:  No, Your Honor.

 5              THE COURT:  Mr. Lau is excused.

 6              THE CLERK:  Do you solemnly swear the answers you

 7    make to the questions asked of you by this Court shall be the

 8    truth, the whole truth, and nothing but the truth, so help you

 9    God?

10              THE WITNESS:  I do.

11              THE CLERK:  Thank you.  For the record, can you

12    please state your name and spell your last name.

13              THE WITNESS:  Jeffrey A. Yesensky, Y-e-s-e-n-s-k-y.

14              THE COURT:  You may inquire.

15              MS. JENNESS:  Your Honor, we have the same motion

16    that we previously had.  I can expedite by not asking the

17    witness all of the specific questions I asked the other

18    witnesses, but I believe it's clear that there have been

19    subsequent communications and we have not received discovery on

20    them.

21              THE COURT:  Is there any discovery to be produced as

22    it relates to the notes or materials with regards to the other

23    witnesses?

24              MR. SINHA:  Not that I am aware of, Your Honor.

25              THE COURT:  We'll flesh this out later.  Go ahead.
```

1          MS. JENNESS:  May I inquire of the witness regarding

2     e-mails with the prosecutors and the other case agent?

3          THE COURT:  I'm sorry.  I just didn't hear.

4          MS. JENNESS:  May I inquire of the witness regarding

5     his communications with the prosecutors and the other case

6     agent, Mr. Hernandez?

7          THE COURT:  Any objection?

8          MR. SINHA:  No, Your Honor.  I would just say I

9     think we produced those as far as they are produceable, but

10    yeah.

11         THE COURT:  As it relates to these issues,

12    certainly.  But --

13         MS. JENNESS:  Your Honor, frankly I've never been in

14    this position where witnesses were prepared for their

15    testimony.  There were detailed declarations submitted, and the

16    prosecution claims there were no communications and no document

17    of those communications.

18       And counsel stood up here and made that representation

19    twice under oath.  It's hard for me -- I guess not under oath

20    but as a member of the court.  It's just hard for me to view it

21    as credible.  I've never seen that happen before.  It seems

22    patent that there's been e-mail communications, both about the

23    witnesses' testimony, about proceedings today.  I just don't

24    understand how declarations of this type could have been

25    prepared and a witness could be prepared to testify with not a

1    single piece of discovery or Jencks statement being created.

2                THE COURT:  Who was their lawyer?

3                MS. JENNESS:  Mr. Blanton is their lawyer, and it

4    may be that communications were funneled through him, but they

5    came from the prosecutors.

6                THE COURT:  Go subpoena Mr. Blanton then.  Let's go.

7    Come on.

8                MS. JENNESS:  And the same motion with respect to

9    this witness.

10               THE COURT:  How many motions do I have pending?

11   I've lost track.  You are laughing.  But you make so many

12   motions that I have no idea what motion --

13               MS. JENNESS:  This is a standing motion for Jencks

14   Act statements.

15               THE COURT:  It's been standing around us ever since

16   we started these proceedings.  So --

17               MS. JENNESS:  I'll stop standing around and start

18   moving.

19                           CROSS-EXAMINATION

20   BY MS. JENNESS:

21   Q    Do you have in front of you a copy of your declaration

22   that was submitted in support of the prosecution's brief?

23   A    No, I do not.

24               MS. JENNESS:  May I approach, Your Honor?

25               THE COURT:  You may.

```
 1   BY MS. JENNESS:

 2   Q     Are you familiar with the declaration?

 3   A     Yes.

 4   Q     Who prepared it?

 5   A     It was prepared, and a draft was submitted to me, and I

 6   reviewed it.  It was prepared by myself along with Ravi Sinha.

 7   Q     Was there more than one draft of this declaration?

 8   A     I just want to make sure I know the declaration we are

 9   referring to.  Okay.  Is there more than one draft of it?

10   There -- this is the only draft.

11   Q     This was the first draft and last draft that was submitted

12   to you?

13   A     Yes.

14   Q     No changes made whatsoever?

15   A     I added my signature and date to it.

16             THE COURT:  Ms. Jenness, on the same page we are

17   talking about his declaration that's signed April 25, 2014?

18             MS. JENNESS:  Of 2014, correct.

19             THE COURT:  In that declaration he basically says

20   everything I said in the affidavit is true.

21             MS. JENNESS:  Correct.

22             THE COURT:  And you are going to examine how long on

23   the declaration?

24             MS. JENNESS:  I'm going to ask him about the

25   statements that he incorporates in the prior search warrant
```

```
 1   affidavit.
 2              THE COURT:  That's exactly where you should be.
 3   BY MS. JENNESS:
 4   Q    In paragraph 3 of your declaration of April 25 of 2014,
 5   you state, "the statements I swore to in the search warrant
 6   affidavit regarding probable cause were known to me prior to
 7   the February 11, 2011 seizure of the computer media to which
 8   the search warrant and search warrant affidavit pertained";
 9   correct?
10   A    That's correct.  That's what I said.
11   Q    So everything in your probable cause statement in the
12   affidavit accompanying your March 19 of 2011 search warrant
13   application was known to you before February 11 of 2011?
14   A    It was known to me prior to the seizure on February 11.
15   Q    Everything in that declaration?
16   A    Correct.
17   Q    Doesn't that affidavit detail your interrogation of
18   Professor Williams at LAX on February 11 of 2011?
19   A    No, it does not.  It wasn't an interrogation.  It was a
20   voluntary interview done with Mr. Williams.
21   Q    Doesn't your affidavit in support of the March 19, 2011
22   search warrant -- your -- let me start again.
23        Doesn't your affidavit in support of your application for
24   a search warrant that was submitted to the Court on May 19 of
25   2011, doesn't that detail your communications with
```

1    Professor Williams at LAX on February 11 of 2011?

2    A    Yes, prior to the seizure of his -- the belongings, yes.

3    Q    So you are making a distinction in your declaration

4    between information that was known to you at what time on

5    February 11th of 2011?

6    A    Prior to the seizure of the computer media on

7    February 11th, 2011.  Is that -- I'm not sure what your

8    question is.  I'm sorry.

9    Q    You are saying here in your declaration that everything in

10   your search warrant affidavit regarding probable cause was

11   known to you before the February 11, 2011 seizure of the

12   computer media; correct?

13   A    Yes.  I believe you are asking the same thing.  If there's

14   a distinction, I'm missing -- could you just clarify.

15   Q    Let me ask you to take a look at paragraph 18 of the

16   affidavit you submitted in support of the May 19 of 2011 search

17   warrant application.

18            THE COURT:  Ms. Jenness, can you make reference to

19   the page number.  Sometimes there's duplication of paragraphs.

20   BY MS. JENNESS:

21   Q    That affidavit you incorporate into your April 25th

22   affidavit is attached as exhibit 8?

23            THE COURT:  That would be page 11 of the original

24   affidavit?

25            MS. JENNESS:  Page 11, bates No. 634, correct,

1    Your Honor.

2                THE COURT:  Okay.

3    BY MS. JENNESS:

4    Q    Those paragraphs detail all of your communications with

5    Professor Williams at LAX on February 11 of 2011; right?

6    A    It details some of the communications, yes.  But not all

7    of the --

8    Q    Those communications were recorded.  So we, in fact, have

9    a complete recording of what they were?

10   A    That's correct.

11   Q    In paragraph 18 you say that on February 11 of 2011

12   during -- Williams arrived at LAX with the items in his

13   possession; correct?

14   A    Correct.

15   Q    You didn't know that before February 11 of 2011, did you?

16   A    No, I did not know that before February 11th.

17   Q    And you state in paragraph 18 that while on the scene --

18   sorry.  Paragraph 19, while on the scene at LAX and in the

19   presence of SA Hernandez, you attempted to preview the

20   following items on the devices.  You didn't know that before

21   February 11 of 2011, did you?

22               MR. SINHA:  Your Honor, I'm going to object on the

23   grounds of relevance.  I don't -- there's no point that he said

24   he knew it before the day of February 11th.

25               THE COURT:  I think Ms. Jenness is reading the

1    declaration literally, as she should.  So she's trying to

2    discount his testimony in the affidavit based on this one

3    technical aspect that the declaration says all the information

4    was known before February.  And, in fact, some information is

5    known afterwards and so based on this nuance, I'm going to

6    discredit the witness.

7                MR. SINHA:  May I respond briefly, please?

8                THE COURT:  You may, but it's not necessary.

9                MR. SINHA:  Okay.  I guess just the language -- I

10   just think that it says prior to the February 11th seizure.

11   Not prior to February 11th.

12               THE COURT:  Well, Ms. Jenness is going to argue what

13   she is going to argue.  She believes I'm going to discount the

14   agent because of this point.  And if she wants to go through

15   every aspect that proves this point, she can knock herself out.

16               MS. JENNESS:  I'd rather not do that, Your Honor.

17               THE COURT:  Go ahead.  Put on a full defense.

18               MS. JENNESS:  Let me attempt to summarize here.

19   Q    Everything in paragraph 18 of your May 19, 2011 search

20   warrant affidavit you first learned on February 11th of 2011;

21   correct?

22   A    Everything that -- I'm sorry.  In paragraph 18?

23   Q    Everything in paragraphs 18 through 21 of your May 19,

24   2011 affidavit in support of the search warrant that you

25   applied for then, all of those things you did not first learn

1    until February 11 of 2011; correct?

2    A      Just let me just look at the paragraphs.  I would just

3    like to make the distinction.  Yes, it's before the seizure of

4    February 11th is what it says in my affidavit.  So it isn't the

5    date.  But yes, February 11th is when I do learn of the -- his

6    arrival, Mr. Williams' arrival at LAX.  It's when we preview

7    one of the items, the following paragraph, for my opinion.  And

8    then paragraph 21 his interview occurred, yes, on

9    February 11th.  Does that answer your question?  Is that the

10   question?

11   Q      Let me be specific, and I'll try and short-circuit this.

12   Everything in paragraphs 18 through 21 of your affidavit in

13   support of the May 19, 2011 search warrant application you

14   first learned on February 11, 2011; correct?

15   A      Correct.

16   Q      In paragraph 25 of that search warrant application, you

17   state, "based on the foregoing, I submit that there's probable

18   cause that the following items themselves constitute

19   instrumentalities of the offense."

20   A      I'm just trying to find that.

21   Q      I believe --

22   A      Yes, I see it now.  Yes, based -- yes, that's correct.

23   Q      That reference includes everything in paragraphs 18

24   through 21 that you first learned on February 11 of 2011 at

25   LAX; correct?

A     Correct.

Q     Your affidavit doesn't say anything at all regarding Professor Williams' travel to the Philippines other than what's in paragraphs 18 through 21, does it?

A     Anything at all about his travel to the Philippines?

Q     Yeah.

A     It does.  It references it in the search of the database in my notification earlier in the affidavit.

        THE COURT:  Ms. Jenness, are you switching tactics?  Are you now going to attack the warrant itself?

        MS. JENNESS:  Your Honor, I'm not sure what the point of this affidavit was, but it appears --

        THE COURT:  Isn't it to secure a search warrant?

        MS. JENNESS:  The declaration that the prosecution submitted contends that the agent knew everything in this --

        THE COURT:  I got that point.  That's the point I was making before.  Let me give you some help here.  This is what's important to me.  There's two things that are important to me about the affidavit and what Mr. Hernandez -- or Special Agent Hernandez did.  I'm particularly interested in what they previewed in the photographs.  And second, what's important to me is what Agent Yesensky said with regard to the reason for the delay.

    Now, the reason for the delay I don't think will get any better for you.  So I'm really just interested in the preview.

1    I've told you where my head is.  So go ahead and do what you

2    want to do.

3            MS. JENNESS:  I'm going to try to go to where

4    Your Honor's head is at.

5    Q    On February 11 did you see any images depicting nudity

6    other than the ten photographs of the nude male lying on his

7    back described in paragraph 19B of your affidavit in support of

8    the May 2011 search warrant?

9    A    I only saw those approximately ten pictures, yes.

10   Q    That's it?  No other pictures of nudity whatsoever?

11   A    As I recall, yes, no other pictures of nudity.

12   Q    You asked Professor Williams who that individual was?

13   A    Correct.

14   Q    Did he tell you it was somebody named Jamaica?

15   A    Yes, he did.

16   Q    On that date, did you find Professor Williams was in

17   possession of child pornography of a 14 year old?

18   A    On that date, no.  Not on that date.  I found him to be in

19   possession of child pornography of a minor that I had

20   approximated to be 16 years old.

21   Q    This is the individual, Jamaica?

22   A    Correct.  That's who I understood to be Jamaica based on

23   his statements.

24   Q    You did not find him to be in possession of child

25   pornography of a 14 year old?

1    A     In that moment, again, it was, I estimated, one boy, and I

2    estimated approximately 16 years old.  All those pictures

3    didn't contain a face based on various things I stated.  One

4    boy, ten nude pictures that I saw.

5    Q     On February 11 of 2011, you didn't find Professor Williams

6    to be in possession of child pornography of anyone with the

7    initials JM, did you?

8    A     Not on February 11th, 2011.

9    Q     Do you recall submitting a sworn affidavit on January 28

10   of 2013 to Magistrate Judge Hillman stating on or about

11   February 11 of 2011 at LAX you found Professor Williams quote,

12   "to be in possession of child pornography that he produced of

13   at least one 14-year-old Philippine boy, JM"?

14   A     Which date was that affidavit?

15   Q     January 28 of 2013.

16   A     He was -- at that point I believe we had determined at

17   that point in the investigation there were, in fact -- it was

18   more than just the one boy that I estimated to be 16 years old.

19   What there was was child pornography of another boy who was

20   approximately 14.  But that boy did not turn out to be the boy

21   that I frequently or commonly have referred to as JM.  It would

22   have been different --

23   Q     At LAX on February 11 of 2011, all you saw were the

24   ten pictures of the nude individual who we've identified as

25   Jamaica; correct?

**UNITED STATES DISTRICT COURT**

A    At that time that's what I had thought.  The ensuing

investigation had determined I had seen more.  But at that

time --

Q    I'm not asking -- at that time.

A    Correct.  I just saw the nude pictures of the boy who

Mr. Williams had identified as Jamaica.

Q    Are you aware you submitted under oath a sworn affidavit

saying on or about February 11 of 2011 at LAX you found

Professor Williams, quote "to be in possession of child

pornography that he produced of at least one 14-year-old

Philippine boy JM"?

A    I'm not aware of that.  If I could see -- I'm not aware of

that affidavit.

Q    This is docket 46, exhibit A.

          Can I have a moment, Your Honor?

          THE COURT:  You may.

          MS. JENNESS:  Your Honor, this document is part of

the record.  I don't seem to have it marked as an exhibit.  May

I provide the witness with a copy?

          THE COURT:  You may.

          MS. JENNESS:  If you'd give me a moment, Your Honor,

we have multiple bates numbers on documents, and it's creating

some confusion for me.  May I approach, Your Honor?

          THE COURT:  You may.

BY MS. JENNESS:

1    Q    Do you recognize that search warrant application and

2    affidavit that you submitted?

3    A    Yes.  I'm just looking at the face sheet, but yes.

4         MS. JENNESS:  For the record, Your Honor, this is

5    docket No. 146, exhibit A.

6    Q    Directing your attention to page -- paragraph 4 of your

7    declaration at bates number 33 on the lower right-hand side --

8    I turned over that page.

9    A    Okay.

10   Q    You state in there that "Professor Williams returned to

11   LAX on or about February 11, 2011."  Do you see that?

12   A    Yes.

13   Q    You state there, "at which time he was found to be in

14   possession of child pornography that he produced of at least

15   one 14-year-old Philippine boy, JM, whom Williams met online."

16   A    Yes.

17   Q    That's your sworn affidavit; correct?

18   A    This is my sworn affidavit, yes.

19   Q    Did you take custody of the two computers and the camera

20   on February 11 of 2011?

21   A    Yeah.  I think if we are being technical, I think it had

22   rolled into possibly the next morning.  But yes, I took custody

23   from Agent Hernandez.

24   Q    There is a document attached to your declaration or

25   perhaps it's Agent Hernandez' that's a custody transfer form,

```
 1   something like that, 6013B.  Are you familiar with that
 2   document?
 3   A    Yeah, vaguely.  I would like to see it, but I believe I
 4   know the document you are referring to.
 5              MS. JENNESS:  May I approach, Your Honor?
 6              THE COURT:  You may.
 7              MS. JENNESS:  For the record, this is docket 147
 8   hyphen 11, and it is a custody receipt for seized property in
 9   evidence, Department of Homeland Security.
10   Q    Do you have that in front of you?
11   A    Yes.
12   Q    Does that document refresh your recollection when you took
13   custody of the items on February 11, 2011?
14   A    Yes.  I'm aware of it, yes.
15   Q    Did the Department of Homeland Security have custody of
16   them after you took possession of them?
17   A    Prior to me taking possession, Department of Homeland
18   Security had seized the items and taken possession.  That same
19   night they were transferred to me.  That's what this reflects
20   is my accepting of it.
21   Q    And from the moment you took custody of them pursuant to
22   that document through today, has the FBI had custody of them?
23   A    The FBI has had custody, yes.
24   Q    Not Customs and Border Protection?
25   A    Correct.
```

```
1    Q     Not Homeland Security Investigations?

2    A     Correct.

3    Q     Where have the items been kept?

4    A     They've been at FBI facility -- FBI facility.

5    Q     Were you obligated to follow Homeland Security regulations

6    regarding how quickly you were required to complete your review

7    of those materials?

8                 MR. SINHA:  Your Honor, I'm going to object on the

9    grounds of relevance.

10                THE COURT:  I told Ms. Jenness that's what I'm

11   interested in.  I'm aware of the policy.  I'm aware it wasn't

12   complied with.  I'm not sure if that's necessarily a

13   constitutional violation or not.

14        But, you know, go ahead, Ms. Jenness.

15                MS. JENNESS:  Your Honor, I'll take guidance from

16   the Court if the Court believes this could be expedited.

17                THE COURT:  I don't think anybody is disputing what

18   the policy is.

19   BY MS. JENNESS:

20   Q     You didn't follow Homeland Security policies after you

21   took possession of the items, did you?

22                THE COURT:  I'm not sure if it's relevant to the

23   constitutional violation.  But --

24                MS. JENNESS:  Agreed, Your Honor.

25                MR. SINHA:  Your Honor, if the Court would like, I
```

```
 1  could make a record that there's Ninth Circuit and Supreme

 2  Court case law that says that that is not a consideration the

 3  Court should take into account and --

 4            THE COURT:  I understand.  Okay.

 5  BY MS. JENNESS:

 6  Q    In paragraph 1 of your -- both your declaration here and

 7  the affidavit that we've been discussing in support of the

 8  May 19th of 2011 search warrant, you described your training

 9  and experience?

10  A    Correct.

11  Q    How many years had you been with the FBI in February of

12  2011?

13  A    With the FBI -- approximately nine years with the FBI.

14  Q    You'd received training in search and seizures; correct?

15  A    When I had changed positions within the FBI, yes.

16  Q    Including training regarding search and seizure; correct?

17  A    Yes.

18  Q    You'd been trained on search and seizure with respect to

19  our national borders?

20  A    No.

21  Q    Had not?

22  A    No.

23  Q    Before February 11 of 2011, had you ever been involved in

24  the seizure of computers at the border?

25  A    I want to say that I was at least one occasion.  Not a
```

1    seizure though.  I guess to answer your question, never

2    involved in a seizure at the border.

3    Q    Did you ever submit a search warrant affidavit before the

4    one you submitted to the Court on May 19 of 2011?

5    A    Yes.

6    Q    Was it your understanding that you were or were not

7    required to submit an application for a search warrant before

8    searching the three devices that had been seized from

9    Professor Williams?

10   A    It was my understanding that I had to apply for a search

11   warrant to search those items after taking custody of them.

12   Q    Were you trained it was appropriate to wait three months

13   after seizing devices and before applying for a warrant?

14   A    No.  We're trained -- there's no time limit on our --

15   associated with our training on when to get a search warrant.

16   Q    Were you trained that it was okay to wait six months?

17              MR. SINHA:  Objection, Your Honor.  Asked and

18   answered.

19              THE COURT:  Overruled.

20              THE WITNESS:  Again, there's no time limit

21   associated with our training as it pertains to search warrants

22   that I can recall.  So to answer your question, no, we are not

23   trained as such.

24   BY MS. JENNESS:

25   Q    What was your understanding about when you were required

1    to apply for a warrant after seizing and before --

2              THE COURT:  Ms. Jenness, what is the case law that

3    you've been arguing is the standard?  It's reasonableness,

4    isn't it?

5              MS. JENNESS:  Yes, Your Honor.

6              THE COURT:  I look at particular cases and

7    circumstances to determine whether it's reasonable.  And if the

8    training manual says two days, I really don't care.  I don't

9    care if it says 98 days.  We are looking at the case law that

10   you've cited and that I have found, looking at the totality of

11   the circumstances.  And I know you are going to suggest that

12   argument, 97 days isn't very reasonable.  And there's cases

13   that support your position.  Counsel will argue that they are

14   not border cases.  So they don't apply.  But in any event, I

15   understand.  And how he's been trained, I don't really care.

16   BY MS. JENNESS:

17   Q    Did you calendar any date by which you planned to apply

18   for a search warrant for the three seized items?

19   A    I don't generally calendar a date.  What I try do is to do

20   it, you know, reasonably as is our policy and within a

21   reasonable time.  But I didn't calendar a specific date.  What

22   I did was triage the cases that I was dealing with and what

23   required urgent attention during that time and prioritized.

24   And then as soon as possible, I applied for the warrant to

25   search.

1          MS. JENNESS:  Your Honor, motion to strike

2    nonresponsive.

3          THE COURT:  Denied.

4    BY MS. JENNESS:

5    Q    Did you direct anybody else to calendar a date by which

6    you planned to apply for a search warrant?

7    A    I did not direct anyone else to calendar a date to apply

8    for my search warrant.

9    Q    What was your understanding of the law regarding the time

10   period within which you were required to apply for a search

11   warrant?

12   A    My understanding was there was no time period associated

13   with the law.  My understanding at that time was the -- was

14   simply that the items were provided to me after being seized

15   lawfully and then my policy applied which accounts for -- as I

16   mentioned, for it to be reasonable.

17   Q    In paragraph 5 of the affidavit, the -- submitted to the

18   Court on May 19 of 2011, you say, "the search warrant was not

19   immediately obtained by me because of an oversight on my part

20   due largely to the demands of two forensic reviews I was

21   conducting."  Why did you include that explanation in your

22   affidavit?

23   A    As I recall, in producing the affidavit and getting advice

24   of, you know, the Assistant U.S. Attorney -- and I don't recall

25   who -- I believe, as I recall, was we need to put something in

1    there to address why it wasn't done immediately.  And I agreed,

2    concurred, and so I addressed it in that paragraph.

3    Q    Why did you need to put something in there?

4    A    I believed to -- I believe that it supported the

5    reasonableness of it, albeit not exhaustive list.  I certainly

6    could have gone on.  But I was not under the impression at that

7    time that I had to give sort of an exhaustive list or that it

8    was necessarily an issue because I felt, again, that I had

9    abided by our policies.

10   Q    You thought you had abided by your policies in submitting

11   the affidavit at the time you did?

12   A    Yes.

13   Q    Did you consult with any supervisors about the long delay

14   between the seizure and the application for a search warrant?

15   A    I don't recall.  I may have, but I don't recall if I did.

16   Q    Did the prosecutors ask you for any of those

17   communications?

18   A    Sorry.  Which prosecutor?

19   Q    The two here in court.

20   A    For communications --

21   Q    Between you and your supervisors regarding the delay

22   between the seizure and the search warrant.

23   A    Not that I recall them asking.  I don't recall them asking

24   for that.

25   Q    Have you looked to see whether you have any documents on

1    your computer or elsewhere regarding that lengthy delay?

2    A    I'm -- during the course of discovery provided e-mails?

3    I'm not sure -- I don't think I understand your question.

4    Q    Are there any communications between you and supervisors

5    where you discussed that delay between --

6    A    If -- there should not be any e-mails.  If I were to have

7    a discussion, it would be in person about something like that.

8    Q    Why would it be in person if you were to have such

9    communications?

10   A    My supervisors just --

11           THE COURT:  Ms. Jenness, let's move on.  I've

12   already -- I think I've tipped my hand pretty good when I told

13   you that the statement in the affidavit, an oversight on his

14   part due largely to the demands of two forensic reviews that he

15   was conducting, was about as good as it got for you.  So now

16   you want to give him an opportunity to explain the delay?  Go

17   ahead.  Then I can consider that as well as to whether the

18   delay was reasonable.  Let him explain the 97 days.  Give him

19   that opportunity.

20           MS. JENNESS:  Let me move along, Your Honor.

21           THE COURT:  Thank you.

22   BY MS. JENNESS:

23   Q    In paragraph 19B of your affidavit supporting the May 19,

24   2011 search warrant, you state that you found ten nude

25   photographs of a boy on the camera; correct?

84

1   A     Ask it one more time.

2   Q     In paragraph 19B of the affidavit supporting your

3   May 19 of 2011 search warrant, you state that on the camera you

4   found ten photographs of a nude boy; correct?

5   A     I believe I said subject item 3 which is not -- which is

6   the camera with a four gigabyte memory card inside of it.

7   Q     You described it was ten nude photographs of a boy who

8   appears to be approximately 16 years old?

9   A     Correct.

10  Q     This is Jamaica who we spoke about earlier?

11  A     Correct.

12  Q     Now, you and special agent questioned Walter Williams at

13  LAX on February 11 of 2011; correct?

14          THE COURT:  Miss Jenness, am I stupid or something?

15          MS. JENNESS:  Perhaps I am, Your Honor.

16          THE COURT:  No.  No.  Don't I know that happened?

17  Do you have to ask it again?  You are asking questions -- am I

18  stupid and I don't know?  I can't read?  I haven't heard this?

19  We have been at this at session on session, and you need to ask

20  the question now, "you and special agent questioned

21  Walter Williams at LAX on February 11, 2011; correct"?  That

22  helps me?

23          MS. JENNESS:  Your Honor, there's a discrepancy

24  between what the witness has sworn under oath and, in fact,

25  what was said on the recorded statements of that interview.  I

**UNITED STATES DISTRICT COURT**

1   was hoping to have an opportunity --

2           THE COURT:  When it happened is relevant to me right

3   now?  That's in dispute as to whether he was questioned at LAX

4   on February 11 of 2011?  That's new information that I haven't

5   been able to glean after reading --

6           MS. JENNESS:  It could be, Your Honor, but it would

7   be set forth in the context of our arguments.  If the Court

8   will accept as evidence that the agent characterized the images

9   being in the age range of 16 to 18 years old --

10          THE COURT:  I understand that point.  What I'm

11  criticizing is your question, again, asking when this interview

12  occurred.  And I'm asking am I stupid or something that I don't

13  know the date that Mr. Williams was interviewed at LAX or that

14  he, in fact -- am I led to believe he was interviewed at

15  Ontario International Airport?  Is there some dispute about

16  this?  Come on.

17  BY MS. JENNESS:

18  Q    On that recorded interview, you don't say that the male

19  who you saw appears to be 16 years old, do you?

20  A    I believe -- I would want to listen to it.  I know I -- he

21  was -- again, I used that approximate figure of 16 because

22  there's a range.  But if you could refresh my recollection

23  with --

24          MS. JENNESS:  Your Honor, may we play an excerpt of

25  the recorded interrogation?

**UNITED STATES DISTRICT COURT**

1          THE COURT:  You may.

2          MS. JENNESS:  This is excerpt No. 2.

3                    (Audio playing.)

4    BY MS. JENNESS:

5    Q    Does that refresh your recollection that you estimated the

6    nude individual you saw in the photographs as being in the age

7    range of 16 to 18 years old?

8    A    That's what I told Mr. Williams, yes.  That's what I told

9    him, that that was the range, yes.

10   Q    Did anything between then and your submitting the

11   affidavit approximately three months later change your

12   estimation of 16 to 18 years old to approximately 16 years old?

13   A    My estimation was always 16 years old or approximately --

14   sorry -- 16 years old.  Mr. Williams -- I used that range with

15   him because I think -- well, first off, it is accurate, and I'm

16   not -- but he's a little more likely to talk to me if I

17   don't -- if I do kind of open up that range a little bit.

18          But my estimation was always the same which is, again,

19   approximately 16, but there's a range.  Could based on what I

20   saw in that photo, could that image have been 18, it's

21   possible.  But I felt that based on my estimation, it was much

22   more probable it was closer to 16.  Could it have been 15?

23   It's probable it could have been 15.  So it's not a science.

24   It's just my estimation based on training and experience.

25   Q    When you seized Professor Williams' property, he told you

1  there's research on there that I need to be working on, didn't

2  he?

3  A    Yes, he did.  And he also defined, at least in part, what

4  his research was and --

5  Q    Did he ask -- finish your answer.

6  A    Yes.  He did say he had research on there, but he also

7  told me that part of his research included the nude pictures of

8  Jamaica.

9  Q    Did he -- what did he say to you in that regard?

10  A    As I recall, when I showed him the images on the camera,

11  he said that that's part of his research initially.

12  Q    The ten pictures you are referring to?

13  A    Yeah, I don't know if we went through all ten, but I

14  showed him -- as least we went through some those images, if

15  not all of them.

16  Q    Did he ask you if he could get copies of the laptop?

17  A    I recall necessarily being a request for copies of the

18  laptop as much as copies of files related to research or

19  something of that nature or files related to his work that were

20  on there.

21  Q    Did he tell you he had publication deadlines to meet and

22  needed to work on the computers?

23  A    Yes, he did.  Well, he said he had publication deadlines.

24  I don't recall him saying specifically needed to work on the

25  computers, but I seem to recall him wanting the files.

1    Q    You wouldn't give him copies; correct?

2    A    I would not.  I could not do that.

3    Q    Did you tell him "we'll definitely try to get them back to

4    you as soon as possible"?

5    A    Yes.  Yes, I believe so.  I believe I did tell him that,

6    either myself or Agent Hernandez.

7    Q    Did you say "they'll be returned to you ASAP"?

8    A    I did say "as soon as possible."  And that, of course,

9    can -- and I also explained to him that can be -- could be a

10   long time.  And in my experience, searching computers is a long

11   time.  So as soon as possible, just to be clear, is a long

12   time.

13   Q    Did you tell him you understood there was stuff on there

14   he needed to work on?

15   A    Yes, I told him that.

16   Q    And did you tell him that you understood that it was going

17   to impede his work, but it is what it is?

18   A    Something to that effect, yes.  I think it's

19   understandable that when we seize computers, that people do mix

20   things.  At that time he had identified, at least in part, his

21   research included, in my estimation, contraband.  So I'm not

22   sure what he's -- I understand that he has a legitimate job as

23   a professor in conducting research, but at the same time he's

24   also advised me that part of his research involves photographs

25   of, again, what I estimated to be children.

 1       So to provide that context, I did understand he wanted his

 2   things back and he probably did need them, but it was going to

 3   take a long time, and I was aware it would take at least some

 4   time to search.

 5   Q    Just to be clear, a nude picture of an 18 year old is not

 6   contraband; right?

 7   A    A nude picture of an 18 year old is not -- if we are just

 8   saying that, yes.  But the images I've seen in my estimation

 9   were contraband, the images of Jamaica, and they were much more

10   than that.

11   Q    Did you tell him we are going to take a look at these as

12   soon as possible?

13   A    I believe so, yes.

14   Q    Now, on February 11 of 2011, you'd already decided that

15   you were going to have a forensic expert examine the devices;

16   correct?

17   A    Yes.  I'm just not sure if it -- the definition of

18   examined, but they are the initial part of the examination

19   process.  But eventually, yes, that's standard policy to bring

20   in the forensic examiner to set things up and -- so yes, that's

21   what they would do.

22   Q    You knew then on that day you were, in fact, going to have

23   a forensic examiner look at the devices; right?

24   A    If I, in fact, got the warrant, yes.  But I had to obtain

25   that search warrant first.

1    Q    You said to him, "I'm going to have a forensic examiner

2    look at it," didn't you?

3    A    Yes, I told him that.  Again, these -- what I'm telling a

4    suspect -- and that's what I think we are referring to here is

5    what I'm telling the suspect.  Yes, and that's true.  We are

6    going to have a forensic examiner handle it.  But I'm

7    simplifying it for him.

8    Q    It wasn't until May 23rd of 2011, over three months later,

9    that you first asked the FBI's forensic expert to take a look

10   at the devices; right?

11   A    I'm not sure of the exact date.  It's in the range because

12   it would have been subsequent to the search warrant.

13   Q    After May 19 of 2011; right?

14   A    Yes, subsequent to that search warrant.

15   Q    You, yourself, didn't begin reviewing the devices until

16   June 20th of 2011; right?

17   A    I would have to refer to the date.  I can't recall.  I

18   would have to see my report as far as that date goes.

19   Q    That sounds about right though, about a month after you

20   got the search warrant?

21   A    I don't believe it was a month after.  But again, I would

22   like to see the dates before I --

23   Q    When do you think you started reviewing them?

24   A    Well, typically it takes -- it takes some weeks for our

25   forensic experts or forensic CART people to set it up.  In this

UNITED STATES DISTRICT COURT

1    particular case, we had an issue with encryption.  That always

2    delays the process even more.  It can take some time.  In my

3    experience, it typically takes weeks, a couple weeks, two or

4    three weeks, something like that, or it can take that long.

5    Q    But you have no recollection here of how soon after you

6    obtained the search warrant you, yourself, started looking at

7    the devices?

8    A    Say again.

9    Q    You don't have any recollection of when you, yourself,

10   began looking at the devices?

11   A    I would have to see my report.  The dates -- it's just

12   long ago.  If you have my written report, it will indicate

13   that.

14   Q    We may -- Your Honor, may I have a moment?

15            THE COURT:  You may.

16            MS. JENNESS:  Your Honor, may I attempt to refresh

17   the witness's recollection with a document that is docket 147.

18   It's exhibit C of that document.

19            THE COURT:  Yes.

20   BY MS. JENNESS:

21   Q    What is that document that you have in front of you now?

22   A    This would be the report of the CART examiner, I believe,

23   or some sort of -- their notes.  It was provided by the --

24   provided by the FBI CART personnel.

25   Q    Does that refresh your recollection about when you started

```
 1   reviewing the devices?

 2   A    The report would be the best -- my report because I'm

 3   familiar with it.  But it's not refreshing my recollection.

 4   This was produced -- if I could see my report, it would be

 5   better.

 6   Q    I'm not sure that we have that document.  I don't know

 7   that I have it here.

 8   A    This was produced by someone else.

 9   Q    Did you receive it?

10   A    During discovery I received it and promptly forwarded it.

11   It just doesn't mean a lot to me.  I don't really understand

12   what they are doing or what their notes are.

13   Q    Is it fair to say you did not start reviewing the devices

14   right after you obtained a search warrant?

15   A    Again, if it I could see the dates.  It's not refreshing

16   my mind.  But I would have started it, again, very soon after

17   or soon after.

18            MS. JENNESS:  Your Honor, I don't have the

19   particular document indicating the witness's review began

20   approximately a month later, but I'd ask the witness be subject

21   to recall and we will get a copy of that document.

22            MR. SINHA:  Your Honor, I'm just not sure what the

23   relevance --

24            THE COURT:  I'm not sure either.  Ms. Jenness won't

25   take a cue from me anymore.  Let's go.
```

**UNITED STATES DISTRICT COURT**

1            MS. JENNESS:  No further questions, Your Honor.

2            THE COURT:  You took a cue maybe.  I don't know.

3       How long do you think you have?

4            MR. SINHA:  Maybe 15 minutes tops.

5            THE COURT:  Let's just take the lunch break.  We'll

6    see you at 1:30.

7                     (The lunch recess was taken.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
  1              LOS ANGELES, CALIFORNIA; THURSDAY, MAY 8, 2014.

  2                            1:30 P.M.

  3                             -oOo-

  4

  5              THE COURT:  You may inquire.

  6              MR. SINHA:  Your Honor, if I may, one housekeeping

  7    matter.  Defense counsel informed me they don't intend to

  8    cross-examine Special Agent Hernandez.  So with the Court's

  9    permission -- we are not going to call him -- is it okay if he

 10    remains through the rest of the hearing?

 11              THE COURT:  Any objection?

 12              MS. JENNESS:  No objection.

 13              THE COURT:  He may.

 14              MR. SINHA:  Thank you, Your Honor.

 15                         REDIRECT EXAMINATION

 16    BY MR. SINHA:

 17    Q    Agent Yesensky, I'd like to start with paragraph 3 of your

 18    search warrant.

 19    A    I no longer have a copy of that exhibit.

 20              MR. SINHA:  Your Honor, if I may approach.

 21              THE COURT:  Sure.  I'm not sure if there's the same

 22    problem with this affidavit, but sometimes there's duplicative

 23    numbering.  If you could also let me know the page number so I

 24    can follow along.

 25              MR. SINHA:  Yes, Your Honor.
```

```
1              THE COURT:  I have it.

2              MR. SINHA:  Oh, I'm sorry.  I misunderstood.

3              THE COURT:  Does the witness have one?

4              MR. SINHA:  Is that who said it?

5              THE COURT:  That's who said he didn't have a copy.

6              MR. SINHA:  May I approach, Your Honor?

7              THE COURT:  Yes.

8              MR. SINHA:  Thank you.

9              THE COURT:  Paragraph 3, page what?

10             MR. SINHA:  Let me find it, Your Honor.

11             THE COURT:  Because there are multiple 3's.

12             MR. SINHA:  This is page 2 under subheading "purpose

13    of affidavit."  It says number -- paragraph 3.

14    Q    Agent Yesensky, I'm particularly interested in the last

15    sentence in this paragraph that says, "the facts contained are

16    merely sufficient to show probable cause and do not purport to

17    set forth all of my knowledge of this matter."

18         Can you explain what that means when you put that in

19    search warrant affidavits.

20    A    It's just to -- an affidavit with all of the knowledge

21    that we've gained can obviously be very lengthy.  So it's just

22    the facts that we feel establishes probable cause and not the

23    entire breadth of what we know at that time.

24    Q    Is that caveat equally applicable to paragraph 5 on the

25    following page in which you discuss the reason for the delay?
```

1    A      Yes, it is.

2    Q      And so, Agent Yesensky, I know when you were being

3    cross-examined, you gave some of the context for that delay.

4    Could you please explain to us what the context for paragraph 5

5    is.

6    A      The -- at the time that -- again, when I applied for this,

7    my explanation for a delay was largely due to the two reviews.

8    At that same time, I was the -- assigned as the sole FBI agent

9    heading a child prostitution human trafficking task force in

10   Los Angeles.  And when I mentioned earlier that there was a

11   triage, if you will, these were the cases or victims that I was

12   handling during that 97-day period.

13       And so, for example, in that 97-day period, we, being me

14   and an LAPD officer, recovered approximately 18 to 20 juvenile

15   victims.  These victims require urgent handling as does their

16   cases.  So those were the sorts of -- one of the reasons that

17   caused the delay as well as, you know, what I had mentioned as

18   far as my understanding of the laws in conjunction with our

19   policy on border search or evidence we are seizing pursuant --

20   evidence that was lawfully seized and handed to us.

21       And my understanding specifically being that it was seized

22   lawfully and provided to me that that evidence -- I was very

23   aware I had to get a search warrant to search it.  But knowing

24   that I had probable cause for all three items that we've

25   discussed in Mr. Williams' possession, knowing that as well as

1    knowing that it does take time to complete the review of these,

2    and, again, that also contributed to my delay.

3        And just to give more context, the two reviews mentioned

4    in my affidavit were of hundreds or hundreds of thousands,

5    rather, of images that -- one of those two reviews, computer

6    reviews, did involve an identified victim.  So similar to the

7    situation of the, you know, approximately 18 to 20 victims that

8    I was involved in the recovery of and identification of, I had

9    known identified child victims that needed -- that sort of came

10   to the top of my priority.  Unfortunately, that is the reality

11   as an investigator working child exploitation.

12   Q    Why was it that the -- it sounds like 19 to 21 child

13   victims that you were dealing with during this 97-day period --

14   why is it that those people were a priority over the search of

15   this laptop?

16   A    Because I had an identified victim, and these particular

17   victims required immediate attention.  As an active task force,

18   this isn't something when you get a call or you are responding

19   to a child that's found on the street.  You can't just push

20   that aside and bring the other cases.  Of course I had more

21   cases than that.  But the -- those particular victims are

22   identified -- known to me, and they are my responsibility or my

23   partner's responsibility at the time.

24   Q    What types of things were you doing for those victims

25   during this time?

1          MS. JENNESS:  Objection, Your Honor.  Relevance,

2    beyond the scope.

3          THE COURT:  I think it relates to the delay.  But I

4    have some frustration.  It's again typical of this case.  I've

5    said from almost day one the issue in this case is the

6    explanation given for the 97-day delay.  I've been pretty up

7    front with that.  And what the cases say is sufficient

8    reasonableness.

9      Now I find it a bit astonishing that I'm hearing about it

10   for the first time on your examination.  Why wasn't this in the

11   affidavit?

12         MR. SINHA:  Your Honor, in retrospect I should have

13   added more detail.

14         THE COURT:  You have got to be kidding me.  I from

15   day one -- even today said Ms. Jenness, you know, this

16   explanation in the affidavit is not good enough.  And you were

17   given opportunity to submit -- ample time, and the only thing

18   you put in the affidavit doesn't address what I think and what

19   I have said is the key issue, what is the explanation -- I've

20   never accepted and to this moment don't accept the Government's

21   position of what the law is given what you say is decades or

22   centuries of jurisprudence.  I think you are wrong.  I've been

23   blunt about that fact.

24     I thought the 97-day delay was not reasonable, and

25   certainly the explanation given in the affidavit did not

1   demonstrate reasonableness for a 97-day delay.  That has been

2   clear.

3        Now you submit a supplemental affidavit of this particular

4   witness, and all you put in the affidavit for my benefit is

5   everything I said before is true and correct.  Why wasn't this

6   in the affidavit?

7             MR. SINHA:  Your Honor, I think at the time that we

8   submitted the affidavit, the thinking was that -- the primary

9   argument that the Government was making and continues to

10  make --

11            THE COURT:  So then why examine him?  You are not

12  making this argument.  So why do this examination?  It's not

13  relevant.  Your border search powers are immense.

14            MR. SINHA:  Your Honor, you know, as an alternative

15  argument --

16            THE COURT:  Do you think I can make some type of

17  adverse credibility finding when I say the affidavit doesn't

18  say it, the supplemental affidavit doesn't say it, and now at

19  the third hearing that we have for the first time you offer the

20  explanation for the delay.  Do you see a bit of my

21  consternation about that?

22       And didn't I tell you before right here in my hand is a

23  26-page tentative ruling on this case that analyzes

24  unreasonable delay and the case law relating to what

25  constitutes reasons why the Government can delay.  And they

1    can.  I cited to some of them before.  There's cases where

2    someone was assigned a Presidential detail.  Frankly, that was

3    my worst concern.  I said now I'm going to hear he was assigned

4    to guard the President, and I'll have to rewrite the analysis.

5         So, you know, go ahead -- this case has been so poorly

6    lawyered on all sides.  Neither side has been helpful to me,

7    neither.  And I telegraphed what I'm thinking so clearly about

8    the 97-day delay.  I've been so frank with what my view of this

9    case is so that I can get help.  And I've been clear about this

10   before.  And now for the first time, for the very first time

11   after a supplemental affidavit, these are the reasons for the

12   delay.  But go ahead.  Go ahead and proceed.

13              MS. JENNESS:  Your Honor, this is all new to the

14   defense.

15              THE COURT:  I just said that.  It's new to me.  If

16   it's new to me, it's new to you.

17              MS. JENNESS:  Yes, Your Honor.  We received no

18   discovery on these claims.

19              THE COURT:  Let's go forward.  And if I want to give

20   Ms. Jenness some time to do discovery -- frankly, I don't even

21   think it's necessary because I don't think once somebody gives

22   me one affidavit to a magistrate judge telling me the reasons

23   for the delay which include oversight, and then I tell you over

24   and over again that this 97-day delay is not reasonable, and

25   the explanation -- I think I was saying the Government's

1   explanation has basically been I was busy.  That's what I said

2   a couple of times at prior hearings and begging for what was

3   the explanation.

4       I get the next affidavit, and again, everything I said

5   before is true.  I even gave Ms. Jenness a hard time because I

6   was thinking, you know, this declaration, in my view, the

7   affidavit in the search warrant is not good enough.  And I even

8   told her what are you going to do?  Let him explain some more

9   reasons for the affidavit?

10      So anyway, let's hear the reasons.  We'll have Ms. Jenness

11  cross-examine on the reasons that she has no discovery on, and

12  then I'll just decide whether or not this late an explanation

13  just isn't credible to me.

14      Go ahead.

15          MR. SINHA:  Yes, Your Honor.

16  Q   Agent Yesensky, why is it that children in your line of

17  work are prioritized over other things?

18  A   I think it's just our responsibility, and I think the --

19  as I had already mentioned, the responsibilities to those

20  victims, you know, along with the forensic reviews that

21  involved an identified victim, they become priority because

22  that's just a responsibility that falls unfortunately on the

23  law enforcement officer.

24  Q   Agent Yesensky, I want to talk to you about what you

25  previewed on the camera on the day of the seizure.  Could you

1    explain that to us a little more.  What was it you saw on the

2    camera?  There's been some discussion about whether it was two

3    children or whether it was one child.  What did you see on the

4    day of the seizure?

5    A    We saw on the day of the seizure what we believed at the

6    time to be one child based on the images we looked at.  And we

7    saw that child -- it was a series of naked images, as I had

8    mentioned in my affidavit.  And some of those images, at least

9    three, were in my estimation to be child pornography.

10   Q    What -- in your subsequent search warrant affidavit, you

11   identified a younger child; is that correct?

12   A    No.  In the --

13          MS. JENNESS:  Your Honor, vague as to "subsequent

14   search warrant."

15          THE COURT:  Overruled.

16          THE WITNESS:  Which subsequent search warrant?  Is

17   it the --

18   BY MR. SINHA:

19   Q    I'm sorry.  Ms. Jenness was asking you about a separate

20   sworn statement that you gave in which you talked about a

21   14 year old being found on the camera.  What is that

22   discrepancy?

23   A    The -- I believe it's actually a technicality.  During the

24   lunch break, I did have a chance to look at the affidavit

25   because I -- to look at it further.  If I could look at it

1    again, I could explain the technicality probably clearer.  But

2    what that statement was was essentially that he was found to be

3    in possession of, I believe it said items that included those

4    images.  And so that's the distinction.  I think I was a little

5    confused at the time.  But if I could look at that again, I

6    think I could give an even clearer explanation of what that

7    was.

8         What I had mentioned in my testimony was, since that

9    initial review, I had -- I conducted investigations which

10   included interviews with children and had determined there

11   is -- those images there on that camera did include one

12   other -- another minor.

13   Q    Finally, Agent Yesensky, you talked about Mr. Williams

14   telling you that in part of the research that he had included

15   the photographs that were child pornography that were found on

16   the camera; is that correct?

17   A    Correct.

18   Q    Could you explain that.  I wasn't quite clear on that.

19   Could you explain what he was talking about.

20   A    Yes.  At one point in that interview, we were showing

21   Mr. Williams the images, and he said that that is -- that is

22   Jamaica.  And I asked him something to the effect of this is

23   your research or what does this have to do with your research.

24   I believe that sort of came first.  He made the statement to me

25   that that's part of his research.

1       So specifically -- either a naked image or an image of

2    child pornography.  I can't recall specifically which one was

3    on the camera at that time, but he referred to that as part of

4    his research.

5    Q    Are did he say that any of the other devices contained his

6    research?

7    A    Yes, he did.  I believe collectively he referred to the --

8    definitely the laptops.  I want to say collectively the camera

9    as well.  But the laptops, the computers.

10   Q    What did that mean to you at the time?

11   A    Well, at that time it meant that at least part of his

12   research involved these kinds of images.  That added to my

13   probable cause that it was on those devices.  And I don't

14   dispute that there was potentially some legitimate research.

15   It wasn't my primary concern.  My primary concern and duty was

16   the images of exploitation.

17   Q    When you say "devices," what are you referring to?

18   A    The subjects one, two, and three in my affidavit.

19   Compaq laptop, HP laptop, and a camera with a memory card.

20           MR. SINHA:  Thank you, Your Honor.  I have no

21   further questions.

22           THE COURT:  Cross?

23           MS. JENNESS:  May I take a moment, Your Honor?

24           THE COURT:  You may.

25           MS. JENNESS:  Your Honor, we have no further

**UNITED STATES DISTRICT COURT**

```
 1   questions.
 2             THE COURT:  Okay.  You may step down.  Thank you.
 3        Let me just take five minutes, and then we'll have
 4   argument.
 5                       (A brief recess was taken.)
 6             THE COURT:  Ms. Jenness, you may be heard.
 7             MS. JENNESS:  Your Honor, unless there are specific
 8   areas that the Court would like counsel to address, I would
 9   submit.  We briefed these issues --
10             THE COURT:  You briefed this one issue, and I would
11   just like to hear from you for the last time on the issue.  And
12   it's an issue I brought up before, and that relates to the
13   ten photographs that were previewed and distinguishing between
14   the ten photographs that are previewed -- and I know you'll
15   argue that it wasn't contraband, couldn't have been determined
16   to be contraband given the 16 to 18.  But for the moment, I
17   want you to assume it's contraband.  What does that do with the
18   rest of the memory card?  Do you see what I'm saying?  Do you
19   understand my question?
20             MS. JENNESS:  Yes, I do, Your Honor.  And I think --
21             THE COURT:  You cited the case in Oregon.
22             MS. JENNESS:  I think the *Cotterman* case is really
23   instructive in that regard, and this is a way in which
24   electronic devices, whether it's the cell phones, that I think
25   the Supreme Court is now considering, or computers or even
```

1    electronic cameras are different from ordinary contraband

2    because, when you see one, you haven't seen it all.  And for

3    that reason, I believe that seizing the entire device and then

4    delaying for three months before obtaining a search warrant is

5    an unconstitutional seizure.

6             THE COURT:  It might be somewhere in between.  I've

7    been focusing on *Cotterman* on this issue, and the way that the

8    Circuit describes it is they say, "laptop computers, iPads and

9    the like are simultaneously offices and personal diaries.  They

10   contain the most intimate details of our lives, financial

11   records, confidential business documents, medical records, and

12   private e-mails.  This type of material implicates the

13   Fourth Amendment's specific guarantee of the people's rights to

14   be secure in their papers."

15        Then you go on the other spectrum, and I forget the name

16   of the case that dealt with the purse.  There was a subsequent

17   search of the purse.

18             MS. JENNESS:  I know the case to --

19             THE COURT:  They say you don't need a search warrant

20   on that.  It's already determined to be contraband.  You can

21   say a person has different compartments and zippers and things

22   like that.  And the camera seems to be somewhere in between.

23   You pointed out the memory capabilities of the camera, but it's

24   not quite an iPad or -- you know, a smart phone would be more

25   closer to that computer, an iPad, if not, just like an iPad.

1    The camera is somewhere.  I don't know where.

2              MS. JENNESS:  I agree with Your Honor.  I think it's

3    a very challenging issue posed by technology.  Courts are

4    wrestling with it nationwide as you might imagine.

5        I have scoured decisions high and low searching for an

6    issue precisely of this type.  And I think the closest analogy

7    that we have is a computer or a smart phone because a camera

8    can, in fact, hold very intimate details, whether it's a

9    photograph of a document or whether it's an intimate photograph

10   or whether it's a photograph that could conceivably implicate

11   someone in a crime.  Those are all the kinds of personal and

12   intimate evidentiary material that would be -- that could be on

13   a camera.

14             THE COURT:  That's kind of interesting.  I hadn't

15   thought of it that way.  People use cameras today much

16   differently than they used them when I was growing up in terms

17   of they'll photograph something, send it -- I hadn't actually

18   thought about photographing of a document to memorialize

19   things, but people are doing crazy things like that to

20   memorialize a whole bunch of legal things that come up in

21   people's lives, whether it be a document or a label for a

22   medicine, something to show a doctor later on, whatever.

23       Okay.  All right.  Thank you.

24             MS. JENNESS:  Thank you, Your Honor.

25             THE COURT:  Let me hear from the Government.  I have

1    some specific questions about a couple of things.  At our last

2    hearing, you asked me to take a look at the case from the

3    Western District of New York, *Rogozin*.  And so we went back,

4    and we looked, and the only thing that's written is a text

5    entry on a docket.  I'm not even sure what it is.

6        But certainly, if you look at that case, it's very

7    distinguishable.  But even having said that, what was a bit

8    more alarming to me is, if you look at that case docket No. 42

9    and you look at the Government's position in that specific case

10   from pages 19 to 25 or 26, the Government in *Rogozin* was taking

11   the exact same position that the defense is taking in this

12   case.

13       And they even cite the Ninth Circuit at page 19 of the

14   Government's memorandum.  They say, "reasonableness is the key

15   component when considering limitations placed on border

16   searches and the manner in which they are conducted.  The

17   Ninth Circuit has held that reasonableness is the context of

18   the border search, is quote 'inescapable of comprehensive

19   definition or mechanical application,'" and again, citing

20   *United States vs. Duncan*.  And then goes on to a type of

21   analysis that Ms. Jenness has been urging us to do in this case

22   and the Government has resisted.  So I want you to address

23   that.

24           MR. SINHA:  Sure, Your Honor.  I want to address the

25   Court's question, and I guess, if I could, please speak for a

**UNITED STATES DISTRICT COURT**

```
 1    moment just about the declaration that was made before the

 2    Court.

 3              THE COURT:  No, I want you to talk about this first.

 4    We'll get to that.  I want you to talk about what I've asked

 5    about first.

 6              MR. SINHA:  Sure.  Your Honor, it's never been the

 7    Government's position that the inquiry before the Court or on a

 8    border search or a border seizure is reasonable.  It's always

 9    been a reasonableness inquiry because it's a Fourth Amendment

10    question.

11         So the Government's position is not that reasonableness

12    isn't what we should be looking at.  The Government's position

13    is that the balancing test that is done in the context of a

14    border seizure is such that the Government's interest are at

15    their zenith and the privacy interest of the individual or the

16    possessory interest of an individual is at its absolute lowest.

17         And so while it's not a mechanical application, there have

18    been courts including, I think, the Supreme Court in *Ramsey* has

19    said, look, you know, border searches are almost per se

20    reasonable.  We still go through this application, but they are

21    pretty much per se reasonable because you have these very --

22              THE COURT:  What do you look at to determine whether

23    it's reasonable?  I understand the broad power to seize these

24    items, especially once you found at least in one of them

25    contraband giving you the probable cause to believe there may
```

**UNITED STATES DISTRICT COURT**

1   be contraband in other items that are seized at the same time.

2       But then what is the -- is it ten years?  Is it one year?

3   Is it ten hours?  How do you measure what's reasonable once the

4   Government takes property?

5           MR. SINHA:  So, Your Honor, that is measured under

6   the test for a seizure in the context of a border search that's

7   set forth by the Supreme Court in *Montoya de Hernandez*.  And

8   what the Supreme Court says is a seizure is reasonable -- you

9   judge the reasonableness by the extent to which its duration

10  corresponds to the reason that it was seized.  Those are the

11  things you are looking at.

12          THE COURT:  The particular circumstances of the

13  search.

14          MR. SINHA:  The particular -- well, Your Honor, I

15  can read you the exact language.  I gave it to you in my brief.

16  But it is, like I say, the extent to which the duration of the

17  seizure, how that relates to the reason that the seizure took

18  place.  So --

19          THE COURT:  In this case, what's the -- in your view

20  under the circumstances, what is the -- how long could the

21  Government have held this before they got a search warrant,

22  given -- so this is a border search.  So okay.  It's not like a

23  non-border search where -- could you have gone 220 days beyond

24  97?

25          MR. SINHA:  Sure.  So, Your Honor, in this instance,

```
 1   I think that the answer is that the Government has a right to

 2   not admit items that it reasonably suspects --

 3           THE COURT:  You are not answering my question.

 4   What's the framework?  Nobody is contesting that the items were

 5   properly seized.  Once the items are properly seized and given

 6   the Circuit seems to think computers are a little different in

 7   this Circuit after Cotterman, how long can the Government hold

 8   computers before they obtain a search warrant?  Is it 98 days?

 9   Is it 220 days?  Is it ten years?  What is it?

10           MR. SINHA:  I don't believe that there's a point at

11   which those computers which are seized on reasonable suspension

12   of containing contraband become an illegal seizure.  So --

13           THE COURT:  So it's forever?

14           MR. SINHA:  There are mechanisms by which an

15   individual can get their property back.

16           THE COURT:  You are saying the law is at the border

17   once you seize something, you can wait up until, I guess,

18   impaneling the grand jury to do a search, and then whatever

19   time that is -- once it's done at the border, you can go as

20   long as you want?  If that's your position, that's fine.  I

21   just want to understand it.

22           MR. SINHA:  It's certainly not true of everything

23   that would be seized at the border.  It's true of --

24           THE COURT:  Let's talk about computers.

25           MR. SINHA:  Sure.  You know, Your Honor, I can give
```

**UNITED STATES DISTRICT COURT**

 1  you case law.  I don't believe that it's been analyzed this

 2  exact -- or a very similar question in the context of a

 3  post-*Cotterman* world.  One was handed down three or four weeks

 4  ago.

 5      I think the answer to that question is computers are

 6  unique, but as far as, you know, how long we can seize things

 7  and hold on to them, the same rules sort of apply.

 8          THE COURT:  What rules does the Government think

 9  they are?

10          MR. SINHA:  I think that the rules are that, you

11  know, though there are unique privacy interests that attend a

12  computer, your interest in getting a computer containing

13  contraband into the United States free of it being seized is no

14  different than other items that contain contraband or are

15  reasonably suspected to contain contraband.  So what we --

16          THE COURT:  So like *Doss* -- because it's not a

17  border search, cases like *Doss* don't apply?

18          MR. SINHA:  Yes, Your Honor.  And I think that I can

19  maybe -- I think three cases might help me illustrate the point

20  I'm trying to make.  There are three cases, one of which is

21  currently pending.  One of which was decided three or

22  four weeks ago and one of which was decided in 2012.

23      And under President Bush, the Government's position with

24  regard to border seizures and including laptops was that we

25  needed less than reasonable suspicion.  If you were trying to

```
 1   bring something into --

 2           THE COURT:  Is President Bush precedent --

 3           MR. SINHA:  I'm sorry, Your Honor?

 4           THE COURT:  Is that something that the

 5   Administration says?  Is that precedent?  Talk about the cases.

 6   I don't want to hear --

 7           MR. SINHA:  Sure.

 8           THE COURT:  I'm trying to get an understanding as to

 9   what supports the Government's position that once laptops --

10   let's be specific.  Once two laptops are seized at the border

11   and there's probable cause to believe there's some form of

12   contraband, let's say, specifically additional child

13   pornography, what are the outer limits in this case as to how

14   long the Government can hold on and delay before getting a

15   search warrant?  And then tell me what it is and tell me what

16   cases support it.

17           MR. SINHA:  The outer limits at a minimum are --

18           THE COURT:  Outer limits by their phrase is not at a

19   minimum.  I'm trying to see what the outer limit is.

20           MR. SINHA:  Your Honor, I don't know the answer to

21   that.  It's defined by statute, the statute we are relying on,

22   until trial.

23           THE COURT:  The statute is not the Constitution.

24   Under the constitutional analysis, what are the outer limits of

25   how long the Government can hold property?
```

1          MR. SINHA:  I think that the outer limits are

2    undefined.  I think they could be, perhaps, forever.  There are

3    mechanisms by which a person can get their property back from

4    the Government --

5          THE COURT:  You would in an appropriate case say

6    that the Government can hold computers forever without

7    obtaining a search warrant and then ultimately -- I wouldn't

8    say "forever."  But ultimately -- because "forever" just means

9    nothing is going to be done with them.  But for a vast

10   unlimited period of time can hold computers before conducting

11   a -- obtaining a search warrant to determine whether, in fact,

12   the probable cause is, in fact, true and they contain --

13         MR. SINHA:  Well, Your Honor, they can hold them --

14   so again, as long as that duration is reasonable in light of

15   what caused them to detain the computers, to seize them in the

16   first place, and those would be different things --

17         THE COURT:  Well, in this case.  Let's say you have

18   probable cause to believe that there's child pornography on the

19   computers based on your view of three photographs.  No one is

20   questioning that probable cause.  Given the facts of this case,

21   what are the outer limits of the Government's power to wait to

22   delay before obtaining a search warrant?

23         MR. SINHA:  So, Your Honor, I mean -- so if the

24   Court is saying there was probable cause and the seizure was

25   probable cause, then the outer limits -- the Government never

```
 1   has to release that computer because it contains contraband.
 2           THE COURT:  We aren't talking about release.  I'm
 3   asking you how long can they wait to search it.
 4           MR. SINHA:  The search --
 5           THE COURT:  As long as they can keep it --
 6           MR. SINHA:  You know, Your Honor, I think then the
 7   question is probably a staleness question.  So at what point
 8   does that hardware degrade to where we couldn't reasonably
 9   believe that what was on it when we had probable cause to seize
10   it.
11           THE COURT:  Are there any cases at the border or
12   anywhere else that support that position?
13           MR. SINHA:  I think there are three border cases.
14   None of them are directly on point, but I think that they
15   support that position.  So if the Court will allow me, I'll
16   tell you about those cases.
17       There are two cases in which the ACLU and the National --
18           THE COURT:  Tell me the three cases.
19           MR. SINHA:  Sure, Your Honor.  The first case is
20   Saboonchi, S-a-b-o-o-n-c-h-i, and that's a District of Maryland
21   case.
22           THE COURT:  When did that come out?
23           MR. SINHA:  It came out April 7th of this year.
24           THE COURT:  Is that in your papers?
25           MR. SINHA:  It's not, Your Honor.
```

1           THE COURT:  Your last filing was April 25th?

2           MR. SINHA:  I'm sorry, Your Honor.  I haven't filed

3   anything since I discovered --

4           THE COURT:  What's the second case?

5           MR. SINHA:  *House v. Napolitano*.  And that came out

6   in March 28th of 2012.

7           THE COURT:  Where is that in your papers?

8           MR. SINHA:  That doesn't appear in my papers either,

9   Your Honor.

10           THE COURT:  What's the third case?

11           MR. SINHA:  It's *Abidor v. Napolitano*.  And that

12   case is still pending, but the opinion came out December 31 --

13   the opinion on the motion to dismiss came out December 31,

14   2013.

15           THE COURT:  Is that in your papers?

16           MR. SINHA:  It is not, Your Honor.  What I'll say

17   with regard to these cases is that these are cases --

18           THE COURT:  Is this really fair play to

19   Mr. Williams?  I don't care if you don't like Ms. Jenness.

20   She's driving me crazy with these document requests or anything

21   else.  I don't care.  Mr. Williams is something different.  Do

22   you think the Government is playing fair and nice with

23   Mr. Williams?

24           MR. SINHA:  Your Honor, I'm certainly not trying to

25   sandbag Mr. Williams.

 1          THE COURT:  You just did.  There's three cases that

 2  you say answer my question.  I've asked a very specific

 3  question, and you just said, Your Honor, I have the help for

 4  you.  There's three.  All of them came out before your last

 5  brief.

 6      And now maybe I'll consider them, maybe I won't.  But I'm

 7  certainly going to give Ms. Jenness the chance to figure this

 8  out.  Did you ever think about calling her and saying,

 9  Ms. Jenness, I know we don't get along but fair play.  I

10  represent the Government.  I should be treating defendants with

11  some respect and dignity.  Ms. Jenness, I know it's not in the

12  papers, and I really apologize, but see, I just want to give

13  you the heads-up that I'm going to be citing these three cases

14  so that you can be prepared to answer the Judge's questions

15  about these because I really think they are at the heart of

16  this case.

17      Or else, Ms. Jenness, I'm going to submit a supplemental

18  briefing before the weekend.  I know it's not really nice

19  because you are not going to have time to respond, and I'll

20  totally understand your request for a continuance to address

21  those questions.

22      Or even for the better part, gee, I've already indicated

23  twice that the Court is fairly prepared having read most, if

24  not all the cases, the briefs, and certainly would like to know

25  about three cases before 2 o'clock in the afternoon on the day

1    of the motion to suppress.

2        I mean, you represent the Government.  Shouldn't you be

3    held to some sort of rigorous standard?

4            MR. SINHA:  I'm certain that that's true,

5    Your Honor.  I guess I want to clarify.  I don't think that

6    these cases decide the matter for the Court.  I just think that

7    they provide some context that would be helpful.  Two of them

8    are civil cases.  And I found these cases after I last appeared

9    before this Court in light of the Court's questions.  And I

10   think I found two of them yesterday.  So I should have done all

11   of those things or any of those things.

12       I'm just trying to respond to what I understood the

13   Court's --

14           THE COURT:  Go ahead and respond to the question

15   then.

16           MR. SINHA:  So, Your Honor, the two cases, *House* and

17   *Abidor*, those are both civil cases.  And those are cases in

18   which the ACLU of New York and Massachusetts respectively are

19   suing Janet Napolitano.  And what they are suing her for is a

20   variety of reasons.  One of the things they are seeking is a

21   declaratory judgment, that before the Government can seize and

22   hold items, including laptop computers, it has to have

23   reasonable suspicion.

24       In the context of a border search, before someone brings

25   an item and the Government seizes and holds it, at times

1    indefinitely --

2            THE COURT:  How would the Ninth Circuit answer that

3    question?

4            MR. SINHA:  Well, if you are to believe the *Abidor*

5    case which discusses *Cotterman* in length, I think that the

6    Ninth Circuit would say, yes, you require reasonable

7    suspicion before you can seize and hold laptops, what the ACLU

8    contends --

9            THE COURT:  Is that really in doubt in the

10   Ninth Circuit?

11           MR. SINHA:  I don't think that is in doubt in the

12   Ninth Circuit, no, Your Honor.  So I guess my point is that the

13   ACLU is saying look, we want a declaratory judgment, that

14   before the Government can hold something like a laptop

15   indefinitely, there has to be reasonable suspicion.

16      So I think that sheds some light on the current state of

17   the law which is that absent such a declaration, there are at

18   least some courts that believe --

19           THE COURT:  Isn't holding different than search?

20           MR. SINHA:  Is seizing something different than

21   searching it?

22           THE COURT:  Yes.

23           MR. SINHA:  Yes, Your Honor.

24           THE COURT:  Isn't that the issue of holding?  It's

25   another word for the prolonged seizure of an item as opposed

```
 1    to -- does it really answer the question of search?

 2              MR. SINHA:  Your Honor, in this case, I don't think

 3    there's a question of illegal -- in our case, I don't believe

 4    that there's a question of illegal search because we did get a

 5    warrant.  My understanding was that the position of the

 6    defendant is the --

 7              THE COURT:  Is --

 8              MR. SINHA:  -- seizure, that it became an unlawful

 9    seizure at some point.  So I think these two questions at least

10    shed some light on, you know, under the current state of the

11    law, how long can the Government hold an item that it seizes at

12    the border?  Which, I think -- like you say, there's civil

13    cases.  They don't answer the Court's question, but they might

14    at least be helpful in understanding the current state of where

15    we are at.

16        The same I think is true of the Saboonchi case, which is

17    the District of Maryland case.  In that case the Government

18    seized some -- an iPhone.  It seized some flash drives.  It

19    imaged those devices, and 14 -- later returned the devices to

20    the owner.  These were all at the border, another border search

21    authority and border seizure authority.

22        The Government kept the images of the devices without a

23    warrant and searched them and kept them, so far as we can tell,

24    indefinitely.  The defendant said this is a Fourth Amendment

25    violation, that you've kept the exact copy of these devices
```

**UNITED STATES DISTRICT COURT**

1    indefinitely without a warrant and that you have no interest in

2    destroying them.

3         What the District of Maryland Court did in analyzing

4    *Cotterman*, was said, look, with regards to a laptop computer,

5    there is a greater interest on behalf of -- a laptop computer

6    believed to contain contraband, there's a greater interest in

7    the Government holding on to that indefinitely.

8         But with regards to a forensic image, when you've let the

9    laptop computer enter the United States, the Government's

10   interest in retaining an item indefinitely is decoupled from

11   the rationale that justified the seizure in the first place.

12        And so the Government said, look -- the Court said, look,

13   you have to have reasonable suspicion to hang on to these

14   things.  But the analysis the Court went through is the

15   *Montoya de Hernandez* analysis which is what is the Government's

16   reason for seizing something and how does that relate to what

17   is a reasonable duration.

18        And so what I think the *Saboonchi* case is instructive of

19   is that, when what we are talking about is seizing a laptop

20   computer that is reasonably suspected of containing contraband,

21   the Government's rationale in keeping contraband from entering

22   the United States justifies a very, very long seizure.

23   Because, you know, at no point is it permissible under the law

24   for contraband to enter the United States.

25             THE COURT:  Aren't you -- okay.  So I follow you as

1   it relates to *Montoya* and *Ramsey*.  But despite the Government's

2   broad border powers, hasn't the Supreme Court in the

3   Ninth Circuit, I think, fairly clearly rejected what I think

4   you are arguing here, and that is the anything goes approach to

5   the border seizures?  You are saying anything goes, I think.

6            MR. SINHA:  I'm not trying to say anything goes,

7   Your Honor.

8            THE COURT:  What else is there?  If the Government

9   can hold and search at any time, it's anything goes, isn't it?

10            MR. SINHA:  So the differentiation that I think the

11   Ninth Circuit has made and what's in the language on *Cotterman*

12   is not anything goes because the Government cannot -- according

13   to Ninth Circuit precedent, cannot just seize anything it likes

14   at the border and hang on to it indefinitely.

15       It seems clear from the Ninth Circuit that there has to be

16   some particularized suspicion that something is contraband or

17   reasonably is suspected --

18            THE COURT:  Isn't there some point -- and this is

19   illustrated in *Segura* that initially permissible border seizure

20   may quote "become unreasonable as a result of its duration or

21   any other reasons."

22            MR. SINHA:  It's certainly true, Your Honor, that

23   this is not a one-step analysis, that a border seizure could

24   become unreasonable based on its duration.  And that's

25   undoubtedly true.  But that's --

1          THE COURT:  How about, let's say, *Illinois vs.*

2  *Caballes* stating that the seizure becomes unreasonable if it is

3  prolonged beyond the time reasonably required to complete the

4  mission?

5          MR. SINHA:  Sure.  So that's fairly consistent with

6  what the Montoya de Hernandez analysis is.

7          THE COURT:  But you've been telling me that once

8  they are lawfully seized, the mission doesn't matter.  Since

9  you don't have to return it, you can do your search any time

10  you want.

11          MR. SINHA:  Well, Your Honor, the seizure that takes

12  place of a computer that contains child pornography at the

13  border, the mission of that seizure is to prevent the

14  introduction of child pornography into the United States.  That

15  is the mission of that seizure.

16          THE COURT:  I get it.

17          MR. SINHA:  So if that mission isn't complete in

18  100 days, it's not complete in 200 days, the reason that you

19  can --

20          THE COURT:  The broader policy of child -- wait a

21  minute.  Just repeat it because I don't quite understand.

22          MR. SINHA:  Your Honor, I guess my point is the

23  duration is tied to what the purpose of the seizure is.

24          THE COURT:  Because we have this broad policy, I

25  think an appropriate one, that we don't want child pornography

1    to enter into the country at the border --

2         MR. SINHA:  Yes.

3         THE COURT:  -- what does that have to do with how

4    long it takes to search Mr. Williams' two computers?

5         MR. SINHA:  What it has to do with, Your Honor, is

6    not the time at which the search warrant is obtained.  What it

7    has to do with is how long the Government can lawfully seize

8    that material.

9       If it was child pornography, if it was visible material,

10   if it was heroin, those are all things that the

11   United States --

12        THE COURT:  I circle back.  How long?  When in this

13   case does the -- at what point can this case turn from a

14   reasonable to an unreasonable situation?

15        MR. SINHA:  Sure.  Your Honor, I think my answer is

16   the same.  There is no point in which the Government can

17   lawfully allow a computer containing child pornography to be

18   introduced into the country.  So there are ways in which a

19   person can get their property back, and that happens.

20        THE COURT:  I understand that.  But what about the

21   search?  I think you are just focused on this lawful seizure.

22   I don't think anyone is saying the search wasn't lawful -- the

23   seizure wasn't lawful.

24        MR. SINHA:  Your Honor, I think the defendant's

25   argument, as I understand it, is that the search is unlawful

```
 1    because the duration of the seizure was unlawful.

 2            THE COURT:  All right.  So why are the non-border

 3    cases not helpful in this case?  Is it just because the border

 4    is different?

 5            MR. SINHA:  Yeah, I think that's a simple way of

 6    saying it.  We always make a reasonableness balance when we are

 7    considering the Fourth Amendment.

 8            THE COURT:  What's the reasonable balance in this

 9    case then?

10            MR. SINHA:  Yes, Your Honor.  So the balance in this

11    case is the Government's paramount interest in protecting its

12    borders including --

13            THE COURT:  That's always going to be the case.

14    Okay.  To prevent child pornography from entering the country.

15            MR. SINHA:  Right.  The defendant's interest in this

16    case are, you know, essentially his right to possess these

17    items in the country.  And that interest is mitigated

18    significantly by the lower expectation of privacy and property

19    interest that one has at an international border.

20        They are mitigated significantly by the fact that he had

21    traveled internationally with these items and thus had a lower

22    expectation that he would be able to enter into the country

23    with them.  They are mitigated significantly by the fact that

24    they are lawfully seized items.  At no point did he regain

25    them.  They were lawfully seized at the border.  I don't think
```

1      that's in dispute.  It's just how long we held on to them.

2           So again, they are mitigated significantly because they

3      were lawfully seized, that he didn't regain either privacy or

4      possessory interest in them.

5           Those things are in play in this case and are often at

6      play in border cases.  Your possessory interest in an item at

7      the border is at its lowest point because no one has a right to

8      bring any specific item into the United States.

9                THE COURT:  Let's just focus for a moment on

10     Special Agent Yesensky's -- can I have an explanation as to why

11     it is the Government waited until today to try to further

12     elaborate the explanation for the 97-day delay?

13               MR. SINHA:  Yes, Your Honor.  That is 100 percent my

14     fault.  It's not anything that Special Agent Yesensky did.

15               THE COURT:  He can only answer what you asked him to

16     answer.  Is he going to file a pleading on his own?

17               MR. SINHA:  Of course, Your Honor.  He didn't.  I

18     made the decision because the Court may have -- did signal it

19     to me repeatedly.

20               THE COURT:  I was kind of hard about it.  I said the

21     explanation is basically that he was busy.  I said that a

22     number of times, busy.  He's busy.  That's like saying -- come

23     on.  It's just beyond me why when you have him prepare a new --

24     trust me.  I place none of this on Special Agent Yesensky in

25     terms of the timing and the presentation.

1    But certainly you ask him to sign a declaration to

2  basically say everything I said in my affidavit is true and

3  correct.  It's beyond me why at that point in time you wouldn't

4  also address and "let me expand upon my reasons for the delay."

5  I'm just astonished by it.

6            MR. SINHA:  Your Honor, my thinking at the time was

7  very much that the statute that the Government has relied on as

8  its primary argument throughout this applies.

9            THE COURT:  I thought reasonableness was the primary

10  argument.

11            MR. SINHA:  Well, the border seizure -- as I say,

12  482 is evaluated by the Fourth Amendment, and that is a

13  reasonableness inquiry.  But those scales are balanced so

14  heavily --

15            THE COURT:  Sorry to interrupt.  Let's go back to

16  the timing.  It's just beyond me why it wasn't in the

17  supplemental affidavit.  You were starting to explain, and I

18  interrupted you.  I apologize.

19            MR. SINHA:  Yes, Your Honor.  My understanding -- my

20  reading of that law -- and I know the Court disagrees with it,

21  but I'll tell you honestly what my reading was -- is that the

22  scales are balanced so heavily with regards to the Government

23  interest, and so lightly with regards to the person's

24  possessory interest at the border, that that reasonableness

25  inquiry is not a difficult hurdle for the Government to

```
 1    overcome.  It's almost de minimus.

 2        So the important thing with regards to Agent Yesensky's

 3    affidavit, which I made the decision not to include this other

 4    thing, the important thing was for us to establish the factual

 5    basis for our argument that we had probable cause at the border

 6    at the time of the seizure.  So as the Court, you know,

 7    notes -- I'm sure can observe --

 8             THE COURT:  That's why I was riding Ms. Jenness.  I

 9    said, come on.  I want to hear about those ten photos.  That

10    was my focus.  It's obviously my focus.

11             MR. SINHA:  Your Honor, it wasn't -- I'm sure the

12    Court made it obvious, and it was my mistake for being my view

13    that what governed this case and what should govern this case

14    is this border seizure.

15             THE COURT:  So today there was an attempt to further

16    explain the reason for the delay because of my concern and my

17    statements, and just for a moment I've talked about several

18    cases that talked about delay.  And just by way of one example,

19    it was cited in the papers, and that was *Doss*.  I know you

20    don't agree that the non-border context applies but just in

21    looking at this analysis of what's a reasonable explanation for

22    a delay.

23        And then there were other cases I made reference to at

24    prior hearings that talked about a three-month delay being

25    warranted due to a Secret Service assignment and another case
```

1    that talked about delay because of a Presidential election.

2    That was justified on a multi-month delay.

3         So the reasons that are offered today relate to -- what I

4    heard was that one aspect was in the affidavit, the review of

5    hundreds of thousands of images.  That's in the affidavit.

6         The second thing was -- there were two other things, the

7    sole FBI agent heading the child prosecution investigation in

8    Los Angeles and that the urgency of handling 18 to 20 juvenile

9    victims.

10        What wasn't explained -- so that's further explanation.

11   It seemed that the special agent is saying that there was a

12   prioritizing of the juveniles in front of Mr. Williams.  But

13   I'm troubled with that because he then -- where does the word

14   oversight -- he used "oversight" not "prioritization" in his

15   affidavit.  So what does "oversight" mean as opposed to the two

16   other reasons we've just been given?

17            MR. SINHA:  Sure, Your Honor.  I talked to

18   Agent Yesensky about this and tried to understand.  I think

19   what it refers to is oversight in terms of a mistake, that I

20   could have done it -- I should have tried to do it -- I should

21   have been able to get it sooner than I could.  I could not do

22   it, but I think --

23            THE COURT:  Oversight is different than

24   prioritization.

25            MR. SINHA:  It is different, Your Honor.  I think

1    the wording of that paragraph could be both more clear and

2    obviously more thorough.

3            THE COURT:  What wasn't offered as well though is

4    let's assume that a reasonable explanation for the delay could

5    be, for the moment, the taking care of the 18 to 20 juveniles

6    who have been victimized in a child prostitution ring.  But

7    there's no explanation.  Does that take up 40 days?  20 days?

8    Is it all 97 days of the delay?  Was he involved for 97 days in

9    taking care of 18 to 20 juveniles who are victims, or is it

10   35 days or is it 40 days?

11           MR. SINHA:  Your Honor, I don't know the answer to

12   that, whether it was 91 days or this or that.  I think my

13   question to him was what are the reasons for this 97-day delay.

14   So whether it was 110 days -- I think the record suggests that

15   it encompassed that delay.

16           THE COURT:  The other thing relates to what I asked

17   Ms. Jenness, and that is should certain aspects of the memory

18   card be treated differently?  The memory card was previewed.

19   There are ten photographs of three -- depicting, in the view of

20   the special agent, child pornography.  Does that mean that the

21   memory card gets treated different than the laptops?

22           MR. SINHA:  Your Honor, I guess accepting that the

23   Court is, you know, not persuaded by the Government's view with

24   regards to the border seizure -- So to try to answer the

25   question I think the Court, setting that aside, is asking --

1          THE COURT:  Let's just say this case was just about

2     the magnetic memory card, and let's just say, okay, it's

3     previewed, you know, according to the agent, for a fact it has

4     child pornography on it, can't return that.  Is there a

5     requirement, let's say, to get a search warrant for the rest of

6     the memory card or to delay even longer because you know it's

7     contraband?

8          MR. SINHA:  Sure, Your Honor.  If the Court finds

9     that there's a meaningful distinction, as I understand the

10    Court is, between items that contain contraband and the laptops

11    which were reasonably suspected, then with regards to the

12    camera and the memory card, that's significantly different.

13       I mean, that item has already been searched because the

14    agents have already previewed it.  Under this line of cases,

15    you know, the sort of *Hells Angels/Burnette* line of cases, that

16    search has taken place.  What we are talking about is a

17    subsequent search that looks at sort of the same things.  That

18    would have --

19         THE COURT:  Refresh my memory.  *Hells Angels* is the

20    purse; right?

21         MR. SINHA:  I think the *Hells Angels* is the purse

22    case.

23         THE COURT:  That's the case I was referring to.

24       Then the next question is this is where I started to go

25    along with Ms. Jenness.  Is a purse different than a -- a purse

1    is here, a computer and iPad -- I'm indicating to my right that

2    the purse is to the right and then the computer and the iPad

3    are way to the left, and somewhere in between lies this memory

4    card.

5         MR. SINHA:  I'm not sure that the memory card, at

6    least with the initial search when you are previewing it, is

7    significantly different than a camera because you are looking

8    at the photos that are on there.

9         When you get into it and have metadata and those types of

10   things, it's obviously closer to that spectrum of a computer.

11   Here the Court, I don't believe, needs to decide, you know,

12   whether we would have needed a warrant to -- whether we could

13   have done a forensic examination of the memory card without a

14   warrant.

15        Because I think it's not disputed here that prior to doing

16   a forensic examination, the United States got a warrant for

17   that search.  Insofar as all we are talking about here is the

18   United States' preview of this memory card, you know, clicking

19   through the photos and seeing child pornography, I think it's

20   much more analogous to a purse or, in fact, pretty directly

21   analogous to a non-digital camera and you are really only

22   looking at the photos that were taken with this camera.

23        THE COURT:  All right.  The last word, Ms. Jenness?

24        MS. JENNESS:  Thank you, Your Honor.

25        With respect to the reasons for the delay, certainly I am

1    sympathetic to the needs of any juvenile victims.  As the Court

2    pointed out, this is the very first time the issue was ever

3    brought to our attention.  So I haven't had an opportunity to

4    examine whether the facts are as they are represented.

5         But assuming even that they do, the FBI according to its

6    own website -- and this is cited in my own briefs -- had over

7    13,500 agents, special agents, as of 2013 and over 35,000

8    employees.  Certainly the agent could have gone to a supervisor

9    or to someone else and said, I'm triaging.  I need help.  We

10   have a legal obligation here.  Can you help me get this done.

11   And there's simply no evidence that any of that went on.  In

12   fact, we know it didn't.

13        With respect to how long is too long, we've briefed, and

14   I've researched this issue extensively, and I can tell you

15   this.  I know it when I see it from reading dozens and dozen of

16   cases because what we see is, for example, in *Montoya de*

17   *Hernandez*, it was 16 hours.  And even that was significantly

18   notable for the Court to point it out.  In *Ramsey* there was no

19   delay.  In *Doss*, I believe it was a 17-day delay.

20             THE COURT:  17 days.

21             MS. JENNESS:  And in the *Mitchell* case, which I

22   believe that was the case involving a comparable delay, but the

23   person was called away to guard the President.  So in all of

24   these cases, the period of delay is viewed as a matter of

25   importance and urgency by the courts.  And *Doss* makes it

1   crystal clear, and I know the Court is familiar with that

2   decision and why that is.

3       But even in *Cotterman*, the agents proceeded lickity split,

4   and the Court noted very specifically the short periods of time

5   in which the agents proceeded.  I believe it was less than

6   three days.  So all of the cases that we've been discussing,

7   the *U.S. vs. Thirty Seven Photographs*, that was a 14-day delay.

8       We have the *Flores-Montano*, a Supreme Court case, that was

9   less than a one-hour delay.  So all of these cases involve a

10  far, far shorter delay than we had here and many of them far

11  more exigent circumstances that didn't appear like this one to

12  be something that could have been remedied but for an

13  oversight.

14      So, your honor, we would submit on the briefs unless the

15  Court has further inquiries.

16          THE COURT:  I suspect I'll get something out in the

17  next week or sooner.  I'll either set up a briefing schedule

18  with regard to the second phase of your motion or set up a

19  scheduling conference.

20          MS. JENNESS:  Can I bring the matter to the Court

21  that I thought about after the Court asked us whether we

22  conferred in a two-part procedure?  If the Court renders a

23  ruling, it is subject to immediate appeal by the Government,

24  and potentially an immediate appeal would deprive the Court of

25  jurisdiction to conduct a tainted fruits proceeding in the

1    event that the Court were to order any of the items suppressed.

2        The Court may want to consider not rendering a final

3    ruling until whatever may be the final hearing the Court holds

4    on the matter.

5                THE COURT:  All right.  Thank you.

6                THE CLERK:  Court is adjourned.

7

8                (At 2:37 P.M. the proceedings concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER

I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME
COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR
THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT
PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE
FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE
STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE
ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
THE UNITED STATES.

DATED THIS  15TH  DAY OF MAY, 2014.


/S/ MAREA WOOLRICH
_____
MAREA WOOLRICH, CSR NO. 12698, CRR
FEDERAL OFFICIAL COURT REPORTER